No. 23-4132

In the United States Court of Appeals
for the Ninth Circuit

_____

UNITED STATES OF AMERICA,
*Plaintiffs-Appellees,*

v.

DANIEL MATTHEW KITTSON,
*Defendant-Appellant.*

_____

On Appeal from the
United States District Court for the District of Oregon
Case No. 3:21-CR-00075-IM-1
Honorable Karin J. Immergut

_____

**BRIEF OF AMICI CURIAE CALIFORNIA RIFLE & PISTOL
ASSOCIATION, INC., SECOND AMENDMENT LAW CENTER, INC.,
AND THE SECOND AMENDMENT FOUNDATION IN SUPPORT OF
NEITHER PARTY AND REVERSAL OR REMAND**

_____

C. D. Michel
Joshua Robert Dale
Konstadinos T. Moros
Alexander A. Frank
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
(562) 216-4444
cmichel@michellawyers.com

Donald Kilmer
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Rd.
Caldwell, Idaho 83607
(408) 264-8489
don@dklawoffice.com

*Counsel for Amici Curiae*

May 17, 2024

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1(a) of the Federal Rules of Appellate Procedure, counsel for amici curiae certify that California Rifle & Pistol Association, Incorporated, Second Amendment Law Center, Inc., and The Second Amendment Foundation are nonprofit organizations and thus have no parent corporations and no stock.

Date: May 17, 2024

**MICHEL & ASSOCIATES, P.C.**

/s/ C.D. Michel
_____
C.D. Michel
*Counsel for Amici Curiae*
*California Rifle & Pistol Association, Incorporated*
*and Second Amendment Law Center, Inc.*

**LAW OFFICES OF DONALD KILMER, APC**

/s/ Donald Kilmer
_____
Donald Kilmer
*Counsel for Amicus Curiae*
*The Second Amendment Foundation*

# TABLE OF CONTENTS

**Page**

Corporate Disclosure Statement.................................................................... i

Table of Contents ...................................................................................... ii

Table of Authorities .................................................................................. iii

Interest of Amici Curiae ............................................................................. 8

Introduction ............................................................................................... 9

Argument .................................................................................................. 10

I.    The Second Amendment Analysis Under *Bruen* is a One-Step Test. ................ 10

II.    Machine Guns Are "Arms," and Any Restrictions on Them Must Comport with Historical Tradition ...................................................................... 14

III.    The Military's Use of a Firearm Does Not Disqualify it from Second Amendment Protection.............................................................................. 19

IV.    This Circuit's History with Second Amendment Cases Warrants Measured Circumspection in Deciding This Matter................................................ 28

Conclusion................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arnold v. Kotek*,
No. 22CV41008, 2023 Ore. Cir. LEXIS 3887 (Or. Cir. Ct. Harney Cnty. Nov. 24, 2023) ........................................................................................... 25

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ...........................................................17, 18

*Barnett v. Raoul*,
671 F. Supp. 3d 928 (S.D. Ill.) ............................................................. 25

*Bevis v. City of Naperville*,
85 F.4th 1175 (7th Cir. 2023) ................................................ 10, 11, 19, 25

*Boland v. Bonta*,
662 F. Supp. 3d 1077 (C.D. Cal. 2023) ................................................ 12

*Caetano v. Massachusetts*,
577 U.S. 411 (2016) ............................................................................... 15

*Capen v. Campbell*,
No. CV 22-11431-FDS, 2023 WL 8851005 (D. Mass. Dec. 21, 2023) .................... 10

*Cargill v. Garland*,
57 F.4th 447 (5th Cir. 2023) ................................................................... 15

*Close v. Sotheby's Inc.*,
894 F.3d 1061 (9th Cir. 2018) ............................................................... 27

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
No. 1:22-CV-00951-RGA, 2023 WL 2655150 (D. Del. Mar. 27, 2023) .................. 19

*District of Columbia v. Heller*,
554 U.S. 570 (2008).........................................................................passim

*Duncan v. Bonta*,
142 S. Ct. 2895 (2022) .......................................................................... 27

*Duncan v. Bonta*,
83 F.4th 803 (9th Cir. 2023)................................................................... 29

*Duncan v. Bonta,*
No. 17-CV-1017-BEN (JLB), 2023 WL 6180472 (S.D. Cal.
Sept. 22, 2023) ........................................................................... 19, 20, 24

*Ezell v. City of Chicago,*
651 F.3d 684 (7th Cir. 2011) ................................................................ 12

*Fresno Rifle & Pistol Club, Inc., v. Van De Kamp,*
965 F.2d 723 (9th Cir. 1992) ................................................................ 28

*Friedman v. City of Highland Park, Illinois,*
784 F.3d 406 (7th Cir. 2015) ........................................................... 16, 18

*Friedman v. Highland Park,*
577 U. S. 1039 (2015) ........................................................................... 28

*Heller v. District of Columbia,*
670 F.3d 1244 (2011) ............................................................................ 18

*Hickman v. Block,*
81 F.3d 98 (9th Cir. 1996) .................................................................... 28

*Jackson v. City & Cnty. of San Francisco,*
746 F.3d 953 (9th Cir. 2014) ................................................................ 12

*Jackson v. City & Cnty. of San Francisco,*
576 U. S. 1013 (2015) ........................................................................... 28

*Luis v. United States,*
578 U.S. 5 (2016) .................................................................................. 12

*McDonald v. City of Chicago, Ill.,*
561 U.S. 742 (2010) .............................................................................. 18

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
597 U.S. 1 (2022) ........................................................................... passim

*Nguyen v. Bonta,*
No. 24-2036 (9th Cir. May 13, 2024) ................................................... 13

*Ocean State Tactical, LLC v. Rhode Island,*
95 F.4th 38 (1st Cir. 2024) ................................................................... 10

*Peruta v. California,*
582 U.S. 943 (2017) .............................................................................. 28

iv

*Peruta v. San Diego Cty*,
  824 F.3d 919 (9th Cir. 2016) ........................................................... 28

*Rigby v. Jennings*,
  630 F. Supp. 3d 602 (D. Del. Sept. 23, 2022) ................................ 12

