No. 23-4132

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DANIEL MATTHEW KITTSON,

Defendant-Appellant.

───────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

THE HONORABLE KARIN J. IMMERGUT, U.S. DISTRICT JUDGE
D.C. NO. 3:21-CR-00075-IM

───────────────

ANSWERING BRIEF OF PLAINTIFF-APPELLEE

───────────────

NATALIE K. WIGHT
UNITED STATES ATTORNEY
DISTRICT OF OREGON
SUZANNE MILES
CRIMINAL APPELLATE CHIEF
**SARAH BARR**
ASSISTANT UNITED STATES ATTORNEY
1000 SW 3RD AVENUE, SUITE 600
PORTLAND, OREGON 97204
TELEPHONE: (503) 727-1000
ATTORNEYS FOR PLAINTIFF-APPELLEE

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT OF JURISDICTION ........................................................ 1

STATEMENT OF ISSUES ..................................................................... 1

STATEMENT OF FACTS ....................................................................... 2

    A.    Defendant negotiated and executed the sale of a machinegun ................. 2

    B.    Defendant was indicted and moved to dismiss the machinegun count ... 6

    C.    The district court did not instruct the jury on the affirmative defense for transfers to or by, or possession by or under the authority of, the United States ............................................................ 7

    D.    The district court instructed the jury on the definition of machinegun ... 8

    E.    The district court denied defendant's motion for judgment of acquittal on the machinegun count ................................................ 9

    F.    The district court calculated defendant's criminal history to include a prior diversion ................................................................ 10

SUMMARY OF ARGUMENT ............................................................... 11

ARGUMENT ........................................................................................ 12

    A.    The district court correctly denied defendant's Rule 29 motion ............ 12

        1.    Standard of Review ................................................................ 12

        2.    The § 922(o)(2)(A) transfer defense applies only to machinegun transfers made to known government agents .......... 13

        3.    A rational juror could find defendant aided the unlawful transfer of a machinegun to a person believed to be a gun and drug trafficker ................................................................ 19

i

B.  The district court correctly declined to instruct the jury
    on the affirmative defense under § 922(o)(2)(A) ...................................... 20

    1.  Standard of Review ......................................................... 20

    2.  Defendant offered no evidence that he or Ray knew SA Weber
        was a government agent .................................................. 20

C.  The district court properly instructed the jury as a matter of
    law that a firearm does not require a functional magazine to
    be a machinegun ........................................................................ 21

    1.  Standard of Review ......................................................... 21

    2.  Whether a firearm requires a functional magazine to
        statutorily qualify as a machinegun is a matter of law .................. 22

        a.  The instruction was a correct statement of the law .......... 22

        b.  The instruction did not invade the province of the jury ... 25

    3.  Any error was harmless ................................................... 29

D.  The district court correctly applied one point to defendant's
    diversion disposition because the diversion case docket sheet
    established it was adjudicated by guilty plea at a court hearing .............. 30

    1.  Standard of Review ......................................................... 30

    2.  The district court relied on documentation of the
        diversion disposition ...................................................... 31

    3.  Any error was harmless ................................................... 33

E.  The district court correctly denied defendant's motion to
    dismiss because § 922(o) is constitutional on its face ............................ 34

    1.  Standard of Review ......................................................... 34

ii

2.     Circuit precedent forecloses defendant's argument....................... 35

3.     *Bruen* did not disturb circuit precedent upholding § 922(o) ......... 36

4.     Even if this Court were not bound by circuit precedent, 18 U.S.C. § 922(o) is constitutional ................................. 38

      a.     As an initial matter, defendant had no right to possess or transfer a firearm as a felon who was on parole............ 38

      b.     The Supreme Court has authoritatively held that the Second Amendment does not protect firearms that are not in "common use" but are "dangerous and unusual." ........................................................... 39

      c.     Machineguns are not in common use, but are dangerous and unusual ......................................... 43

      d.     The machinegun ban meets the "how" and the "why" of the historical analogues........................................ 45

      e.     Defendant's and Amicus's arguments fail........................... 48

CONCLUSION .................................................................... 49

STATEMENT OF RELATED CASES........................................................ 51

CERTIFICATE OF COMPLIANCE .......................................................... 52

# TABLE OF AUTHORITIES

## United States Constitution

U.S. Const. amend. II.................................................................................*passim*

## Cases

*B & L Prods., Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024) .......................... 39, 48

*Bevis v. City of Naperville, Illinois*, 85 F.4th 1175 (7th Cir. 2023) ................... 40, 43

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)................................................44–45

*DeWilde v. United States Attorney General*, No. 23-8054 (10th Cir. 2024)....................42, 44

*District of Columbia v. Heller*, 554 U.S. 570 (2008)............................... 6, 35–40, 48

*Doe v. Biden*, 2022 WL 16545125 (Fed. Cir. Oct. 31, 2022) ........................... 17

*Farmer v. Higgins*, 907 F.2d 1041 (11th Cir. 1990) .......................................... 17

*Garland v. Cargill*, 602 U.S. 406, 429 (2024)................................................43–46

*Harrel v. Raoul*, 144 S. Ct. 2491 (2024)........................................................... 40

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016)................................................... 44

*Jones v. Thompson*, 156 Or. App. 226 (1998)................................................... 39

*Maleng v. Cook*, 490 U.S. 488 (1989)............................................................... 39

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ......................6, 36–48

*Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024) ............. 43

*Perri v. Dep't of Treasury; Bureau of Alcohol, Tobacco & Firearms*,
    637 F.2d 1332 (9th Cir. 1981)................................................................15–17

*Ridgeway v. Walmart Inc*, 946 F.3d 1066 (9th Cir. 2020)................................22, 26

*Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022) ................................... 38

*Ruan v. United States*, 597 U.S. 450 (2022) ......................................... 13

*Staples v. United States*, 511 U.S. 600 (1994) ................................ 14, 47

*United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206 (9th Cir. 1992) .............. 26

*United States v. Alaniz*, 69 F.4th 1124 (9th Cir. 2023) ........................ 48

*United States v. Amparo*, 68 F.3d 1222 (9th Cir. 1995) ........................ 25

*United States v. Atherton*, 106 F.4th 888 (9th Cir. 2024) ........................ 32

*United States v. Bachmeier*, 8 F.4th 1059 (9th Cir. 2021) ................... 21, 29

*United States v. Bascue*, 97 F.3d 1461 (9th Cir. 1996) ..................... 13, 16

*United States v. Bear*, 439 F.3d 565 (9th Cir. 2006) ......................... 18

*United States v. Burrows*, 36 F.3d 875 (9th Cir. 1994) ........................ 18

*United States v. Cabaccang*, 332 F.3d 622 (9th Cir. 2003) ..................... 15

*United States v. Collazo*, 984 F.3d 1308 (9th Cir. 2021) ........................ 14

*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018) ........................ 43

*United States v. Doe*, 705 F.3d 1134 (9th Cir. 2013) ......................... 18

*United States v. Dorsey*, 105 F.4th 526 (3rd Cir. 2024) ........................ 39

*United States v. Franklin*, 18 F.4th 1105 (9th Cir. 2021) ..................... 30

*United States v. Friedman*, 445 F.2d 1076 (9th Cir. 1971) ..................... 26

*United States v. Gagarin*, 950 F.3d 596 (9th Cir. 2020) ........................ 12

*United States v. Garcia*, 768 F.3d 822 (9th Cir. 2014) ........................ 34

*United States v. Gaudin*, 515 U.S. 506 (1995) ..................................................... 25

*United States v. Gay*, 98 F.4th 843 (7th Cir. 2024) ............................................. 39

*United States v. Gillis*, 474 F.2d 4 (9th Cir. 1973) ............................................... 15

*United States v. Goodheim*, 686 F.2d 776 (9th Cir. 1982) ............................... 26–27

*United States v. Gracidas–Ulibarry,* 231 F.3d 1188 (9th Cir. 2000) ..................... 29

*United States v. Gravenmeir*, 121 F.3d 526 (9th Cir. 1997) .................... 13, 22, 28

*United States v. Harris*, 792 F.2d 866 (9th Cir. 1986) .......................................... 26

*United States v. Henry*, 688 F.3d 637 (9th Cir, 2012) ...................... 6, 35–37, 43

*United States v. Hill*, 915 F.3d 669 (9th Cir. 2019) ............................................. 32

*United States v. Holden*, 908 F.3d 395 (9th Cir. 2018) ....................................... 14

*United States v. Humphries*, 728 F.3d 1028 (9th Cir. 2013) .......................... 22, 28

*United States v. Hunter*, 101 F.3d 82 (9th Cir. 1996) .......................................... 26

*United States v. Kuzma*, 967 F.3d 959 (9th Cir. 2020) ................................... 22, 24

*United States v. Martinez,* 967 F.2d 1343 (9th Cir. 1992) .................................... 25

*United States v. McCauley*, 601 F.2d 336 (8th Cir. 1979) ................................... 24

*United States v. Melancon*, 462 F.2d 82 (5th Cir. 1972) ..................................... 24

*United States v. Miller*, 307 U.S. 174 (1939) ...................................................... 35

*United States v. Neuner*, 535 F. App'x 373 (5th Cir. 2013) ........................... 16–17

*United States v. O'Brien*, 560 U.S. 218 (2010) ..................................................... 43

*United States v. Ocampo-Estrada*, 873 F.3d 6615 (9th Cir. 2017) ........................ 20

*United States v. Pallares-Galan*, 359 F.3d 1088 (9th Cir. 2004) ............................................. 49

*United States v. Perez-Garcia*, 96 F.4th 1166 (9th Cir. 2024) ................................... 35, 42, 48

*United States v. Price*, 980 F.3d 1211 (9th Cir. 2019) ...................................... 13–15

*United States v. Rahimi*, 144 S. Ct. 1889 (2024) ................................................ 38–48

*United States v. Shih*, 73 F.4th 1077 (9th Cir. 2023) ......................................... 27

*United States v. Studhorse*, 883 F.3d 1198 (9th Cir. 2018) ................................. 49

*United States v. Theunick*, 651 F.3d 578 (6th Cir. 2011) ..................................... 17

*United States v. Thomas*, 612 F.3d 1107 (2010) ................................................ 20

*United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505 (1992) ......................... 47

*United States v. Tuan Ngoc Luong*, 965 F.3d 973 (9th Cir. 2020) ....................... 27

*United States v. Ubaldo*, 859 F.3d 690 (9th Cir. 2017) ...................................... 15

*United States v. Vanderwerfhorst*, 576 F.3d 929 (9th Cir. 2009) ........................ 32

*United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010) ................................... 38

*United States v. Walls*, 784 F.3d 543 (9th Cir. 2015) ........................................ 26

*United States v. Walton*, 881 F.3d 768 (9th Cir. 2018) ...................................... 49

*United States v. Warr*, 530 F.3d 1152 (9th Cir. 2008) ....................................... 30