*Rupp v. Bonta*,
  No. 8:17-cv-00746-JLS-JDE, 2024 WL 1142061 (C.D. Cal. Mar. 15, 2024) ...... 10, 17

*Silveira v. Lockyer*,
  312 F.3d 1052 (9th Cir. 2002) ........................................................ 28

*Silveira v. Lockyer*,
  328 F.3d 567 (9th Cir. 2003) ............................................... 24, 26, 28

*Silvester v. Becerra*,
  583 U.S. 1139 (2018) ..................................................................... 27

*Silvester v. Harris*,
  843 F. 3d 816 (CA9 2016) ............................................................. 27

*United States v. Alaniz*,
  69 F.4th 1124 (9th Cir. 2023) ...................................................... 9, 18

*United States v. Berger*,
  No. 5:22-CR-00033, 2024 WL 449247 (E.D. Pa. Feb. 6, 2024) ........... 15, 20

*United States v. Duarte*,
  No. 22-50048, 2024 WL 2068016, (9th Cir. May 9, 2024) ............ 9, 12, 14

*United States v. Henry*,
  688 F.3d 637 (9th Cir. 2012) ....................................................... 16, 23

*United States v. Mack*,
  164 F.3d 467 (1996) ...................................................................... 28

*Viramontes v. Cnty. of Cook*,
  No. 21 C 4595, 2024 WL 897455 (N.D. Ill. Mar. 1, 2024) ................. 10

*Young v. Hawaii*,
  992 F.3d 765 (9th Cir. 2021) ........................................................ 29

## Statutes

18 U.S.C. § 922 ................................................................................... 8

## Other Authorities

"A Pennsylvanian,"
*Remarks on the First Part of the Amendments to the Federal Constitution*, Philadelphia
Federal Gazette (June 18, 1789) ................................................................................ 21

Bishop, Joel,
*Commentaries on the Criminal Law* (1868) .............................................................. 23

Black, Henry Campbell,
*Handbook of American Constitutional Law* (1895) ................................................ 23

Burleigh, Joseph Bartlett,
*The American manual: containing a brief outline of the origin and progress of political power
and the laws of nations* (1852) ................................................................................. 24

Bynum, Russ,
*How bump stocks ended up before the U.S. Supreme Court*, PBS News Hour, (Feb. 28,
2024), https://www.pbs.org/newshour/politics/how-bump-stocks-ended-up-
before-the-u-s-supreme-court (last visited May 7, 2024) ..................................... 15

Cooley, Thomas M., LL.C.,
*The General Principles of Constitutional Law in the United States of America* (1898) .......... 23

Coxe, Tench,
Letter to the *Philadelphia Gazette*, 20 February 1788 .................................................. 21

Michel, C.D. & Konstadinos Moros,
*Restrictions "Our Ancestors Would Never Have Accepted": The Historical Case Against
Assault Weapon Bans*, 24 Wyo. L. Rev. (2024) ...................................................... 24

Pomeroy, John Norton,
*An Introduction to the Constitutional Law of the United States* (1868) .......................... 23

*Slavery Question.: Speech of Hon. Edward Wade of Ohio in The House of Representatives,
August 2, 1856,* (Buell & Blanchard Publishers, 1856) ........................................ 22

Suciu, Peter,
*Yes, Machine Guns Are 'Legal' (But Here Comes All the Catches)*, The National Interest,
(July 2, 2020), https://nationalinterest.org/blog/reboot/yes-machine-guns-are-
legal-here-comes-all-catches-163921 (last visited May 12, 2024) ........................... 8

Sumner, Charles,
*The Kansas Question, Senator Sumner's Speech, Reviewing the Action of the Federal
Administration Upon the Subject of Slavery in Kansas* (Cincinnati, G.S. Blanchard,
1856) ........................................................................................................................... 23

Webster, Noah,
   *An Examination into the Leading Principles of the Federal Constitution Proposed by the Late Convention Held at Philadelphia* (1787) ........................................................................... 22

Whiting, Samuel, et al.,
   *Second American Edition of the New Edinburgh Encyclopædia*, Vol. 1 Part 2, (1813)........ 21

## INTEREST OF AMICI CURIAE[1]

Founded in 1875, California Rifle and Pistol Association, Incorporated, is a nonprofit organization that seeks to defend the Second Amendment and advance laws that protect the rights of individual citizens. In service of its mission to preserve the constitutional and statutory rights of gun ownership, California Rifle and Pistol Association regularly participates as a party or amicus in firearm-related litigation.

Second Amendment Law Center, Inc. is a nonprofit corporation headquartered in Henderson, Nevada. Second Amendment Law Center is dedicated to promoting and defending the individual rights to keep and bear arms as envisioned by the Founding Fathers. Its purpose is to defend these rights in state and federal courts across the United States. It also seeks to educate the public about the social utility of firearm ownership and to provide accurate historical, criminological, and technical information about firearms to policymakers, judges, and the public.

The Second Amendment Foundation is a non-profit membership organization founded in 1974 with over 720,000 members and supporters in every State of the Union. Its purposes include education, research, publishing, and legal action focusing on the constitutional right to keep and bear arms.

---

[1] The parties have given their consent to the filing of this brief. No counsel for a party authored the brief in whole or in part. No party, counsel for a party, or any person other than amici and their counsel made a monetary contribution intended to fund the preparation or submission of this brief.

# INTRODUCTION

Amici are Second Amendment advocacy groups that focus on civil litigation to advance the rights of their members, law-abiding and responsible citizens. They do not typically advocate in criminal matters like this one. They do so here because the district court's ruling was striking in the degree to which it refused to conduct the historical analysis required under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). That was a critical error that Amici urge this Court to correct.