*United States v. Williams*, 427 F.2d 1031 (9th Cir. 1970) .................................. 19

*United States v. Woodberry*, 987 F.3d 1231 (9th Cir. 2021) ............................... 26

*United States v. Woodfolk,* 656 A.2d 1145 (D.C. 1995) ..................................... 25

*United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994) ............................. 15

*Yee v. City of Escondido*, Cal., 503 U.S. 519 (1992) ................................ 49

## Statutes

Act of Jan. 29, 1795, ch. 2, 1795 Mass. Acts 436 ................................ 41

Statute of Northampton, 2 Edw. 3, c. 3 (1328) (Eng.) ................................ 41

18 U.S.C. § 2 ................................................................................................ 34

18 U.S.C. § 921 ............................................................................................ 26

18 U.S.C. § 922 ........................................................................................ *passim*

18 U.S.C. § 924 ........................................................................................ 25–26

18 U.S.C. § 925 ........................................................................................ 15, 17

18 U.S.C. § 3231 ............................................................................................ 1

22 U.S.C. § 2778 .......................................................................................... 15

26 U.S.C. § 5845 .................................................................. 23–28, 46–47

26 U.S.C. § 5852 .......................................................................................... 15

28 U.S.C § 599A .......................................................................................... 18

28 U.S.C. § 1291 ............................................................................................ 1

Firearm Owners Protection Act, Pub. L. 99-308, § 102,
    100 Stat. 449 (May 19, 1986) ................................................................ 16

National Firearms Act 26 U.S.C. §§ 5801–45 ................................ 46

Alaska Stat. § 11.61.200 ............................................................................ 47

Ariz. Rev. Stat. Ann. § 13-3101 ............................................................ 47

Ariz. Rev. Stat. Ann. § 13-3102 ............................................................ 47

Cal. Penal Code § 32625 ................................................................. 47

Colo. Rev. Stat. § 18-12-102 ........................................................ 47

Del. Code tit. 11, § 1444 ............................................................... 47

D.C. Code § 22-4514 .................................................................... 47

Fla. Stat. § 790.221 ...................................................................... 47

Ga. Code Ann. § 16-11-122 ......................................................... 47

Haw. Rev. Stat. § 134-8 ............................................................... 47

720 Ill. Comp. Stat. 5/24-1 .......................................................... 47

Ind. Code § 35-47-5-8 .................................................................. 47

Iowa Code § 724.1 ....................................................................... 47

Iowa Code § 724.3 ....................................................................... 47

Kan. Stat. Ann. § 21-6301 ........................................................... 47

La. Stat. Ann. § 40:1752 .............................................................. 47

Mass. Gen. Laws ch. 140, § 128 .................................................. 47

Mass. Gen. Laws ch. 140, § 131 .................................................. 47

Mass. Gen. Laws ch. 140, § 131M ............................................... 47

Me. Rev. Stat. Ann. tit. 17-A, § 1051 .......................................... 47

Me. Rev. Stat. Ann. tit. 17-A, § 1052 .......................................... 47

Mich. Comp. Laws § 750.224 ...................................................... 47

Minn. Stat. § 609.67 .................................................................... 47

Mo. Ann. Stat. § 571.020 ...................................................................... 47

Neb. Rev. Stat. § 28-1203 ...................................................................... 47

Nev. Rev. Stat. § 202.350 ...................................................................... 47

N.J. Stat. Ann. § 2C:39-5 ...................................................................... 47

N.J. Stat. Ann. § 2C:58-5 ...................................................................... 47

N.Y. Penal Law § 265.02 ...................................................................... 47

N.C. Gen. Stat. § 14-409 ...................................................................... 47

N.D. Cent. Code § 62.1-05-01 ...................................................................... 47

Ohio Rev. Code Ann. § 2923.11 ...................................................................... 47

Ohio Rev. Code Ann. § 2923.17 ...................................................................... 47

Or. Rev. Stat. § 166.272 ...................................................................... 47

18 Pa. Stat. § 908 ...................................................................... 47

11 R.I. Gen. Laws § 11-47-8 ...................................................................... 47

S.C. Code Ann. § 16-23-230 ...................................................................... 47

S.D. Codified Laws § 22-1-2 ...................................................................... 47

S.D. Codified Laws § 22-14-6 ...................................................................... 47

Tenn. Code Ann. § 39-17-1302 ...................................................................... 47

Tex. Penal Code Ann. § 46.05 ...................................................................... 47

Wash. Rev. Code § 9.41.190 ...................................................................... 47

W. Va. Code § 61-7-9 ...................................................................... 47

Wis. Stat. § 941.26 ................................................................................ 47

## Legislative Materials

132 Cong. Rec. 9600 (1986) ................................................................. 46

H.R. Rep. No. 83-1337 (1954) ............................................................. 47

H.R. Rep. No. 99-495 (1986) ..........................................................46–47

*National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. On Ways & Means*,
    73d Cong. 4 (1934) ......................................................................45–46

S. Rep. No. 73-1444 (1934) ........................................................... 43, 46

## Rules

Fed. R. Crim. P. 29 .............................................. 1, 9–12, 19–20

## Regulations

27 C.F.R. § 479.84 ................................................................................ 18

## Sentencing Guidelines

USSG § 2X2.1 ...................................................................................... 34

USSG § 4A1.1 ............................................................................... 10, 31

USSG § 4A1.2 ...........................................................................10, 30–31

USSG § 4C1.1 ............................................................. 1, 10–11, 34

## Ninth Circuit Authority

Ninth Cir. Model Jury Instruction 5.13 (2022 Edition) ...................... 18

Ninth Cir. R. 36-2 ............................................................................... 17

## Other Authorities

Act of June 14, 1701, ch. 7, *in* 1 *Laws of New Hampshire 679*
(Albert Stillman Batchellor ed., 1904) .......................................................... 41

Act of Nov. 1, 1692, ch. 18, § 6, *in* 1 *Acts and Resolves of the Province of
Massachusetts Bay* (1869) .......................................................................... 41

Act of Nov. 27, 1786, ch. 21, *in A Collection of all such Acts of the General Assembly of
Virginia, of a Public and Permanent Nature, as are now in Force* (1794) ......................... 27

An Act Against Wearing Swords, &c., ch. 9, *in* Aaron Leaming & Jacob Spicer, *Grants,
Concessions, and Original Constitutions of the Province of New Jersey* (2d ed. 1881) ........... 41

ATF, Firearms Commerce in the United States: Annual Statistical Update 2021,
https://perma.cc/5FBE-2C9C .......................................................................... 44

William Blackstone, *Commentaries on the Laws of England* (10th ed. 1787) ....................... 41

Richard Burn, *The Justice of the Peace, and Parish Officer* (2d ed. 1756) ........................ 42

John Ellis, *The Social History of the Machine Gun* (1986) ........................................ 45

Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* (1773) ... 41

William J. Krouse, Cong. Research Serv., *Gun Control Legislation* (2012) ......................... 44

Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* (2d ed. 1792) ...................... 41

*Letter to National Firearms Act Trade & Collectors Ass'n* (Feb. 24, 2016)
https://www.nfatca.org/pubs/ MG_Count_FOIA_2016.pdf ................................................ 44

George C. Neumann, *Swords and Blades of the American Revolution* (1973) ......................... 40

James Parker, *Conductor Generalis* (1764) ....................................................... 41

James Parker, *Conductor Generalis* (Robert Hodge printing 1788) ................................. 41

James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) ................... 41–42

Robert J. Spitzer, *Understanding Gun Law History after Bruen: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 58 (2023)....................................................42–43

William Waller Hening, *The New Virginia Justice* (1795)................................................... 41

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this criminal case under 18 U.S.C. § 3231. This Court has jurisdiction over this timely appeal. 28 U.S.C. § 1291. Defendant is serving his federal sentence at Victorville Medium FCI with a projected release date of August 25, 2024.

## STATEMENT OF ISSUES

1. Did the district court correctly deny defendant's Rule 29 motion where the statute covers machinegun transfers made to unknown undercover agents and the trial evidence established that defendant aided in such a transfer?

2. Did the district court correctly decline to instruct the jury on § 922(o)(2)(A)'s affirmative defense where the evidence established that defendant did not know he was transferring the machinegun to a government agent?

3. Did the district court properly instruct the jury that a machinegun does not require a functional magazine and, in any event, was any error harmless?

4. Did the district court correctly score defendant's diversion disposition based on evidence it was entered at a hearing pursuant to a guilty plea, and was any error harmless where defendant was ineligible for the "zero-point offender" reduction based on his disqualifying firearm transfer under USSG § 4C1.1(a)(7)?

5.    Is § 922(o) facially constitutional where "dangerous and unusual weapons" like machineguns fall outside of the Second Amendment's scope and regulating such weapons is part of this nation's historical tradition?

## STATEMENT OF FACTS

### A.    Defendant negotiated and executed the sale of a machinegun.

In January 2020, ATF Special Agent (SA) Jason Weber, acting undercover, received information that someone named "Dan" was trying to sell a machinegun. 4-ER-723. He received Dan's phone number and a picture of the machinegun. 4-ER-723-34. SA Weber investigated the phone number and learned it was subscribed to defendant, Daniel Kittson. 4-ER-724. He also learned that defendant was a felon previously convicted of manslaughter and attempted murder with a firearm. 4-ER-724; PSR ¶ 44.

On January 7, 2020, SA Weber, still acting undercover, called defendant. 4-ER-725. The call was recorded. *Id.* SA Weber pretended to be a trafficker from California who brought guns and drugs to Oregon and Washington. *Id.* They each checked that the other was "not a cop." 4-ER-725-26. Defendant verified he had a fully automatic Russian PPSh-41 firearm for sale. 4-ER-726. He explained it was a popular gun used in World War II and was stamped "1945." 4-ER-726. Defendant elaborated that this gun was in excellent working condition, could fire 12- to 1400 rounds a minute and could chop down a tree. 4-ER-727. He said he had seen it fired and knew it worked. 4-ER-728. He described where the selector switch was and how to flip it from semi-

2

automatic to fully automatic. 3-ER-280. He said it had very few moving parts and could be broken down easily. *Id.* Defendant also explained the type of magazines that would work in the gun: it would take a 32-round clip as well as a drum magazine. 4-ER-732.

Defendant and SA Weber negotiated the price. Defendant initially opined the machinegun could command between $16,000 to $22,000 based on internet research he had done. 4-ER-727. SA Weber noted those were for lawful transactions with a tax stamp; since their deal was a street sale, he would only agree to a much lower price. 4-ER-728, 730. Defendant said he understood and indicated he wanted $8,000-$10,000. 4-ER-732. Defendant noted that the serial number on the magazine didn't match the number on the stock and acknowledged that matching serial numbers would get a higher price. *Id.* SA Weber told defendant he wanted to inspect the firearm to determine if it was worth the asking price. 4-ER-733.