In doing so, Amici take no position on whether Appellant himself may possess firearms, because 18 U.S.C. § 922(o) prohibits anyone from possessing or transferring an unregistered machine gun,[2] whether or not they have a prior conviction. They also do not take any position at this stage on whether Section 922(o) is constitutional. Under *Bruen*, that question can only be answered with a proper analysis examining the historical tradition of restrictions on "dangerous and unusual" weapons, and determining whether machine guns fit that tradition. That analysis may not be skipped by misconstruing *Bruen* as a "two-step test," nor by declaring that machine guns are not "arms," nor by limiting the scope of the Second Amendment only to firearm types that are most commonly used for personal self-defense. This brief discusses

---

[2] While the law technically exempts registered machine guns, in practice machine guns are banned. 18 U.S.C. § 922(o)(2)(B) only allows possession and transfer of machine guns "lawfully possessed before the date this subsection took effect" in 1986. Due to their limited number, registered machine guns from before 1986 command prohibitive prices today, to the point that they are effectively banned for all but the wealthiest individuals. Section 922(o)(2)(B) "has resulted in the cost of legal machine guns to skyrocket, simply because what is out there is all there can ever be. Today a Thompson submachine gun can cost more than a new car. . . ." *See* Peter Suciu, *Yes, Machine Guns Are 'Legal' (But Here Comes All the Catches)*, The National Interest, (July 2, 2020), https://nationalinterest.org/blog/reboot/yes-machine-guns-are-legal-here-comes-all-catches-163921 (last visited May 12, 2024).

each of these issues.

## ARGUMENT

### I.   THE SECOND AMENDMENT ANALYSIS UNDER *BRUEN* IS A ONE-STEP TEST.

The parties and the lower court mischaracterized *Bruen* as requiring a two-step analysis. Appellant's. Br. ("AB") at 35; 1-ER-46-47. Unfortunately, lower courts and reviewing courts have been similarly mischaracterizing the breadth and application of *Bruen*'s analysis, to the point that the myth of a two-step analysis has become pervasive, including in this Circuit. *See United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (asserting that *Bruen* abrogated one two-step test but then adopted another); *see also United States v. Duarte*, No. 22-50048, 2024 WL 2068016, at *4 (9th Cir. May 9, 2024) (also erroneously applying the new two-step test). This panel should use this opportunity to correct this error.

By its plain language, *Bruen* eschews a two-step test and calls for a one-step test: "Despite the popularity of th[e] two-step approach, it is one step too many." *Bruen*, 597 U.S. at 19. It would make little sense for the Court to expressly abrogate a step as unnecessary only to then reinsert a substitute.

Because the district court fundamentally misunderstood the approach *Bruen* requires, this case provides an excellent opportunity for this Court to clarify that the simple requirement that a Second Amendment case implicate the right to keep or bear arms is not a significant analytical "step," and thus, as the district courts and other courts have transmuted it, an imposing hurdle. Rather, it is a simple qualifier. This is critical because courts have cynically transformed this manufactured first step into a

10

barrier relieving the government of its burden of the historical analysis altogether, unfairly shifting burdens from the government to civil plaintiffs (or criminal defendants), and reinserting the interest balancing derided and forbade by *Bruen* under the guise of a purported "plain text" analysis that allows lower courts like this one to treat obvious arms-related questions as though they are not.

One example of this revisionism is the Seventh Circuit's ruling in *Bevis v. City of Naperville*. The court in that case astonishingly held that a ban on extremely popular rifles and magazines does not implicate the Second Amendment at all because the semiautomatic AR-15 is not a protected "arm" as a threshold textual matter, with the panel majority arguing that such a rifle is indistinguishable from the fully automatic M-16 that the armed forces use. 85 F.4th 1175, 1197 (7th Cir. 2023).[3] In fact, the Seventh Circuit held in *Bevis* that no weapon used by the military—such as a semiautomatic pistol like the M1911, or a pump shotgun like the Mossberg 590—is an "arm," notwithstanding their national ubiquity as personal self-defense weapons. *Id.* at

---

[3] The misrepresentations about and misapprehension of the AR-15 rifle in recent decisions are as astonishing as they are false. The semi-automatic AR-15 is not only seen as the same firearm as a fully-automatic M-16, but possesses physics-defying abilities such as: a firing rate faster than any other semi-automatic firearm requiring the same repeated manual trigger pull, at a rate that ignores principles of basic metallurgy; the ability to cut men in half like a 30mm cannon; the ability to turn a .223 Remington jacketed cartridge into a fragmenting or exploding round; and other fantastic and specious claims that turn a common and ordinary rifle chambering a varmint round into one of the most lethal commercial devices ever sold. *See, e.g., Bevis*, 85 F.4th at 1197; *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 49 (1st Cir. 2024); *Rupp v. Bonta*, No. 817CV00746JLSJDE, 2024 WL 1142061, at *11, n. 9 (C.D. Cal. Mar. 15, 2024); *Viramontes v. Cnty. of Cook*, No. 21 C 4595, 2024 WL 897455, at *4 (N.D. Ill. Mar. 1, 2024); *Capen v. Campbell*, No. CV 22-11431-FDS, 2023 WL 8851005, at *14 (D. Mass. Dec. 21, 2023). Yet, the same courts that give the AR-15 this Paul Bunyon-like mythos also decide whether it is an arm or not creating an unnecessary burden for plaintiffs and criminal defendants in a grave distortion of the *Bruen* analysis.

1191. And despite the Supreme Court stating repeatedly in *Bruen* that the burden is on the government, *Bevis* places the burden on *plaintiffs* to prove that the banned firearms "are Arms that ordinary people would keep at home for purposes of self-defense. . . ." *Id.* at 1194.

*Bevis*'s steps and burdens are in tension with the Supreme Court, which has been abundantly clear that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). In fact, even M-16s meet the definition of an "arm" because they are "[w]eapons of offence." *Heller*, 554 U.S. at 581. That does not mean that such weapons cannot be regulated (or even banned) *if consistent with historical tradition*,[4] as this brief will discuss *infra*. But courts should not be short-circuiting *Bruen* with a made-up "first step" to help the government dodge the rigors of historical scrutiny.

To be sure, for there to be a viable Second Amendment challenge, the right to keep and bear arms must at least be implicated. *Id.* at 17. Just as a First Amendment free speech case must involve speech,[5] so must a Second Amendment case involve the peaceable use or ownership of arms. But this should be no more than a qualifier, not an independent "step" requiring in-depth analysis that allows the government to dodge the burden of historical scrutiny.