Three days later, SA Weber and defendant had another recorded call. 3-ER-282. They again discussed the fully automatic PPSh-41 machinegun, continued their price negotiations, and arranged to meet later that afternoon so that SA Weber could see it. *Id.* Defendant explained that "the Russian" was in a location nearby and that they would need to go together. *Id.* SA Weber picked defendant up at defendant's house, at which time defendant gave SA Weber the address where the machinegun was being kept. 3-ER-289. During the drive, defendant reiterated he would accept no less than $8,000. *Id.* Even if SA Weber put $7,500 in defendant's hand, defendant

3

would walk away from the deal. *Id.* Defendant continued pitching the fully automatic gun during the drive. *Id.* He indicated it was his gun, and the other party was holding it for him. *Id.*

SA Weber was wearing a recording device that captured video and audio of his conversation with defendant in the car, and audio of the deal once they were out of the car. 3-ER-286.

When they arrived at the address, defendant led SA Weber down an alleyway toward a "tiny house." 3-ER-289. They met another man who identified himself as "Ray."[1] 3-ER-300. Defendant told Ray that SA Weber was there to see "the Russian." *Id.* Ray then picked up a soft rifle case containing the machinegun and handed it to SA Weber. 3-ER-303. A drum magazine was with it. *Id.*

SA Weber function tested the machinegun with no magazine attached. 3-ER-308. While he was doing that, both defendant and Ray touted the quality of the gun, how well it worked, and features like the selector switch. *Id.* Defendant again plugged how easily the gun comes apart with the push of a button. 3-ER-308-09. SA Weber asked if he could go lower in price and defendant said "no." 3-ER-309. SA Weber pulled out a stack of $8,000 in cash and asked who the money should go to. *Id.* Defendant said to give it to Ray, and Ray gave half to defendant to count. *Id.*

---

[1] Ray was later identified as Ray Bohanen, a non-felon. He died in June 2020, before the United States presented indictments in the case.

Inside the tiny house, SA Weber saw another PPSh-41 machinegun and other guns including a semi-automatic AR-15 rifle. 3-ER-302. Defendant and Ray told SA Weber that the other machinegun was not ready for sale yet but had matching serial numbers and will go for a higher price. 3-ER-302, 310, 376. Ray told SA Weber that he had assembled the AR-15s himself, and that he would contact SA Weber through defendant when the other PPSh-41 was ready for sale. 3-ER-310.

SA Weber told defendant that he planned to trade the machinegun he just bought along with twelve AR-15 style rifles for two kilograms of cocaine that he'd sell in Seattle for a profit. 3-ER-316. Defendant told SA Weber that he was in financial distress and his employment right now was "basically this," referring to selling the machinegun. 3-ER-316-17. After the deal, defendant texted SA Weber to let him know that he'll be working on a list of guns to send SA Weber for the next time he's around. 3-ER-318.

Investigators submitted the PPSh-41 and the drum magazine to the ATF Firearms and Ammunition Technology Division (FATD) to determine whether it was capable of firing more than one round per pull of the trigger, thus meeting the federal definition of a machinegun. 3-ER-402-03. FATD Chief Daniel Hoffman performed a function test by placing the selector in the automatic position and confirmed the weapon was designed to shoot automatically. 3-ER-411-12.

Chief Hoffman also test-fired the weapon with an operable drum magazine from the National Firearms Collection, as the magazine sold to SA Weber was

broken. 3-ER-412-13. He put the selector switch to automatic, and when he pulled the trigger, the weapon shot continuously until the ammunition was exhausted. 3-ER-421-22. He again concluded the PPSh-41 was a weapon that could shoot, automatically, more than one shot by a single function of the trigger without manually reloading. *Id.*

**B. Defendant was indicted and moved to dismiss the machinegun count.**

On March 9, 2021, a federal grand jury indicted defendant on two counts: (1) illegal possession and transfer of a machine gun, in violation of 18 U.S.C. §§ 922(o) and 2; and (2) felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

On June 30, 2023, defendant moved to dismiss the machinegun count, arguing that 18 U.S.C. § 922(o) violates the Second Amendment on its face. 5-ER-950 (docket sheet). He argued that *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), abrogated *United States v. Henry*, 688 F.3d 637 (9th Cir, 2012), which held the statute constitutional. 1-ER-47. He argued the Second Amendment's text covers machineguns and regulating their possession and transfer is inconsistent with this nation's historical tradition of firearms regulation. *Id.* The district court denied the motion. 1-ER-50. It found *Bruen* did not overrule *Henry* because *Henry* was explicitly based on *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *Bruen* did not disturb *Heller*. 1-ER-47-49.

The case proceeded to trial.

**C. The district court did not instruct the jury on the affirmative defense for transfers to or by, or possession by or under the authority of, the United States.**

The parties did not dispute that the elements of the machinegun offense were (1) the defendant knowingly possessed and transferred a Russian machinegun, model PPSh-41, 7.62x25mm Tokarev caliber, bearing serial number CA01716; and (2) the defendant knew the firearm was a "machinegun." But a third element was in dispute.

Defendant proposed a third element taken from § 922(o)(2)(A): "the possession and transfer was not to or by, or possession under authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof." SER-36. The United States objected because that subsection is an affirmative defense, not an element. 5-ER-846, 848-50; 5-ER-952-53 (docket at ECF Nos. 85, 98). Defendant requested that the court instruct the jury on the affirmative defense, if it found it to be one. 5-ER-850; 3-ER-480-81.

The court rejected the argument that § 922(o)(2)(A) was an element of the offense and rejected the affirmative defense instruction. 2-ER-84, 103. The court found "the evidence we have now" did not "warrant[ ]" it because the evidence was based "solely" on the transferee being an undercover agent. 2-ER-103. The court found it misleading and confusing to the jury to allow argument that a transfer to an unknown undercover agent was a lawful transfer to the government. *Id.* It found that § 922(o)(2)(A) "does not immunize defendants who sell to undercover agents." 2-ER-

7

84. The district court ruled, "to the extent it's based on an unknowing undercover agent, then I'm not giving it." 3-ER-104.

### D. The district court instructed the jury on the definition of machinegun.

The parties also disputed how the court should instruct on the machinegun definition. The parties agreed that the magazine sold to SA Weber with the PPSh-41 was non-functional. But they disagreed on whether the nonfunctional magazine put the firearm outside of the statutory definition of "machinegun."

The district court held that this was a question of law that needed to be resolved for the jury to avoid confusion. 5-ER-804-07. It sought to "come up with the most balanced instruction" that "do[esn't] comment on specific evidence in the case," but is a correct "statement of the law" and is not "confusing." 4-ER-492-93, 498; 3-ER-483.

After regular discussion with the parties regarding several possible iterations, 5-ER-804-07; 4-ER-492-98; 3-ER-260-270; 2-ER-176-77, the court settled on language. 2-ER-100-01. Regarding the magazine, it instructed:[2]

---

[2] The full instruction was:

> In order to convict a defendant of Count 1, illegal Possession or Transfer of a Machinegun, the government must prove beyond a reasonable doubt each of the following two elements:
> First, the defendant knowingly possessed or transferred a Russian machinegun, model PPSh-41, 7.62x25mm Tokarev caliber, bearing serial number CA01716;
> Second, the defendant knew that the firearm was a "machinegun."

8

> A weapon need not be equipped with a functioning magazine to qualify as a machinegun, as long as the government proves that the weapon shoots, is designed to shoot, or can be readily restored to shoot automatically as defined by this instruction.

2-ER-67, 189. Defendant objected to this paragraph. 2-ER-101, 176-77.

### E.  The district court denied defendant's motion for judgment of acquittal on the machinegun count.

After the government closed its case, defendant filed a Rule 29 motion on the machinegun count arguing the transfer and accomplice liability theory be dismissed. 3-ER-437 (oral motion); 6-ER-954 (written filing docketed). He argued that because of the comma in between the transfer and possession clauses of the statute, transfers do not require authorization, so the statute imposes no liability whenever the recipient is in fact a government agent. 3-ER-437.

The district court disagreed. It found that defendant's interpretation "would provide complete immunity for any defendant who transfers a machinegun to an

---

As used in this instruction, the term "machinegun" includes any weapon which shoots, is designed to shoot or can be readily restored to shoot, automatically more than one shot without manual reloading, by a single function of the trigger.

A weapon need not be equipped with a functioning magazine to qualify as a machinegun, as long as the government proves that the weapon shoots, is designed to shoot, or can be readily restored to shoot automatically as defined by this instruction.

A weapon may be "designed to shoot" automatically even if a minor defect makes the weapon temporarily inoperable for that use. The weapon's design features must be such that it would ordinarily shoot automatically more than one shot without manual reloading by a single function of the trigger, but for a readily fixable defect. If the defect to automatic operation is significant and not readily repaired, then the weapon is not designed to shoot automatically.

undercover government agent, even if the defendant does not know or believe the undercover agent to be an agent of the government." 1-ER-41. It found defendant's reading was "contradicted by Ninth Circuit case law and by the purpose of the exemption itself." 1-ER-40-44 (written ruling).

> **F.** **The district court calculated defendant's criminal history to include a prior diversion.**

The jury convicted defendant of the machinegun charge. 2-ER-79. At sentencing, the district court applied one criminal history point to a DUI diversion disposition. 1-ER-23. It found the diversion was entered pursuant to a guilty plea in a judicial proceeding, as required by USSG §§ 4A1.1(c), 4A1.2(f). It looked to the case docket records attached to the PSR which made it "clear there was a court proceeding. There was a change of plea. . . . He's represented by counsel." 1-ER-23. Given that point, the court found defendant was not eligible for a 2-level "zero-point offender" reduction under USSG § 4C1.1. *Id.* The court found that, in any event, he "would not be eligible for the zero-point offender" because "he was convicted of transfer of a firearm." *Id.* With a total offense level 18 and a criminal history category I, his advisory guideline range was 27 to 33 months in custody. 1-ER-25. The court sentenced him to 27 months' imprisonment. 1-ER-36.

Defendant timely appealed his conviction and sentence.

# SUMMARY OF ARGUMENT

The district court correctly denied defendant's Rule 29 motion because the trial evidence established that defendant aided the transfer of a machinegun and there is no statutory exemption for transfers made to unknown undercover agents.

The district court correctly declined to instruct the jury on the affirmative defense under 18 U.S.C. § 922(o)(2)(A) because the defense is not viable for unknowing undercover transfers and the evidence established that's what this transfer was.

The district court properly instructed the jury as a matter of law that a firearm does not require a functional magazine to be a machinegun, and any error was harmless given undisputed testimony that a particular magazine is not a necessary part of the machinegun definition.

The district court correctly scored defendant's diversion disposition based on the case docket sheet establishing it was entered by guilty plea at a hearing, and any error was harmless because even if defendant had zero criminal history points, he was ineligible for the "zero-point offender" reduction because his firearm transfer offense disqualified him under USSG § 4C1.1(a)(7).