---

[4] *Bruen*, 597 U.S. at 28 (emphasis added) (noting that "*we use history* to determine which modern 'arms' are protected by the Second Amendment").

[5] Even in the context of commercial speech, there is no extended handwringing over whether the First Amendment is at least implicated, because commercial speech is still plainly speech. Instead, courts quickly move past that question and apply the test laid out in *Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557 (1980).

This is especially so because supposed "plain text" analyses often require historical analysis anyway, as this Court's recent ruling in *United States v. Duarte* demonstrates. *See* 2024 WL 2068016, at *1, No. 22-50048 (9th Cir. May 9, 2024). There, the Court had to determine whether Mr. Duarte, a nonviolent felon, was one of "the People" the Second Amendment protects. To do so, the panel ended up conducting an extensive historical analysis. *Duarte*, 2024 WL 2068016, at *10-13 (tracing the meaning of "the People" all the way back to English common law). It is apparent that except in cases where the right to keep and bear arms is obviously not related at all, in order to determine the Second Amendment's applicability to the conduct at issue, historical review is required even to discern the meaning of the text in the first place, further supporting that *Bruen* is a one-step historical test.

Further, "implicating" the Second Amendment may be direct or indirect because "[t]he Second Amendment also protects attendant rights that make the underlying right to keep and bear arms meaningful." *Boland v. Bonta*, 662 F. Supp. 3d 1077, 1085 (C.D. Cal. 2023) (citing *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011); *Rigby v. Jennings*, 630 F. Supp. 3d 602, 615 (D. Del. Sept. 23, 2022)); *see also Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment) ("Constitutional rights . . . implicitly protect those closely related acts necessary to their exercise."). Otherwise, the government could impose, for example, ahistorical strict sales restrictions that effectively ban the sales of firearms, and cynically claim they do not implicate the Second Amendment because literal "keeping" and "bearing" of arms is unaffected. In fact, this sheer absurdity is close to what California is arguing

13

in another pending case. *See* Appellant's Opening Br. at 1, *Nguyen v. Bonta*, No. 24-2036 (9th Cir. May 13, 2024), ECF No. 13.1. Thus, any law that in any way affects the right of an American to peaceably acquire, possess, use, or carry bearable arms must be backed by historical tradition; that is *Bruen's* fundamental holding. It is not for any inferior court to ask whether particular aspects of the Second Amendment right are "really worth insisting upon." *Heller*, 554 U.S. at 634. The lower court should be corrected on this point, and this Court's precedent clarified.

## II.  MACHINE GUNS ARE "ARMS," AND ANY RESTRICTIONS ON THEM MUST COMPORT WITH HISTORICAL TRADITION

The text of the Second Amendment guarantees individuals the rights "to keep and bear Arms." U.S. Const. amend. II. That, of course, includes the right to use them "for offensive or defensive action." *Bruen*, 597 U.S. at 32. It is not even a close question whether machine guns are "arms" because they are indisputably "weapon[s] of offence" that a person "takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581 (citing Founding-era dictionaries). Thus, Appellant's assertion here that "[t]he PPSh-41 in this case is clearly an 'arm' under the Second Amendment" is undeniably true. AB at 37. Regardless of the ultimate constitutionality of machine gun bans or restrictions on the use of such firearms, it is fundamentally unserious to assert that they are not even "arms" presumptively protected by the Second Amendment. To be sure, a ban on "arms" not "in common use" may be "consistent with the Nation's historical tradition of firearm regulation" and thus survive *Bruen*'s historical inquiry. *Bruen*, 597 U.S. at 24. But that is irrelevant in determining whether an item is an "arm" within the Amendment's text that is

14

deserving of that historical inquiry. Indeed, its text reaches all arms, dangerous, unusual, or otherwise, because we begin from the premise that the Second Amendment "extends, prima facie, to **all instruments that constitute bearable arms**, even those that were not in existence at the time of the founding." *Id.* at 28 (emphasis added) (quoting *Heller*, 554 U.S. at 582). The Supreme Court has stated the same principle several different ways, and all lower courts need to accept the message and conduct a full historical analysis to determine the constitutionality of any firearm restriction, including the ban on machine guns.

In its short discussion, the district court relied on *Heller's* dicta and stated that "the Supreme Court suggested that it would be 'startling' for the Second Amendment to protect machineguns." 1-ER-48 (rephrasing *Heller*, 554 U.S. at 628 (would be startling if "**only** those weapons useful in warfare are protected.") (emphasis added)). But in *Heller*, the Supreme Court was not definitively deciding the scope of the Second Amendment, and it said as much when it explained that "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Heller*, 554 U.S. at 635. And this Court also just explained, in rejecting an argument to defer to *Heller*'s dicta, that "[to uphold a challenged law] we must first flesh out what the relevant tradition is and how it compares to the law before us. That is the whole point of the 'analogical inquiry' at *Bruen*'s second step." *Duarte*, 2024 WL 2068016, at *8. *Bruen* confirms that *Heller* was not adding a limitation to its textual interpretation of the word "arms" by clarifying that every Second Amendment case must proceed by examining our nation's history of firearm regulation, which, in challenges to a ban on a type of firearm, requires

15

determining whether the specific arm is "dangerous and unusual." *Bruen*, 597 U.S. at 21.

Only by establishing that machine guns are part of the historical tradition of restricting "dangerous and unusual" weapons may a ban on them be upheld. *Bruen*, 597 U.S. at 47. It may be a challenging task for the government to establish that machine guns are unusual for a couple of reasons. The first is that the government has acknowledged that there are over 700,000 registered machine guns in circulation. *See United States v. Berger*, No. 5:22-CR-00033, 2024 WL 449247, at *9 (E.D. Pa. Feb. 6, 2024). The Supreme Court already held that the Second Amendment's protection extends to stun guns, of which there were only about 200,000 in circulation. *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring).