Section 922(o) is facially constitutional because dangerous and unusual weapons like machineguns do not fall within the Second Amendment's scope and regulating dangerous and unusual weapons is part of this nation's historical tradition.

## ARGUMENT

### A.     The district court correctly denied defendant's Rule 29 motion.

The evidence at trial proved that defendant played a critical role in transferring the PPSh-41 to an undercover agent he believed was a gun- and drug-trafficker. Defendant does not dispute those facts. Rather, he claims that § 922(o) exempts *all* transfers to the government, even if the transferor did not know the recipient was a government agent. Section 922(o)(2)(A)'s affirmative defense does not sweep that broadly.

#### 1.     Standard of Review

This Court reviews de novo a district court's ruling on a motion for judgment of acquittal. *United States v. Gagarin*, 950 F.3d 596, 602 (9th Cir. 2020). The question is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (cite omitted) (emphasis in original). Questions of statutory interpretation are also reviewed de novo. *Id.* at 603.

#### 2.     The § 922(o)(2)(A) transfer defense applies only to machinegun transfers made to known government agents.

The prohibition on transferring or possessing machineguns does not apply with respect to "a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof." 18 U.S.C. § 922(o)(2)(A).

Defendant argues that subsection (2)(A) exempts him from criminal liability because the phrase "under the authority of" qualifies only possession, not transfer. Def. Op. Br. at 35. In his reading, any transfer to the government is exempt from criminal liability, making his act merely an attempted transfer, which is not covered by the statute. *Id.* at 20. Even granting defendant's parsing of the statute's commas, subsection (2)(A)'s government agency exception applies only if defendant knew he was giving the gun to a government agent, and he did not. The district court correctly rejected defendant's overbroad reading of subsection (2)(A); it does not bestow "complete immunity" on any transfer to a government agent. 1-ER-41-42.[3]

Subsection (2)(A) is an affirmative defense. *United States v. Gravenmeir*, 121 F.3d 526, 528 (9th Cir. 1997). An offense's mental state attaches to its affirmative defense when necessary to effectuate the separation of innocent from culpable conduct. *Ruan v. United States*, 597 U.S. 450, 457 (2022) (applying the "knowingly or intentionally" offense mental state to statutory defense for dispensing controlled substances "except as authorized"). On the flip side, a silent affirmative defense should not stay quiet as to mental state if the result broadly absolves the core criminal culpability.

Here, requiring that a defendant know that he is handing a machinegun to a government agent to make the act legal "helps advance the purpose of scienter, for it helps to separate wrongful from innocent acts." *Id.* at 459; *United States v. Price*, 980

---

[3] The district court relied on this Court's unpublished decision in *United States v. Bascue*, 97 F.3d 1461 at *2 (9th Cir. 1996), finding it persuasive, albeit non-binding.

F.3d 1211, 1219 (9th Cir. 2019) (a mental state is read into silent criminal statutes to "separate wrongful conduct from otherwise innocent conduct."). It's the difference between carving out an exception for behavior society wants to promote—turning over ultra-dangerous weapons to the government and getting them off the street—and defendant's approach in which the ends justify the means irrespective of actual culpability.

Here, both the offense and affirmative defense are silent concerning the mental state. *Compare* §§ 922(o)(1) and 922(o)(2)(A). As to the offense, courts read in the requirement that a defendant must know about the characteristics of a firearm that make it a machinegun because we "presume[ ]" that "Congress did not intend to dispense with" the need for the defendant to "know the facts that make his conduct illegal." *United States v. Collazo*, 984 F.3d 1308, 1324 (9th Cir. 2021) (citing *Staples v. United States*, 511 U.S. 600, 605 (1994)). This knowledge avoids making "outlaws of gun owners who were wholly ignorant of the offending characteristics of their weapon." *Staples,* 511 U.S. at 605. Similarly, the affirmative defense must require knowledge of a government recipient to avoid absolving the very black-market transfers at the core of the law.

When interpreting a statute, courts must "give effect to the will of the Legislature." *United States v. Holden*, 908 F.3d 395, 400 (9th Cir. 2018) (cite omitted). The Court "must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of

14

the same statute inconsistent, meaningless or superfluous." *United States v. Cabaccang*, 332 F.3d 622, 627 (9th Cir. 2003).

Moreover, courts need not "follow the most grammatical reading of the statute" where that reading is "positively absurd." *Price*, 980 F.3d at 1218 (citing *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69-70 (1994)). "It would seem odd, to say the least," that Congress meant to distinguish between a black-market machinegun sale to private citizens and one made to an unsuspected undercover agent. The culpability of the seller is the same. *See X-Citement Video, Inc.*, 513 U.S. at 69 (noting the odd result if "knowingly" modified only certain parts of the statute at issue).

This Court has consistently read a knowledge requirement into other exceptions for firearms activity that are silent as to mental state. *See United States v. Ubaldo*, 859 F.3d 690, 702-03 (9th Cir. 2017) (statutory exception under 18 U.S.C. § 922(l) and 22 U.S.C. § 2778(b)(2) does not absolve undercover firearm importation scheme); *Perri v. Dep't of Treasury; Bureau of Alcohol, Tobacco & Firearms*, 637 F.2d 1332, 1337 (9th Cir. 1981) (same, regarding 18 U.S.C. § 925(a)(1) for firearm sale to undercover agent); *see also United States v. Gillis*, 474 F.2d 4, 6 (9th Cir. 1973) (same, regarding 26 U.S.C. § 5852(a) for machinegun sale to undercover agent, in part because another provision requiring application for tax-free transfer suggests knowledge). In these cases, the Court rejected the theory that the exceptions flatly immunize defendants just because they get caught in an undercover's dragnet.

15

Doing the same here accords with the statute's purpose. Section 922(o)(1) was enacted under the Firearm Owners Protection Act. Pub. L. 99-308, § 102, 100 Stat. 449, 453 (May 19, 1986). The goal of that Act was to strengthen firearms laws without burdening the ability of "law-abiding citizens" to use firearms for "lawful activit[ies]" like "hunting, trapshooting, target shooting, [and] personal protection." Pub. L. 99-308, § 1(b)(2), 100 Stat. 449.[4] The Act "aim[ed]" "to redirect law enforcement toward the kind of transaction most likely to be a factor in violent firearms crime." *Id.* (statement by Sen. McClure). Lawful transfers, such as sales to the military, law enforcement, defense contractors, and foreign allies, were exempted. *Id.* (Statement by Sen. Hatch).

No other court has adopted the over-broad reading of section (2)(A)'s exemption that defendant is pushing. The Fifth Circuit rejected the argument in a footnote calling it "utterly meritless," and saying, "[t]he statute and legislative history do not except unwary targets of undercover operations, line Neuner, from criminal liability for possessing machine guns. . . . To find otherwise would be absurd." *United States v. Neuner*, 535 F. App'x 373, 374 n.1 (5th Cir. 2013). This Court was equally decisive in *Bascue*, holding that its decision in *Perri* controlled to a degree that

---

[4] Section 1(b)(2) states "it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes."

publication was unwarranted. *See* Ninth Cir. R. 36-2 (listing when a decision "shall be" published, including when it "[e]stablishes, alters, modifies or clarifies a rule of federal law"). *Perri* addressed a comparable government agency exemption in 18 U.S.C. § 925(a)(1) and held that excusing "a willful violation of the [Gun Control] Act . . . simply because the government ultimately receives the firearm would circumvent the Act in a way Congress did not intend," unless the dealer "*knew* the purchaser was a government agent." 637 F.2d at 1337 (emphasis added).

Instead of the broad reading that defendant endorses, courts have read subsection (2)(A)'s exemption as "shield[ing] the transfer or possession of machineguns 'for law enforcement uses.'" *Doe v. Biden*, No. 2022-1197, 2022 WL 16545125, at *5 (Fed. Cir. Oct. 31, 2022) (noting the legislative history shows the exemption is for the "benefit of the government, not possession by private citizens."); *Neuner*, 535 F. App'x at 374 n.1 ("Clear statutory language and Congressional intent limited lawful transfer and possession of machine guns to authorized governmental personnel for use in their official capacities."); *Farmer v. Higgins*, 907 F.2d 1041, 1045 (11th Cir. 1990) ("Congress intended to limit lawful transfer and possession of machine guns to instances authorized by the government for the benefit of federal, state, or local governmental entities.").

To effectuate the statute's aim, the government agent must have actual authority to receive a machinegun transfer. *See e.g.*, *United States v. Theunick*, 651 F.3d 578, 587 (6th Cir. 2011) (suggesting machinegun possession is unlawful even for law

17

enforcement personnel if they possess the item in their personal capacity). And the defendant must know the recipient was a government agent.

Reading a mental state into the provision brings the statutory defense in line with the non-statutory public authority defense. *United States v. Doe*, 705 F.3d 1134, 1144-45 (9th Cir. 2013) (explaining that the non-statutory public authority defense is an affirmative defense). That requires showing that the criminal conduct was made in reasonable and sincere reliance on a representation made under the actual authority of a government official. *United States v. Burrows*, 36 F.3d 875, 881-82 (9th Cir. 1994). It is "properly used when the defendant reasonably believed that a government agent authorized [him] to engage in illegal acts." *United States v. Bear*, 439 F.3d 565, 568 (9th Cir. 2006); *see also* Ninth Circuit Model Jury Instruction 5.13 (2022 Edition).

ATF is not empowered to authorize black-market transfers, other than in a sting investigation. *See e.g.*, 28 U.S.C § 599A(b)(1) (making ATF responsible for investigating criminal and regulatory violations of federal firearms laws); 27 C.F.R. § 479.84(a) (no firearm may be transferred in the United States unless an application has been filed with and approved by the director).

Any transfer "to . . . the United States" must be to a *known* government representative. Otherwise, the exemption eliminates the fulcrum of culpability.

18

### 3. A rational juror could find defendant aided the unlawful transfer of a machinegun to a person believed to be a gun and drug trafficker.

With the legal question answered, the factual basis for denying defendant's Rule 29 motion is beyond dispute. Testimony that the weapon "could be fired, and had been fired, automatically" is sufficient to support a finding that the weapon is a machinegun. *United States v. Williams*, 427 F.2d 1031, 1033 (9th Cir. 1970). Here, the evidence went far beyond that, and the evidence that defendant knew it was a machinegun was equally strong.

Chief Hoffman testified that he examined the PPSh-41 in this case and "determined that, yes, it was a PPSh-41," "it was a weapon designed to shoot automatically," and through test-firing, he "confirmed it was a weapon that will shoot automatically more than one shot by a single function of the trigger without manually reloading." The jury saw video of a 25-round test fire that demonstrated "burst[s]" of ammunition. 3-ER-428.

Defendant's witness, John Nixon, agreed that the PPSh-41 in this case shoots automatically and that it's a machinegun. 2-ER-172-73.