Second, the government is currently arguing that bump stocks, an arms accessory that it previously had considered legal until the Bureau of Alcohol, Tobacco, Firearms & Explosives recently reversed course, are actually machine guns. *Cargill v. Garland*, 57 F.4th 447, 450 (5th Cir. 2023), *cert. granted*, 144 S.Ct. 374 (Mem), 217 L.Ed.2d 202 (2023). The Supreme Court is about to issue a ruling deciding that question. But the government's stated position in that case would mean there are many more "machineguns" in circulation than it otherwise states, and it cannot have it both ways. There were about 520,000 bump stocks in circulation as of 2019. *See* Russ Bynum, *How bump stocks ended up before the U.S. Supreme Court*, PBS News Hour, (Feb. 28, 2024), https://www.pbs.org/newshour/politics/how-bump-stocks-ended-up-before-the-u-s-supreme-court (last visited May 7, 2024). So, if the bump stock is deemed a machine gun, then the total number of privately owned machine guns in the

16

US is at least sixfold larger than the number of Second Amendment-protected stun guns. If bump stocks are not machine guns, then the disparity is a mere threefold.

The district court's reliance on this Court's prior precedent regarding machine guns is also no longer appropriate under *Bruen*. In *U.S. v. Henry*, this Court was operating under the old interest-balancing approach that the Supreme Court has firmly rejected. Its definition of "dangerous" was not historically based but rather turned on whether a firearm was "likely to cause serious bodily harm." 688 F.3d 637, 640 (9th Cir. 2012) (citing a Black's Law Dictionary edition from 2009). As for whether machine guns are "unusual," *Henry* simply said they have been banned since 1986, while ignoring that thousands of machine guns are legally registered and lawful to transfer in most states. Moreover, "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity." *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 409 (7th Cir. 2015). *Henry*'s entire Second Amendment analysis comes in at about 550 words. 688 F.3d at 639-40. Decided pre-*Bruen*, *Henry* simply made no attempt to square 18 U.S.C. § 922(*o*) with history. A proper historical review is overdue.

Furthermore, that full historical review might show that machine guns can indeed be banned constitutionally. But no such argument has been put forward here. As the Appellant also explains (AB at 38-39), the government only presented two proposed historical analogue laws that both pertained to carrying weapons in a way that would terrify the people. These laws are simply not "relevantly similar" to a ban on the possession of an entire class of arms. A ban on *carrying* arms in a threatening

17

way burdens the Second Amendment right in a dramatically different way than a ban on *possession* of certain types of arms does; arguably, the "comparable burden" is much greater with the latter. *See Bruen*, 597 U.S. at 29 (explaining that because everything is similar in infinite ways to everything else, there must be metrics in place to assess relevant similarities). It is also notable that even in a recent case upholding a ban on common semiautomatic AR-type rifles, the court determined that laws pertaining to carry were not relevantly similar under *Bruen* "because they employ a different 'how.' " *Rupp v. Bonta*, No. 8:17-cv-00746-JLS-JDE, 2024 WL 1142061, at *21 (C.D. Cal. Mar. 15, 2024).

Appellant argues that the government, having had its chance to present its historical analogues below and failing to do so, should not be given a second bite at the apple. AB at 39-40. That is probably correct, and thus the case would end there. However, if this Court is not inclined to rule that way, then a remand to the district court to conduct a full historical analysis would be the next best option. In *Baird v. Bonta*, this Court was faced with a district court that had skipped the historical analysis in upholding California's ban on open carry at the preliminary injunction stage. 81 F.4th 1036, 1039 (9th Cir. 2023). In sending the case back down to the district court, this Court explained that the burden on California to uphold its ban was considerable. "In short, as numerous courts have correctly observed in applying *Bruen*, California must identify a historical analogue that curtails the right to peaceably carry handguns openly for self-defense to a comparable degree, with a comparable severity, and with a comparable blanket enforcement to California's open-carry ban." *Id.* at 1047. And the district court, which ultimately upheld the open carry ban once again, provided a

18

lengthy historical analysis in its second review of the case. *See Baird v. Bonta*, No. 2:19-CV-00617-KJM-AC, 2023 WL 9050959 (E.D. Cal. Dec. 29, 2023).

The *Baird* plaintiffs are appealing that ruling, and at least this time this Court will have the benefit of a more complete historical analysis to review when deciding whether the Second Amendment protects the peaceable open carry of firearms. In the same way, maybe the machine gun ban will be upheld, or maybe it will not be, but this Court must also get the benefit of a full historical analysis before deciding that question.

## III. THE MILITARY'S USE OF A FIREARM DOES NOT DISQUALIFY IT FROM SECOND AMENDMENT PROTECTION.

If this Court opts to remand the case back to the district court to conduct a complete historical analysis, it should guide that review in three ways to ensure it is productive.

**First**, the district court should not constrain its analysis by assuming that only firearms commonly used for personal self-defense are protected. This Court adopted that erroneous view in *Alaniz*, and it should be corrected here. 69 F.4th 1124, 1128 (9th Cir. 2023). To be sure, self-defense is the "central component" of the Second Amendment right. *McDonald v. City of Chicago, Ill.,* 561 U.S. 742, 787 (2010). But "central" is not the same thing as "exclusive," and courts have acknowledged that the right is not only confined to personal self-defense.[6]

---

[6] *See, e.g., Heller*, 554 U.S. at 624 (discussing "lawful purposes *like* self-defense," thereby implying the existence of other such lawful purposes); *Heller v. District of Columbia*, 670 F.3d 1244, 1260 (2011) ("Of course, the [Supreme Court] also said the Second Amendment protects the right to keep and bear arms for other "lawful purposes," such as hunting…"); *Friedman v. City of Highland Park*, 577 U.S. 1039, 1039–40 (Thomas, J., and Scalia, J., dissenting from the denial of certiorari) (discussing other

Even the dissent in *Bruen* acknowledged this when it explained that "Some Americans use guns for legitimate purposes, such as sport (*e.g.*, hunting or target shooting), certain types of employment (*e.g.*, as a private security guard), or self-defense." *Bruen*, 597 U.S. at 89 (Breyer, J., dissenting). Indeed, if the government could ban any firearms except those most commonly used for self-defense, then many hunting rifles and all long-barrel shotguns could be banned without violating the Second Amendment. And for all the focus on self-defense, the qualifier that an item must be "in common use for self-defense" is found neither in the Second Amendment's text nor in any historical authority. Indeed, the definition of "arms" *Heller* relied on contemplated *offensive* use as well. "The 1773 edition of Samuel Johnson's dictionary defined 'arms' as **'[w]eapons of offence**, or armour of defence.'" *Heller*, 554 U.S. at 581 (emphasis added).