The jury also heard audio recording of defendant tell SA Weber—after confirming he "wasn't a cop"—that the gun was a fully automatic Russian PPSh-41 in excellent working condition, that it could fire 12- to 1400 rounds a minute, and he had seen it work. 4-ER-725-28. Defendant described where the selector switch was and how to flip it from semi-automatic to fully automatic and explained the types of

19

magazines that would fit it. 3-ER-280; 4-ER-732; *see also* 3-ER-310, 333, 346, 351, 360, 374 (conversation with both defendant and Ray about gun features).

Viewing the evidence presented in the light most favorable to the Government, there was ample evidence from which any rational juror could find that the PPSh-41 was a machinegun and that defendant and Ray both knew it was a machinegun. The district court correctly denied defendant's Rule 29 motion.

## B. The district court correctly declined to instruct the jury on the affirmative defense under § 922(o)(2)(A).

Defendant argues alternatively that the court should have instructed the jury on the subsection (2)(A) affirmative defense. But without evidence that defendant knew SA Weber was a government agent, it was not a valid defense.

### 1. Standard of Review

The district court's denial of a requested jury instruction due to insufficient evidence to support the instruction is reviewed for abuse of discretion. *United States v. Ocampo-Estrada*, 873 F.3d 661, 665 (9th Cir. 2017).

### 2. Defendant offered no evidence that he or Ray knew SA Weber was a government agent.

A defendant is not entitled to an instruction on a defense theory with no basis in law or foundation in evidence. *United States v. Thomas*, 612 F.3d 1107, 1120 (2010). Defendant's (2)(A) defense has no basis in either. A "mere scintilla of evidence supporting defendant's theory" is not enough. *Id.* at 1121.

The district court rejected his theory that SA Weber's mere status as a government agent is enough, as a matter of law, and defendant offered no evidence that either he or Ray knew SA Weber was a government agent. The court correctly decided that instructing the jury on subsection (2)(A) would have been "misleading and confusing to the jury." 2-ER-103.

### C. The district court properly instructed the jury as a matter of law that a firearm does not require a functional magazine to be a machinegun.

Defendant appeals the paragraph of the machinegun instruction that informed the jury "[a] weapon need not be equipped with a functioning magazine to qualify as a machinegun, as long as the government proves that the weapon shoots, is designed to shoot, or can be readily restored to shoot automatically as defined by this instruction." Def. Op. Br. at 59. He claims the instruction omitted an element of the offense by directing a verdict on whether the PPSh-41 was a machinegun and deprived him of his right to present a defense. *Id.* at 60.

The jury instruction accurately defined the law and appropriately left the jury to evaluate the facts within the framework of that law. The district court did not err in defining the parameters of the law.

### 1. Standard of Review

This Court reviews de novo whether the district court's jury instructions misstated or omitted an element of the charged offense. *United States v. Bachmeier*, 8 F.4th 1059, 1063 (9th Cir. 2021). Such error can be harmless. *Id.* The district court's

formulation of a jury instruction is reviewed for an abuse of discretion. *Gravenmeir*, 121 F.3d at 529.

> **2.** **Whether a firearm requires a functional magazine to statutorily qualify as a machinegun is a matter of law.**

This Court reviews jury instructions with a "practical approach," not a "line-by-line examination." *Ridgeway v. Walmart Inc*, 946 F.3d 1066, 1081 (9th Cir. 2020). The focus is on whether "in the light of the issues and viewed as a whole, the instructions were complete, clear, correct, and adequate." *Id.* (internal quotations omitted). "So long as the instructions fairly and adequately cover the issues presented, correctly state the law, and are not misleading, no error will have occurred." *Id.* (internal quotations omitted).

> **a.** **The instruction was a correct statement of the law.**

It is not instructional error to provide the jury with a "legally accurate instruction." *United States v. Humphries*, 728 F.3d 1028, 1033 (9th Cir. 2013) (considering supplemental instruction to a jury question). The magazine instruction here was legally accurate.

This Court has already found as a matter of law that a "a non-operational device" may still be "designed to shoot" "automatically." *United States v. Kuzma*, 967 F.3d 959, 969 (9th Cir. 2020); *see also id.* at 970 (describing this conclusion as one of statutory construction). The statutory phrase "designed to shoot . . . automatically" includes a device that is "designed for a particular use even though, due to a readily

fixable defect, the device cannot at the moment be put to that use." *Id.* at 969. It is not error to instruct the jury consistently with this legal definition. *Id.* at 972.

If the firearm is "lacking irreplaceable parts necessary to shoot automatically," then it falls outside of machinegun definition. *Id.* at 969 (quote omitted). Defendant's argument hinges on the contention that the PPSh-41's magazine is an "irreplaceable part."

That is not true as a matter of legal definition. The plain text of 26 U.S.C. § 5845(b) does not refer to a magazine in defining a machinegun. It includes both fully-assembled guns "designed to shoot" automatically and "mere parts": "the frame or receiver . . . , any part designed and intended [alone or in combination] for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled." 26 U.S.C. § 5845(b). But it does not specify that a functioning magazine is required.

It is also not true as a matter of fact. Defendant argues that he presented expert testimony that this particular gun needed a specific magazine to function—"how without a matching magazine it would not be possible to fire the weapon automatically." Def. Op. Br. at 42. But his expert did not say that. He testified that firearms fitted with their issued magazine are "likely to work reliably" and that the firearm cannot work automatically "without *a* working magazine." 2-ER-167-69 (emphasis added).

That is consistent with the government's expert, who showed a video of the gun firing 25 rounds automatically with a replacement magazine and explained the magazine is "not an integral part of the classification of the machinegun" because the definition includes what the weapon is "designed to" do. 3-ER-413, 415, 428. He analogized "a car that gets a flat tire. Even though you have a flat tire, you wouldn't be able to drive it at that point, but you could either replace or fix that tire. You still have a car." [5] 3-ER-416.

Section 5845(b)'s broad definition—encompassing gun design and "mere parts"—shows Congress did not consider operability as an essential element of the crime. *See Kuzma*, 967 F.3d at 973 (no plain error in instructing that the term machinegun "includes weapons which have not previously functioned as machineguns.").

Other circuits agree that, as a matter of law, a firearm "need not be equipped with a functioning magazine to qualify as a machinegun." *See, e.g.*, *United States v. McCauley*, 601 F.2d 336, 340 (8th Cir. 1979) (finding the statute includes weapons "not then equipped with a magazine"); *United States v. Melancon*, 462 F.2d 82, 94–95 (5th Cir. 1972) (statutory definition permitted the conclusion that a Russian PPSh firearm

---

[5] ATF Special Agent Caleb Enk also testified to his conclusion after examining the PPSh-41 that it was capable of fully automatic firing. 4-ER-701. He testified that "in this case," the weapon "acts as a machinegun as well." 4-ER-706. He walked the jury through a photograph of the PPSh-41, pointing to "the selector switch there. It's got the ability to accept a magazine." 4-ER-707. And he testified that a "magazine doesn't play a role in determining where, when, or how the gun itself was manufactured." *Id.*

without a magazine was a machinegun); *see also United States v. Woodfolk,* 656 A.2d 1145, 1148 (D.C. 1995) (finding a magazine is not "an integral part of a machine gun" as "a matter of law" in D.C. Code that defines a machine gun as "any firearm which shoots automatically or semiautomatically more than 12 shots without reloading"); *cf. United States v. Martinez,* 967 F.2d 1343, 1346 (9th Cir. 1992) (interpreting the statutory term "machinegun" to include unloaded weapons).

The district court's instruction was a correct statement of the law and appropriate under the facts established at trial.

> **b.** **The instruction did not invade the province of the jury.**

Defendant argues the magazine instruction "wholly removed from the jury's consideration" the element of whether the PPSh-41 was a machinegun and whether defendant knew it was a machinegun and directed the jury's verdict. Def. Op. Br. at 61. It did not.

The district court "must be permitted to instruct the jury on the law and to insist that the jury follow [its] instructions." *United States v. Gaudin,* 515 U.S. 506, 513 (1995). It remains the jury's role to apply the facts to the law. *Id.*; *United States v. Amparo,* 68 F.3d 1222, 1224 (9th Cir. 1995) (no error in the district court instructing jury that possession of an unregistered sawed-off shotgun is categorically a crime of violence for purposes of 18 U.S.C. § 924(c)). A "purely legal determination" that "delineate[s] the scope" of a statutory term does "not strip the jury of the ability to

resolve the factual disputes underlying the charges." *United States v. Woodberry*, 987 F.3d 1231, 1235 (9th Cir. 2021).

This Court regularly rejects directed verdict challenges to instructions that define the scope of a statutory term. *See id.* at 1235-36 (not a directed verdict to instruct the "market for marijuana, including its intrastate aspects," meets jurisdictional requirement); *United States v. Friedman*, 445 F.2d 1076, 1087 (9th Cir. 1971) (not a directed verdict to instruct that grand jury transcripts "are the property of the United States" in unlawful possession of government property case); *see also Ridgeway*, 946 F.3d at 1081-82 (no error in instructing jurors that company's manual, if applied as written, subjected employees to company's "control"); *United States v. Walls*, 784 F.3d 543, 549 (9th Cir. 2015) (instruction that "merely defined" interstate commerce element was not a conclusive statement about whether that element was met and "left for the jury to decide whether [the defendant] committed conduct"); *United States v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206, 1210 (9th Cir. 1992) (instruction that "price fixing is per se illegal" was accurate statement of the law and the government was still "required to prove" that price fixing occurred).

This Court also regularly defines the scope of firearms statutes. *United States v. Hunter*, 101 F.3d 82, 85 (9th Cir. 1996) ("semiautomatic assault weapon" definition in 18 U.S.C. §§ 924(c) and 921(a) includes inoperable and unloaded gun); *United States v. Harris*, 792 F.2d 866, 868 (9th Cir. 1986) ("firearm" definition under 18 U.S.C. §§ 924(c) and 921(a)(3) does not require gun be loaded or operable); *United States v.*

*Goodheim*, 686 F.2d 776, 778 (9th Cir. 1982) ("firearm" definition under 18 U.S.C. § 922(h)(1) does not require operable weapon).

There is no reversible error if the defense theory was "fairly and adequately covered" by the complete instructions. *United States v. Shih*, 73 F.4th 1077, 1094 (9th Cir. 2023). The question is whether the instructions "as a whole are" misleading or inadequate to guide the jury's deliberation. *United States v. Tuan Ngoc Luong*, 965 F.3d 973, 986 (9th Cir. 2020).

Here, the full uncontested machinegun instruction informed the jury of the conduct and knowledge elements;[6] that it was the government's burden to prove both elements beyond a reasonable doubt;[7] that a machinegun includes any weapon that functions, is designed to function, or can be readily restored to function by shooting automatically by a single trigger pull without reloading;[8] and that a weapon is still a machinegun even if it is temporarily inoperable but for a readily fixable defect.[9] 2-ER-67.