**Second**, this Court should acknowledge that there never has been a rule or principle that firearms may be banned if they are also used by the military. A Seventh Circuit panel recently reached such a ruling, *Bevis*, 85 F.4th at 1179, but it is in error. The supposed "distinction between military and civilian weaponry" it insisted upon, *id*, is an illusion. As the dissent pointed out, the military uses many firearms that are also commonly used by civilians. "Under the majority opinion, the military's decision

---

lawful purposes such as hunting and target shooting); *Duncan v. Bonta*, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at \*17 (S.D. Cal. Sept. 22, 2023) ("[T]he Supreme Court has enlarged the breadth of firearms protected by the Second Amendment to include commonly owned firearms useful for the core right of self-defense and other lawful purposes like hunting, sporting, and target shooting."); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, No. 1:22-CV-00951-RGA, 2023 WL 2655150, at \*14–15 (D. Del. Mar. 27, 2023) ("Gun owners seek such rifles for a variety of lawful uses, including recreational target shooting, self-defense, collecting, hunting, competition shooting, and professional use.").

to award Beretta a military contract for the Beretta 92 [pistol] would take the firearm out of the 'Arms' protected by the Second Amendment." *Id.* at 1226 (7th Cir. 2023) (Brennan, J., dissenting).

This erroneous conflation of the actual historical standard—"dangerous and unusual"—with any guns that are used by the military has taken hold in more than just the Seventh Circuit. For example, in *United States v. Berger*, a district court referred to the idea that the Second Amendment covers firearms used by the police or military as "absurd." No. 5:22-CR-00033, 2024 WL 449247, at *9 (E.D. Pa. Feb. 6, 2024). But what is truly absurd (and ahistorical) is limiting the Second Amendment only to firearms not used by the military or police. Such a rule would have made muskets unprotected in the Founding era because they were used as the standard small arm by both sides of the Revolutionary War. Use by the military in and of itself does not make a gun outside of the scope of the Second Amendment.

None of this is to say that weapons used by the military which *are* shown to be "dangerous and unusual" are protected. As one district court explained, weapons "useful **solely** for military purposes" are outside the scope of the Second Amendment. *Duncan v. Bonta*, No.: 17-cv-1017-BEN (JLB), 2023 WL 6180472, at *17 (S.D. Cal. Sept. 22, 2023) (emphasis added). But machine guns, hundreds of thousands of which are owned by civilians, are not in the same category as warheads, chemical weapons, stealth bombers, or other weapons that have never been in civilian hands and, in any case, are not "instruments that constitute bearable arms." *Heller*, 554 U.S. at 582.

**Third**, the district court must not ignore the anti-tyranny roots of the American right to keep and bear arms. It is all too easy to forget that the Second Amendment was written by people who had just revolted against a tyrannical government. They sought to guarantee that the People would have a final recourse should the new government they were forming turn tyrannical, or if a foreign invader toppled the Republic. Tench Coxe, delegate to the Constitutional Convention, wrote that "[w]hereas civil rulers, not having their duty to the people duly before them, may attempt to tyrannize, . . . the people are confirmed by the article in their right to keep and bear their private arms." *Remarks on the First Part of the Amendments to the Federal Constitution*, under the pseudonym "A Pennsylvanian" in the Philadelphia Federal Gazette, June 18, 1789, p. 2 col. 1 (as quoted in the *Federal Gazette*, June 18, 1789). He also wrote that "Congress have no power to disarm the militia. Their swords, and every other terrible implement of the soldier, are the birthright of an American." Tench Coxe, Letter to the *Philadelphia Gazette*, 20 February 1788. Coxe reaffirmed this view in 1813, writing that "militia" members,[7] "have all the right, even in profound peace, to purchase, keep and use arms of every description", deeming this militia "the army of the constitution." Samuel Whiting, et al., *Second American Edition of the New Edinburgh Encyclopædia*, Volume 1 Part 2, at 652 (1813).

---

[7] While Coxe defined "militia members" as "all the free white males of the proper ages", he made clear that the right was not limited to just them. "Independently to own and to use their arms, is another of the rights of *all* Americans, which they have caused to be solemnly engraven on the immutable tablet of their public liberties." Samuel Whiting, et al., *Second American Edition of the New Edinburgh Encyclopædia*, Volume 1 Part 2, at 662 (1813) (italics in original).

Several other founders and their contemporaries felt similarly. For example, Noah Webster, the famous early American lexicographer and later a member of the Connecticut House of Representatives from 1802–1807, wrote that "[b]efore a standing army can rule, the people must be disarmed; as they are in almost every kingdom of Europe." Noah Webster, *An Examination into the Leading Principles of the Federal Constitution Proposed by the Late Convention Held at Philadelphia* (1787), reprinted in *Pamphlets on the Constitution of the United States*, at 56 (Paul Ford ed., 1888). Unlike in Europe, the United States is less susceptible to tyrants enforcing unjust laws "because the whole body of the people are armed, and constitute a force superior to any band of regular troops that can be, on any pretense, raised in the United States." *Id.* And James Madison considered being armed an advantage "the Americans possess over the people of almost every other nation," which guards against the rise of tyrants. The Federalist No. 46 (James Madison).

This view not only dominated the Founding era, but continued into the 19th century through Reconstruction. In a speech to the House of Representatives, Abolitionist Representative Edward Wade said the " 'right to 'keep and bear arms,' is thus guarantied, in order that if the liberties of the people should be assailed, the means for their defence shall be in their own hands." *Slavery Question.: Speech of Hon. Edward Wade of Ohio in The House of Representatives, August 2, 1856*, at p.7 (Buell & Blanchard Publishers, 1856).[8] Senator Charles Sumner's "The Crime Against Kansas" speech likewise bristled at the notion that slavery opponents in Kansas should be

---

[8] Available online at https://digitalcommons.cedarville.edu/cgi/ viewcontent.cgi?article=1025&context=pamphlet_collection, (last visited May 10, 2024).