---

[6] That "the defendant knowingly possessed or transferred a Russian machinegun, model PPsh-41, 7.62x25mm Tokarev caliber, bearing serial number CA01716," and that "the defendant knew that the firearm was a 'machinegun.'" 2-ER-67.

[7] "[T]he government must prove beyond a reasonable doubt each of the following two elements." 2-ER-67.

[8] "As used in this instruction, the term 'machinegun' includes any weapon which shoots, is designed to shoot or can be readily restored to shoot, automatically more than one shot without manual reloading, by a single function of the trigger." 2-ER-67.

[9] "A weapon may be 'designed to shoot' automatically even if a minor defect makes the weapon temporarily inoperable for that use. The weapon's design features must be such that it would ordinarily shoot automatically more than one shot without manual reloading by a single function of the trigger, but for a readily fixable defect. If the

The court also instructed the jury on aid and abet liability. That uncontested instruction says that a defendant can still be liable if the government proves beyond a reasonable doubt that someone else committed the illegal transfer crime, and that the defendant aided that person with respect to at least one element of the illegal transfer crime, acted with the intent to facilitate the illegal transfer, and acted before the crime was completed. 2-ER-72.

Other instructions repeated that the government must prove guilt beyond a reasonable doubt, that the jury decides how much weight to give the evidence, and that each juror must decide the case for himself or herself. 2-ER-54, 58, 73.

The whole of the instructions are complete, clear, correct, and adequate, fairly cover the issues presented, and are not misleading. *See e.g.*, *Gravenmeir*, 121 F.3d at 529 (alleged nominal error "did not impermissibly highlight the prosecution's case so as to imply the guilt of the accused"). "That the court's legally accurate instruction may have influenced the jury to reject [a] defense does not show that the district court committed instructional error; rather, it shows that [the] defense was not persuasive to the jury." *Humphries*, 728 F.3d at 1033. Defendant's theory was simply not persuasive.

The magazine instruction here "merely defined" the statutory term machinegun under 26 U.S.C. § 5845(b). It left the jury to decide if the PPSh-41 at issue was in fact a weapon that shoots, is designed to shoot, or can be readily restored to shoot

defect to automatic operation is significant and not readily repaired, then the weapon is not designed to shoot automatically." 2-ER-68.

automatically, and to assess defendant's factual argument that it needed a matching magazine to work properly against the evidence that the gun, in fact, functioned with a replacement magazine.

### 3. Any error was harmless.

Omitting an element of the crime is harmless if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Gracidas–Ulibarry,* 231 F.3d 1188, 1197 (9th Cir. 2000) (quotation omitted). It is harmless if "the omitted element [i]s uncontested and supported by overwhelming evidence." *Id.* Reversal is not required when "there is no reasonable possibility that the error materially affected the verdict." *Bachmeier*, 8 F.4th at 1065.

Defendant argues that by including the magazine paragraph, the court effectively took away the element of whether the PPSh-41 was a machinegun, and whether defendant and Ray knew it was. But overwhelming undisputed evidence supported those elements. Defendant offered an alternative theory of the evidence but did not rebut the evidence establishing the PPSh-41 was a machinegun and that defendant and Ray knew it. *See Gracidas–Ulibarry,* 231 F.3d at 1197 (harmless error where defendant did not offer evidence that contradicted the government's evidence and overwhelming evidence undermined the defense theory); *Bachmeier*, 8 F.4th at 1065 (same). Both parties' experts agreed that the PPSh-41 in the case is a machinegun. 3-ER-421 (Chief Hoffman); 2-ER-172-73 (John Nixon). The jury watched the gun test-fire automatically. They also heard recorded statements of

defendant promising SA Weber that he had seen it fire automatically. And they heard Ray say he would let SA Weber know through defendant when the other PPSh-41 was ready for sale. It is clear beyond a reasonable doubt that the jury would have convicted even if the court had instructed on the machinegun definition without the magazine paragraph.

### D. The district court correctly applied one point to defendant's diversion disposition because the diversion case docket sheet established it was adjudicated by guilty plea at a court hearing.

Defendant argues the district court committed procedural error and violated his due process rights in finding that his diversion disposition scored a point based only on "the court's own prior personal practice as a judge on the Multnomah County Circuit Court." Def. Op. Br. at 63. He claims the government "did not produce any evidence" that the plea had been entered during a judicial proceeding as required by USSG § 4A1.2(f). The record belies defendant's claim.

### 1. Standard of Review

This Court reviews de novo the district court's calculation of the advisory sentencing guidelines range and examines for clear error a district court's factual findings. *United States v. Warr*, 530 F.3d 1152, 1158 (9th Cir. 2008). Procedural due process related to evidence at sentencing is also reviewed de novo, while substantive due process is reviewed for clear error. *United States v. Franklin*, 18 F.4th 1105, 1125 (9th Cir. 2021) (considering the reliability of hearsay evidence).

### 2. The district court relied on documentation of the diversion disposition.

USSG § 4A1.1(c) adds one point for each prior sentence not counted under subsections (a) or (b). However, a diversion disposition "is counted only where there is a finding of guilt in a judicial proceeding." USSG §§ 4A1.1(c), 4A1.2(f). A finding or admission of guilt in open court is required for the diversion to count. USSG § 4A1.2(f), comment. (n.9).

Here, defendant was arrested for driving under the influence (DUI) and possessing marijuana. PSR ¶ 45. He pleaded guilty to both counts, received a fine for the marijuana offense, and entered diversion on the DUI. *Id.* Accordingly, the PSR assessed him one point for the DUI. *Id.*

The U.S. Probation Office attached to the PSR a copy of the docket sheet for the DUI case. PSR at 30. It shows that defendant changed his plea to guilty and accepted a diversion disposition at a hearing overseen by Judge Gale M. Rader. PSR at 30-31. Defendant was represented by privately retained counsel Michael Paul De Muniz and was present at the hearing. PSR at 31-32. The judge accepted the guilty plea and entered an order of diversion. *Id.*

Thus, his DUI diversion was based on a finding or admission of guilt made in open court. The district court based its one-point finding on the docket sheet. It explained, "I find it was a guilty plea. Looking at the attachments, it's clear there was a court proceeding. There was a change of plea." 1-ER-23. Further, "just based from

the judgment - - or the record docket itself . . . I find . . . Probation is correct, that he does get one point . . . ." *Id.*

Nevertheless, defendant claims the district court impermissibly based its finding on its own personal practice as a prior state court judge. Def. Op. Br. at 64. He points to passing comments the court made about its familiarity with state court practice based on its own experience. Def. Op. Br. at 63-64. But those comments were not the basis of the court's sentencing finding. Moreover, they confirm the court relied on the docket sheet, not its personal experience.

"To succeed on a claim that a district court violated the Due Process Clause by imposing a sentence founded at least in part upon misinformation of constitutional magnitude, a defendant must establish the challenged information . . . demonstrably made the basis for the sentence." *United States v. Hill*, 915 F.3d 669, 674 (9th Cir. 2019). This requires showing that the court "made it abundantly clear that the challenged information was the basis for its sentence." *Id.* (internal punctuation omitted). A "passing reference" to the challenged information does not establish the court based its sentencing decision on it. *Id.* at 675 (evidence mentioned "in passing" not enough to establish it was the basis of the sentence); *United States v. Atherton*, 106 F.4th 888, 901 (9th Cir. 2024) ("passing reference" insufficient to establish sentence was based on impermissible assumptions); *United States v. Vanderwerfhorst,* 576 F.3d 929, 936-37 (9th Cir. 2009) (similar).

Here, the passing comments show the district court did the opposite of what defendant accuses: it *declined* to rely on its own experience alone. It noted it has "a lot of familiarity with diversion court" and that in its experience "one cannot accept a defendant for diversion unless they either do a nolo contender plea or admit guilt." 1-ER-22. But it did so when demanding the government point to the guilty plea in the docket sheet. *Id.* ("[AUSA], direct me where you are pointing to"). It was saying, in other words, its experience gives it a basis to expect that a guilty plea would have been entered, but it wanted the government to point to evidence that expectation was met here. The government did so, pointing to "the third page of the docket" which records that "defendant is present, there is a judge" and the district court observed "defendant has counsel." *Id.*

In response to a comment by defense, the court observed that "every DUI diversion case I have ever seen has – the judge has taken a guilty plea, and I spent many years doing that [or a nolo plea]." *Id.* It then turned to fact-finding and made the basis of its one-point finding "abundantly clear": it was "[l]ooking at the attachments" and "just based on the judgment - - or the record docket itself." 1-ER-23. Its passing comments about its own experience were not "demonstrably" the basis of the court's one-point finding.

### 3.  Any error was harmless.

Any error in the court's one-point finding is harmless because the defendant's guideline would not change even if the diversion garnered no points. Defendant's one

33

point places him in criminal history category I. Zero points would place him in the same category.

Defendant argued that as a zero-point offender he would receive a 2-level reduction under USSG § 4C1.1. *See* PSR at 28 (noting paragraph 34). But even if he had zero points, the court found he is disqualified from the 2-level reduction because he was convicted of transferring a machinegun. 1-ER-23; 2-ER-79 (verdict form); USSG § 4C1.1(a)(7) (disqualifying defendants who transferred a firearm in connection with the offense). Even on an aid and abet theory, defendant is punishable as a principal. 18 U.S.C. § 2; USSG § 2X2.1, comment. (backg'd).

Because the point did not change his criminal history category, and because he is facially ineligible for the zero-point reduction even if he was a zero-point offender, any error in the court applying one point to his diversion is harmless.

### E. The district court correctly denied defendant's motion to dismiss because § 922(o) is constitutional on its face.

The district court correctly denied defendant's Second Amendment challenge. That challenge is foreclosed by circuit precedent upholding § 922(o). And even under a fresh analysis, § 922(o) is constitutional because machineguns are not in common use for lawful purposes, but are dangerous and unusual.

#### 1. Standard of Review

This court reviews the constitutionality of a statute de novo. *United States v. Garcia*, 768 F.3d 822, 827 (9th Cir. 2014).

## 2.  Circuit precedent forecloses defendant's argument.

The Supreme Court has made clear that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 625. The right to keep and bear arms "extends only to certain types of weapons." *Id* at 623 (summarizing *United States v. Miller*, 307 U.S. 174 (1939)). Specifically, it extends to "the sorts of lawful weapons that [citizens] possessed at home," that were "in common use" and "expected" to be supplied by regular civilians themselves if called for militia service. *Heller*, 554 U.S. at 624-25, 627. It does not reach "weapons not typically possessed by law-abiding citizens for lawful purposes," including "dangerous and unusual weapons." *Id.* at 625, 627; *see also United States v. Perez-Garcia*, 96 F.4th 1166, 1177 (9th Cir. 2024) (noting "legislatures may ban dangerous and unusual weapons because the Second Amendment does not guarantee an unlimited right to possess every kind of weapon") (cites omitted).