23

disarmed of their Sharps rifles by the pro-slavery government: "Never was this efficient weapon more needed in just self defence, than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached." Charles Sumner, *The Kansas Question, Senator Sumner's Speech, Reviewing the Action of the Federal Administration Upon the Subject of Slavery in Kansas* 22-23 (Cincinnati, G.S. Blanchard, 1856).

Thomas Cooley, the longtime Michigan Supreme Court Justice, added "[t]he right declared was meant to be a strong moral check against the usurpation and arbitrary powers of rulers, and as necessary and efficient means of regaining rights when temporarily overturned by usurpation." Thomas M. Cooley, LL.C., *The General Principles of Constitutional Law in the United States of America* 298 (1898).

It is somewhat ironic that *Henry* cited a modern edition of Black's Law Dictionary in determining that machine guns are too dangerous to be protected by the Second Amendment (*Henry*, 688 F.3d at 640) because the dictionary's eponymous author emphatically wrote that "[t]he citizen has at all times the right to keep arms of modern warfare." Henry Campbell Black, *Handbook of American Constitutional Law* 403–04 (1895). And Black was far from alone in singling out the "arms of modern warfare" as what the Second Amendment protected most of all; many others said the same. *See, e.g.*, John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* 152 (1868) ("a militia would be useless unless the citizens were enabled to exercise themselves in the use of warlike weapons."); Joel Bishop, *Commentaries on the Criminal Law* 75 (1868) ("the [Second Amendment] protects only the right to 'keep'

24

such 'arms' as are used for purposes of war, in distinction from those which are employed in quarrels and brawls and fights between maddened individuals . . . .").

An 1852 book by Joseph Bartlett Burleigh went even further, explaining that the term "Arms . . . is used for whatever is intentionally made as an instrument of offence. . . ." Joseph Bartlett Burleigh, *The American manual: containing a brief outline of the origin and progress of political power and the laws of nations* 31 (1852). He contrasted that from the term "weapons," which are instruments of offence or defense. *Id.* "We say fire-arms, but not fire-weapons; and weapons offensive or defensive, but not arms offensive or defensive." *Id.*

Many additional examples abound and have been detailed in a recent law review article by Amici's counsel. *See* C.D. Michel & Konstadinos Moros, *Restrictions "Our Ancestors Would Never Have Accepted": The Historical Case Against Assault Weapon Bans*, 24 Wyo. L. Rev. 89, 90 (2024).

There can be no historical tradition of barring firearms just because they may be useful in combat, when one of the main purposes of the Second Amendment was as a "doomsday provision" for the People to protect themselves from a tyrannical government. *See Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing en banc). "Once one understands the history of tyrants resorting to taking away people's arms to suppress political opposition, *Heller* explains, one can see that the militia clause fits perfectly with the operative clause." *Duncan,* 2023 WL 6180472, at *6.

A district court in Illinois said the same: "During the founding era, '[i]t was understood across the political spectrum that the right . . . might be necessary to

oppose an oppressive military force if the constitutional order broke down.' Therefore, although 'most undoubtedly thought [the Second Amendment] even more important for self-defense and hunting' the additional purpose of securing the ability of the citizenry to oppose an oppressive military, should the need arise, cannot be overlooked." *Barnett v. Raoul*, 671 F. Supp. 3d 928, 940 (S.D. Ill.), *vacated sub nom. Bevis*, 85 F.4th 1175. For this reason, neither the Founders nor their immediate descendants drew any distinction between purportedly "military" and "civilian" weaponry, as they were "one and the same." *Heller*, 554 U.S. at 625. This understanding persisted well into the 19th century. Indeed, as one Oregon court recently observed, "[t]he court finds, and all the experts agree, there was no clear distinction between private and military use at the time of statehood [in 1859]." *Arnold v. Kotek*, No. 22CV41008, 2023 Ore. Cir. LEXIS 3887, at *9–10 (Or. Cir. Ct. Harney Cnty. Nov. 24, 2023); *see also Bruen*, 597 U.S. at 37 ("19th-century evidence [i]s 'treated as mere confirmation of what the Court thought had already been established.' ").

Ironically, the federal government previously not only acknowledged this anti-tyranny purpose, but argued it was the *sole* purpose of the Second Amendment:

> [I]t would seem that the early English law did not guarantee an unrestricted right to bear arms. Such recognition as existed of a right in the people to keep and bear arms appears to have resulted from oppression by rulers who disarmed their political opponents and who organized large standing armies which were obnoxious and burdensome to the people. This right, however, it is clear, gave sanction only to the arming of the people as a body to defend their rights against tyrannical and unprincipled rulers. It did not permit the keeping of arms for purposes of private defense.

Brief for United States in *United States v. Miller,* O.T. 1938, No. 696, pp. 11–12 (citations omitted).

Most importantly, the Supreme Court has acknowledged this purpose; history showed "that the way tyrants had eliminated a militia consisting of all the able-bodied men was not by banning the militia but simply by taking away the people's arms, enabling a select militia or standing army to suppress political opponents." *Heller*, 554 U.S. at 598. And the fact that the United States may be far removed from an imminent threat of tyrannical government or foreign invasion at the present time should not temper a court's understanding of the import of the anti-tyrannical underpinnings of the Second Amendment, i.e., "[h]owever improbable these contingencies may seem today, facing them unprepared is a mistake a free people get to make only once." *Silveira*, 328 F.3d at 570 (Kozinski, J., dissenting from denial of rehearing en banc).

If civilian possession of machine guns is ultimately deemed to not be protected by the Second Amendment, it will not be because they are not "arms" or because they are used by the military. Instead, the government will identify historical analogues supporting that machine guns are analogous to "dangerous and unusual" firearms that were regulated at the time of the Founding. The district court must do the necessary analysis of this historical record if it is to make such a determination and finding. Reconstruing *Heller* or *Bruen* to not require the analysis, and to substitute the court's interest balancing opinions as to whether a handheld firearm that shoots a bullet out of a barrel is or is not an "arm," imposes an unnecessary burden on civil plaintiffs and criminal defendants. This is a step and a burden that *Bruen* specifically rebuked.