Relying on *Heller*, this Court upheld § 922(o)'s prohibition on the possession of machineguns in *Henry*, 688 F.3d 637. The Court explained the limitations outlined in *Heller* on the types of firearms protected by the Second Amendment.  *Id.* at 640. It noted Heller's warning that it would be "'startling' for the Second Amendment to protect machine guns." *Henry*, 688 F.3d at 640 (citing *Heller*, 554 U.S. at 624). And it agreed with the unanimous view of other circuits that "machine guns are 'dangerous and unusual weapons' that are not protected by the Second Amendment." *Id.* "Short

35

of bombs, missiles, and biochemical agents," the Court said, "we can conceive of few weapons that are more dangerous than machine guns." *Id.* And machineguns are "'unusual' because private possession of all new machine guns, as well as all existing machine guns that were not lawfully possessed before the enactment of § 922(o), has been unlawful since 1986." *Id.* Because it held that "the Second Amendment does not apply to machine guns," *Henry* had no occasion to apply any type of means-end scrutiny. *Id.*

### 3. *Bruen* did not disturb circuit precedent upholding § 922(o).

*Bruen* did not disturb *Henry*'s holding—based upon *Heller*—that § 922(o) is constitutional. Although *Bruen* abrogated circuit precedent that had applied means-end scrutiny as part of the Second Amendment analysis, 597 U.S. at 19-24, *Henry* did not rely on means-end scrutiny. Instead, it relied on *Heller*'s statements that the Second Amendment does not protect "dangerous and unusual" weapons or weapons "not typically possessed by law-abiding citizens for lawful purposes." *Henry*, 688 F.3d 640. Defendant is simply incorrect in his assertion that *Henry* "utilized an interest-balancing inquiry that *Bruen* overruled." Def. Op. Br. 36; *see Henry*, 688 F.3d at 640 ("[B]ecause we conclude that machine gun possession is not entitled to Second Amendment protection, it is unnecessary to consider Henry's argument that the district court applied the incorrect level of constitutional scrutiny in evaluating his claims.").

*Bruen* did not call into question *Heller*'s statements about the Second Amendment's "common use" limitation. Indeed, *Bruen* discussed *Heller*'s explanation

36

"that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large'" or "'dangerous and unusual.'" *Bruen*, 597 U.S. at 57; *see id.* at 81 (J. Kavanaugh and J. Roberts concurring) (prohibitions on "the carrying of dangerous and unusual weapons" remain an "important limitation" on the right to keep and bear arms); *id.* at 72 (J. Alito concurring) (*Bruen* does not "decide anything about the kinds of weapons that people may possess").

Defendant suggests that *Henry* is inconsistent with *Bruen* because it "did not cite a single founding era source and did not address whether machineguns constitute 'arms' within the plain meaning of the Second Amendment." Def. Op. Br. 36-37. But *Henry* had no need to cite founding-era sources given its reliance on *Heller*, which cited *twelve* historical sources to support its conclusion that there is a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627. Nor did *Henry* need to analyze whether machineguns are "arms." Of course they are. But *Heller* makes clear that the Second Amendment does not protect all "arms," but only those "arms in common use at the time for lawful purposes like self-defense." *Id.* at 624.

*Bruen* does not call into question *Henry*'s reasoning, but rather reiterates the very statements in *Heller* upon which *Henry* relied. *Bruen* therefore does not overrule *Henry*, and a panel of this Court is bound by that precedent. This Court need go no further,

but should reject defendant's Second Amendment challenge based on circuit precedent.

### 4. Even if this Court were not bound by circuit precedent, 18 U.S.C. § 922(o) is constitutional.

Regardless, a fresh evaluation of § 922(o)'s constitutionality demonstrates that *Henry* reached the correct result. The federal machinegun ban is consistent with the principle that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.

### a. As an initial matter, defendant had no right to possess or transfer a firearm as a felon who was on parole.

Although defendant mounts only a facial challenge to the statute, a facial challenge fails when it is constitutional as applied to the challenger. *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024); *see also Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1203 (9th Cir. 2022) (considering facial and as applied constitutional challenge). The Second Amendment does not protect defendant's right "to keep and bear arms" because he is a felon who is on parole.

Defendant is indisputably a felon. He is therefore prohibited from possessing *any* firearm.[10] 18 U.S.C. § 922(g)(1); *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010). And he does not argue that transferring a firearm is protected conduct.[11] *See*

---

[10] That defendant was acquitted of possessing the PPSH-41 in this case does not negate the fact that he remains prohibited from possessing a gun.

[11] Defendant does not challenge the constitutionality of 18 U.S.C. § 922(g)(1).

*e.g.*, *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 118 (9th Cir. 2024) (selling firearms is not a protected ancillary right of the Second Amendment).

Moreover, the district court found that defendant "is on parole." 5-ER-769 (addressing motions in limine); 5-ER-941 (listing prior convictions in the state of Oregon). He thus lacks the same armament rights as a free person. *United States v. Gay*, 98 F.4th 843, 847 (7th Cir. 2024) (finding § 922(g)(1) constitutional as applied to the defendant because "[p]arole is a form of custody" that just "allow[ed] him to serve some of his sentences outside prison walls"); *see also Jones v. Thompson*, 156 Or. App. 226, 231 (1998) (en banc) (parole is a form of custody under Oregon law); *see also Maleng v. Cook*, 490 U.S. 488, 491 (1989) ("a prisoner who ha[s] been placed on parole [i]s still 'in custody' under his unexpired sentence" for purposes of federal habeas statute). Parolees are "in a position different from the general population because they are still subject to an extant term of imprisonment." *United States v. Dorsey*, 105 F.4th 526, 532 (3rd Cir. 2024) (rejecting Second Amendment challenge to § 922(g)(1) on plain error review).

The machinegun ban as applied to defendant, a felon on parole, is constitutional.

**b. The Supreme Court has authoritatively held that the Second Amendment does not protect firearms that are not in "common use" but are "dangerous and unusual."**

The Second Amendment's text and historical context confirm that arms are unprotected if they are not typically possessed by law-abiding citizens for lawful

purposes. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "[T]he way in which the Second Amendment's operative clause furthers the purpose announced in its preface" is precise: It protects only those weapons that "men were expected to . . . bear[]" when "called for [militia] service"—namely, "arms supplied by themselves" and "of the kind in common use," rather than "weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 624-25; *see Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1193 (7th Cir. 2023) ("We take from this that the definition of 'bearable Arms' extends only to weapons in common use for a lawful purpose.").

That principle conforms to the public understanding of the text at the time. The "historical sources indicate that the Arms the Second Amendment is talking about are weapons in common use for self-defense." *Bevis*, 85 F.4th at 1192, *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024). The public understood that certain "types of weapons" fell outside Second Amendment protection. *Heller*, 554 U.S. at 624. In the "colonial and revolutionary war era," the weapons protected were just those "used in defense of person and home," *id.* at 624-25 (citing George C. Neumann, *Swords and Blades of the American Revolution* 6-15, 252-254 (1973)).

And *Heller* cited many sources that established a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627. That tradition is supported by myriad laws prohibiting carrying firearms in a manner

that would naturally terrorize, such as the Statute of Northampton[12] and the common law "affray" which "encompass[ed] the offense of 'arming' oneself 'to the Terror of the People,'" *Rahimi*, 144 S. Ct. at 1901.

Colonial laws continued regulating unusual and dangerous weapons, such as in the province of East New Jersey (1686),[13] Colonial Massachusetts (1692),[14] and New Hampshire (1701),[15] as did states after the founding such as Virginia (1786)[16] and Massachusetts (1795).[17] More generally, early American justice-of-the-peace manuals empowered justices to confiscate the arms of a person who "arm[ed] himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people."[18]

---

[12] Understood to mean "riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land." 2 Edw. 3, c. 3 (1328) (Eng.); 4 William Blackstone, *Commentaries on the Laws of England* 148-49 (10th ed. 1787); *Bruen*, 597 U.S. at 40-42.

[13] An Act Against Wearing Swords, &c., ch. 9, *in* Aaron Leaming & Jacob Spicer, *Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289-90 (2d ed. 1881).

[14] *See* Act of Nov. 1, 1692, ch. 18, § 6, *in* 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869).

[15] Act of June 14, 1701, ch. 7, *in* 1 *Laws of New Hampshire 679* (Albert Stillman Batchellor ed., 1904).

[16] Act of Nov. 27, 1786, ch. 21, *in A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794).

[17] Act of Jan. 29, 1795, ch. 2, 1795 Mass. Acts 436.

[18] Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer,* 12-13 (1773) (Mass.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22- 24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).

Defendant and Amicus argue that bans on carrying weapons in a terrifying way are not analogous to bans on the possession of classes of arms. Def. Op. Br. at 53; Amicus Br. at 18-19. But "analogical reasoning under the Second Amendment" is not a "regulatory straightjacket," and there is no need to identify a "historical twin." *Bruen*, 597 U.S. at 30. Restrictions on the manner of carrying firearms for unlawful purposes—*i.e.*, to terrorize the people—support prohibitions on the possession of firearms not typically possessed for lawful purposes—*i.e.*, "dangerous and unusual" firearms that would "naturally" terrorize the people, 1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756). *See also Rahimi*, 144 S. Ct. at 1900-01 (finding surety laws and going armed law sufficiently analogous to statute disarming people subject to domestic violence restraining orders). "[W]e . . . examine the historical evidence as a whole, determining whether it establishes a tradition of permissible regulation (such as 'dangerous and unusual weapons' or 'sensitive places'), and whether the historical precedent and the modern regulation are 'relevantly similar.'" *Perez-Garcia*, 96 F.4th at 1186 (citing *Bruen*, 597 U.S. at 27). Defendant's "divide-and-conquer approach to the historical evidence" fails. *Id.* at 1191.

Indeed, through the 1800s, states persisted in restricting the use and possession of the dangerous weapons of the times such as Bowie knives, slingshots and other melee weapons, and trap guns. *See DeWilde v. United States Attorney General, et al*, 2023 WL 7740322, at *22-28, n.11-21 (gov't brief); *see also* Robert J. Spitzer, *Understanding Gun Law History after Bruen: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 58,

88-94 (2023); *Bevis*, 85 F.4th at 1201-02 (citing Bowie knives among other examples); *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 46, 48 (1st Cir. 2024) (same).

Section § 922(o) is "relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *Rahimi*, 144 S. Ct. at 1898.

### c. Machineguns are not in common use, but are dangerous and unusual.

The machinegun ban is based on its inherent dangerousness and limited lawful civilian purpose. Machineguns are a "law violator['s] . . . most dangerous weapon." S. Rep. No. 73-1444, at 1 (1934). "The immense danger posed by machineguns" is clear. *United States v. O'Brien*, 560 U.S. 218, 230 (2010). As automatic weapons, they can "fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds." *Henry*, 688 F.3d at 640. This "heightened capability to cause damage" supports that they are not possessed for lawful use. *United States v. Cox*, 906 F.3d 1170, 1185 (10th Cir. 2018). The Supreme Court recently found that while bump stocks are not machineguns, "Congress can amend the law" to ban them, given they "can have the same lethal effect as a machinegun." *Garland v. Cargill*, 602 U.S. 406, 429 (2024) (J. Alito, concurring); *see id.* at 412 (noting the "tragic" consequence of bump stocks that allowed the Las Vegas music festival shooter to "fire hundreds of rounds in a matter of minutes").