IV. **THIS CIRCUIT'S HISTORY WITH SECOND AMENDMENT CASES WARRANTS MEASURED CIRCUMSPECTION IN DECIDING THIS MATTER.**

The district court relied on the pre-*Bruen* precedent of *Henry* because this Court has said that "some" tension between intervening higher authority and prior circuit precedent is not enough to disturb the prior precedent. 1-ER-48 (citing *Close v. Sotheby's Inc.,* 894 F.3d 1061, 1073 (9th Cir. 2018)). There isn't just "some" tension between this Circuit's Second Amendment adjudications and those of the Supreme Court, there is a massive gap in reasoning and methodology that has resulted in the Supreme Court expressly rebuking this Circuit's Second Amendment precedent on multiple occasions.

The Supreme Court expressly called out the Ninth Circuit's wayward Second Amendment jurisprudence in a post-*Bruen* case, vacating the judgment of this Court, and remanding the case for consideration in light its holding in *Bruen. See Duncan v. Bonta,* 142 S. Ct. 2895 (2022) (adjudicating the constitutionality of magazines for firearms that hold more than 10 rounds).

Justice Thomas, the author of the *Bruen* opinion, has specifically called out this Circuit for applying the Supreme Court's Second Amendment jurisprudence in a cramped and improper way:

> [The Ninth Circuit] upheld California's 10-day waiting period for firearms based solely on its own "common sense." *Silvester v. Harris*, 843 F. 3d 816, 828 (CA9 2016). It did so without requiring California to submit relevant evidence, without addressing petitioners' arguments to the contrary, and without acknowledging the District Court's factual findings. This deferential analysis was indistinguishable from rational-basis review. And it is symptomatic of the lower courts' general failure to afford the Second Amendment the respect due an enumerated constitutional right.

*Silvester v. Becerra*, 583 U.S. 1139, 1140, (Thomas, J. dissenting).

28

The Ninth Circuit's deviation from ordinary principles of law is unfortunate, though not surprising. Its dismissive treatment of petitioners' challenge is emblematic of a larger trend. As I have previously explained, the lower courts are resisting this Court's decisions in *Heller* and *McDonald* and are failing to protect the Second Amendment to the same extent that they protect other constitutional rights. *See Friedman v. Highland Park*, 577 U. S. 1039, 1039-1043 (2015) (Thomas, J., dissenting from denial of certiorari); *Jackson v. City and County of San Francisco*, 576 U. S. 1013, 1013-1018 (2015) (same).

*Id., at* 1147–48.

Nor are *Duncan* and *Silvester* the only instances of the Ninth Circuit's was just flat wrong about the Second Amendment:

- In *Fresno Rifle & Pistol Club, Inc., v. Van De Kamp*, 965 F.2d 723 (9th Cir. 1992), the Ninth Circuit's Second Amendment rulings regarding individual rights versus collective rights, and incorporation against state action doctrine, were all eventually overruled by the Supreme Court;

- The Ninth Circuit repeated its errors from *Fresno* in *Hickman v. Block,* 81 F.3d 98 (9th Cir. 1996);

- The same erroneous result was obtained in a criminal case: *United States v. Mack,* 164 F.3d 467 (1996);

- The Court made the same mistakes again in *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002); en banc review was denied with several dissents at 328 F.3d 567 (9th Cir. 2003), *cert. denied at* 540 U.S. 1046 (2003);

- Justices Scalia and Thomas filed dissents to a certiorari denial in *Jackson v. City and County of San Francisco,* 576 U.S. 1013 (2015), after the Ninth Circuit upheld San Francisco's local gun control ordinances;

- Justices Thomas and Gorsuch filed dissents to a certiorari denial in *Peruta v. California*, 582 U.S. 943 (2017), after an en banc panel of the Ninth Circuit upheld a California ban on bearing arms in public similar to the ban that was eventually struck down in *Bruen. See Peruta v. San Diego Cty*, 824 F.3d 919 (9th Cir. 2016); and

- In *Young v. Hawaii*, the Ninth Circuit held that banning open carry was also constitutional, which, when paired with *Peruta*, meant that this Court had written out the "and bear" part of the Second Amendment entirely. There was no right to carry at all according to this Circuit. *Young*, of course, was vacated in light of *Bruen. Young v. Hawaii,* 992 F.3d 765, 773

(9th Cir. 2021), *cert. granted, judgment vacated,* 142 S. Ct. 2895, 213 L. Ed. 2d 1108 (2022), *and abrogated by Bruen,* 597 U.S. at 1.

The Ninth Circuit's Second Amendment jurisprudence has been wrong on every single constitutional theory advanced by this Court. Several members of this Court have said as much. "If the protection of the people's fundamental rights wasn't such a serious matter, our court's attitude toward the Second Amendment would be laughably absurd." *Duncan v. Bonta*, 83 F.4th 803, 808 (9th Cir. 2023) (Bumatay, J., Ikuta, J., R. Nelson, J., and VanDyke, J., dissenting). In deciding this matter, this Court should take a measured and thoughtful approach that is faithful to the instruction provided by the Supreme Court in *Heller* and *Bruen* so that this Circuit's decisions are no longer an outlier.

## CONCLUSION

For these reasons, Amici urge this Court to, at a minimum, remand this matter to the district court so it can conduct a proper historical review as required by *Bruen.*

Dated: May 17, 2024

/s/ Donald Kilmer
Donald Kilmer
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Rd.
Caldwell, Idaho 83607
(408) 264-8489
don@dklawoffice.com
*Counsel for Amicus Curiae*
*The Second Amendment Foundation*

Respectfully submitted,

/s/ C.D. Michel
C.D. Michel
Joshua Robert Dale
Konstadinos T. Moros
Alexander A. Frank
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Email: cmichel@michellawyers.com
*Counsel for Amici Curiae*
*California Rifle & Pistol Association, Incorporated and Second Amendment Law Center, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-4132

I am the attorney or self-represented party.

**This brief contains** 6,996 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____ .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ C.D. Michel **Date** May 17, 2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*