Moreover, however "common use" is quantified, no methodology "allow[s] a conclusion that a machinegun is a usual weapon." *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016) (noting raw numbers, percentages, and number of states that allow or ban a particular weapon as methodologies that courts have employed).

There are hundreds of millions of firearms in the United States. *See, e.g.*, William J. Krouse, Cong. Research Serv., *Gun Control Legislation* 8 (2012). Only 741,146 are registered machineguns. ATF, Firearms Commerce in the United States: Annual Statistical Update 2021, at 15-16.[19] Excluding those possessed by law enforcement, the number of civilian-owned pre-1986 machineguns is no greater than 175,977. *Hollis*, 827 F.3d at 449 (citing number as of 2016); *see also letter to National Firearms Act Trade & Collectors Ass'n* (Feb. 24, 2016), available at https://www.nfatca.org/pubs/ MG_Count_FOIA_2016.pdf (last accessed July 14, 2024) (included in *DeWilde v. United States Attorney General*, No. 23-8054 (10th Cir.) Record on Appeal, at 167). Far less than one percent of firearms in this country, machineguns "are highly unusual in society at large," *Bruen*, 597 U.S. at 47, and are not a typical self-defense weapon.

Amicus suggests that machineguns cannot be unusual because the Supreme Court has already held the Second Amendment extends to stun guns, "of which there were only about 200,000 in circulation." Amicus Br. at 17 (citing *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring)). But that decision did not hold that stun guns were in common use; it remanded the case to the Supreme

---

[19] Available at https://perma.cc/5FBE-2C9C.

Judicial Court of Massachusetts to make that determination in the first instance. *Id.* at 412. And although Justice Alito thought it probative that at least 200,000 stun guns had been sold to private citizens, he determined that stun guns were constitutionally protected only because they were also "accepted as a legitimate means of self-defense across the country" and were lawful to possess in 45 states. *Id.* at 420 (Alito, J., concurring in the judgment). That is not true for machineguns.

Amicus also suggests that machineguns cannot be unusual if "bump stocks" are considered machineguns, given the "about 520,000" bump stocks in circulation as of 2019. But bump stocks are not machineguns, so that point is moot. *Cargill*, 602 U.S. 406.

### d. The machinegun ban meets the "how" and the "why" of the historical analogues.

The machinegun ban falls within this nation's historical tradition because it shares the "how and why" of these analogues: It bans weapons (the how) that have been determined not to be typically possessed by law-abiding citizens for lawful use (the why). *Rahimi*, 144 S. Ct. at 1898.

Congress first regulated machineguns shortly after World War I, when machineguns entered the civilian market and were soon widely used by criminals. *See* John Ellis, *The Social History of the Machine Gun* 149-77 (1986). Many states enacted bans, *see infra* 47 n.20. But these automatic weapons brought a crisis "beyond the power of control of merely local authorities." *National Firearms Act: Hearings on H.R.*

45

*9066 Before the H. Comm. On Ways & Means*, 73d Cong. 4 (1934) (statement of

Attorney General Homer Cummings).

To address "the law violator" and "his most dangerous weapon," S. Rep. No.

73-1444, at 1-2 (1934), the National Firearms Act (NFA) enacted a $200 tax on

machineguns and required that they be registered with the federal government. *See* 26

U.S.C. §§ 5801-02, 5811-12, 5821-22, 5841-42, 5845(a) – (b). In this way, the NFA

made it more difficult for "the criminal class" to obtain the weapons and made it

easier "to convict [criminals] when they have the weapons." *National Firearms Act:*

*Hearings on H.R. 9066* at 6, 12, 22.

By 1986, there was a "need for more effective protection of law enforcement

officers from the proliferation of machine guns." H.R. Rep. No. 99-495, at 7 (1986).

Congress enacted the federal ban on the possession and transfer of machineguns, 18

U.S.C. § 922(o).

"Congress has long restricted access to machineguns, a category of firearms

defined by the ability to shoot, automatically more than one shot by a single function

of the trigger." *Cargill*, 602 U.S. at 410 (internal quotes omitted). It has observed

"there is no reason why anyone except a law officer should have a machine gun." *Id.*

at 431 (J. Sotomayor, J. Kagan, J. Jackson, dissenting) (citing S. Rep. No. 73-1444, at 2

(1934)).

The machinegun ban is "designed to deal with crime guns." 132 Cong. Rec.

9600 (1986) (Sen. Hatch). Machineguns are "used readily and efficiently by criminals

or gangsters," H.R. Rep. No. 83-1337, at A395 (1954); they are "used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime," H.R. Rep. No. 99-495, at 4 (1986); and their "proliferation" undermines "protection of law enforcement officers," *id.* at 7.

Given that, the Supreme Court has described machineguns as "quasi-suspect" weapons, *Staples*, 511 U.S. at 611-12, "likely to be used for criminal purposes," *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality). Machineguns are banned or regulated under federal law for private persons, *see* 26 U.S.C. § 5845(a)-(b), and 35 states and the District of Columbia have banned them for private persons as well.[20]

---

[20] *See* Alaska Stat. § 11.61.200; Ariz. Rev. Stat. Ann. §§ 13-3101, 13-3102; Cal. Penal Code § 32625; Colo. Rev. Stat. § 18-12-102; Del. Code tit. 11, § 1444; D.C. Code § 22-4514; Fla. Stat. § 790.221; Ga. Code Ann. § 16-11-122; Haw. Rev. Stat. § 134-8; 720 Ill. Comp. Stat. 5/24-1; Ind. Code § 35-47-5-8; Iowa Code §§ 724.1, 724.3; Kan. Stat. Ann. § 21-6301; La. Stat. Ann. § 40:1752; Me. Rev. Stat. Ann. tit. 17-A, § 1051; Mass. Gen. Laws ch. 140, §§ 128, 131, 131M; Mich. Comp. Laws § 750.224; Minn. Stat. § 609.67; Mo. Ann. Stat. § 571.020; Neb. Rev. Stat. § 28-1203; Nev. Rev. Stat. § 202.350; N.J. Stat. Ann. §§ 2C:39-5, 2C:58-5; N.Y. Penal Law § 265.02; N.C. Gen. Stat. § 14-409; N.D. Cent. Code § 62.1-05-01; Ohio Rev. Code Ann. §§ 2923.11, 2923.17; Or. Rev. Stat. § 166.272; 18 Pa. Stat. § 908; 11 R.I. Gen. Laws § 11-47-8; S.C. Code Ann. § 16-23-230; S.D. Codified Laws §§ 22-1-2, 22-14-6; Tenn. Code Ann. § 39-17-1302; Tex. Penal Code Ann. § 46.05; Wash. Rev. Code § 9.41.190; W. Va. Code § 61-7-9; Wis. Stat. § 941.26. Some, but not all, of these state laws have exceptions or affirmative defenses for machineguns possessed in compliance with federal law. *See, e.g.*, Ga. Code Ann. § 16-11-122; La. Stat. § 40:1752; Me. Rev. Stat. Ann. tit. 17-A, § 1052; Mo. Ann. Stat. § 571.020(1)(6); Or. Rev. Stat. § 166.272(4).

### e.  Defendant's and Amicus's arguments fail.

Amicus argues that *Bruen* "eschews" a two-step test. Amicus Br. at 11. But defendant correctly recognizes the test as "two-step." Def. Op. Br. at 50-51. The Supreme Court and this Court have confirmed the two steps. *Bruen*, 597 U.S. at 17 (only after determining that "the Second Amendment's plain text covers an individual's conduct" do courts analyze whether "the regulation [of that conduct] is consistent with this Nation's historical tradition of firearm regulation"); *Rahimi*, 144 S. Ct. at 1928 (J. Jackson, concurring); *B & L Prods., Inc.*, 104 F.4th at 119; *Perez-Garcia*, 96 F.4th at 1178; *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023).

Amicus's rejection of the first step misreads *Heller*. *Heller* did not say that "all arms" are "bearable arms." Amicus Br. at 16; Def. Op. Br. at 52. It said "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms" in the limited context of rejecting the argument that it protects only arms that existed in the 18th century. *Heller*, 554 U.S. at 582. "All instruments" was a temporal guide, not a definitional one. The analysis still must determine whether the arm at issue is a bearable arm within the meaning of the Second Amendment.

Regardless, the result is the same. The machinegun ban comports with this nation's longstanding tradition of regulating dangerous and unusual weapons.

Both defendant and Amicus suggest that the government cannot have a "second bite at the apple" in presenting additional historical analogues on appeal. Def. Op. Br. at 39-40; Amicus Br. at 18. But this is de novo review. And on appeal, the

parties can make any argument in support of a properly raised federal claim; they are not limited to the precise arguments made below. *Yee v. City of Escondido*, Cal., 503 U.S. 519, 534 (1992). "[I]t is claims that are deemed waived or forfeited, not arguments." *United States v. Walton*, 881 F.3d 768, 771 (9th Cir. 2018) (reviewing de novo a sentencing claim for which the defendant presented a different argument on appeal from the one made in the district court) (citation omitted); *United States v. Studhorse*, 883 F.3d 1198, 1203 n.3 (9th Cir. 2018) (same), and *United States v. Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004) (reviewing de novo defendant's argument not raised in the district court because "it constitutes an alternative argument to support what has been his consistent claim from the beginning").

The United States argued below that the statute is constitutional because it covers conduct outside the Second Amendment's textual scope and it comports with historical firearms regulation. 5-ER-932-39. It argues the same on appeal, with added citations to support the preserved claim. That is just a deeper bite, not a second one.

As the analogues described herein show, the machinegun ban comports with Second Amendment principles that have permitted the regulation of dangerous and unusual weapons since the founding.

## CONCLUSION

This Court should affirm the denial of the motion for judgment of acquittal, the district court's formulation of jury instructions, the denial of the motion to

dismiss, and the court's sentencing calculation, and affirm the conviction and sentence.

DATED this 7th day of August 2024.

Respectfully submitted,

NATALIE K. WIGHT
United States Attorney
District of Oregon

*/s/ Sarah Barr*
SARAH BARR
Assistant United States Attorney

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** 23-4132

The undersigned attorney or self-represented party states the following:

(•) I am unaware of any related cases currently pending in this court.

( ) I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

( ) I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/ Sarah Barr   **Date** Aug. 7, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17**   51   *New 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-4132

I am the attorney or self-represented party.

**This brief contains** 13,744 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [           ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Sarah Barr **Date** Aug. 7, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*

52