No. 23-4132

_____

**UNITED STATES COURT OF APPEALS**

**FOR THE**

**NINTH CIRCUIT**

_____


**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

    v.

**DANIEL KITTSON,**

Defendant-Appellant.

_____

Appeal from the United States District Court
for the District of Oregon
No. 3:21-cr-00075-IM
The Honorable Karin J. Immergut

_____

**APPELLANT'S REPLY BRIEF**

_____


Michael Charles Benson
C. Renée Manes
Assistant Federal Public Defenders
101 SW Main Street, Suite 1700
Portland, Oregon 97204
(503) 326-2123

Attorneys for Defendant-Appellant

# TABLE OF CONTENTS

**Page**

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. The Clear Language Of 18 U.S.C. § 922(o)(2)(A) Precludes
   Criminal Liability For Transferring A Machinegun To A
   Government Agent, Regardless Of A Defendant's Knowledge
   Or Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   1. The doctrine of scienter narrows criminal liability where
      required to avoid punishing innocent conduct; it cannot
      be used to broaden a statute to impose liability for conduct
      that does not violate the plain text of the statute . . . . . . . . . . . . . .  2

   2. The government identifies no case or doctrine that would
      permit the Court to impose liability for conduct excluded by
      the plain language of the statute . . . . . . . . . . . . . . . . . . . . . . . . . . 7

   3. The plain text of 18 U.S.C. § 922(o)(2)(A) exempts transfer
      to a government agent and cannot be re-written to reflect
      the government's policy concerns . . . . . . . . . . . . . . . . . . . . . . . . .  10

B. Finding That Machineguns Fit Within A Tradition Of Banning
   "Dangerous And Unusual" Weapons Requires This Court To
   Engage In A Historical Analysis, Which It Has Not Yet Done;
   Doing So Would Find No Colonial Or Founding Era Tradition
   Of Banning Certain Types Of Arms . . . . . . . . . . . . . . . . . . . . . . . . . . 13

   1. This Court's decisions have not yet engaged in the
      mandatory historical analysis required by recent
      Supreme Court precedent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Table of Contents** - continued

**Page**

2. The historical tradition referenced in *Heller* did not involve banning particular kinds of weapons, and the government does not explain how going armed laws support a total ban on machineguns ........................................ 16

3. Bans on Bowie knives were limited, and there is no principle connecting them to a total ban on machineguns ............. 18

4. Transfer of firearms is protected under the Second Amendment and no historical tradition connects Mr. Kittson's 1987 felony conviction and a ban on transfer of firearms ................ 22

C. The Government's Authorities Confirm That The Trial Court Improperly Removed A Contested Issue Of Fact From The Jury With An Instruction That Excluded Any Consideration Of An Operable Magazine From The Definition Of A Machine Gun As A Matter Of Law ........................................ 23

D. The Government Fails To Point To Any Evidence Regarding What Occurred In Marion County Circuit Court, And The Only Such Evidence Was The 'Testimony' Of The Court Regarding Her Prior Personal Practice As A State Court Judge ........... 27

III. Conclusion .............................................. 28

Brief Format Certification Pursuant to Rule 32(a)(7)(C) .............. 30

# TABLE OF AUTHORITIES

**<u>Case Law Authority</u>**                                              **<u>Page(s)</u>**

*62 Cases, More or Less, Each Containing Six Jars of
Jam v. United States,*
340 U.S. 593 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Bittner v. United States,*
598 U.S. 85 (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Bostock v. Clayton County,*
590 U.S. 644 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Commissioner v. Acker,*
361 U.S 87 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Crooks v. Harrelson,*
282 U.S. 55 (1930) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Day v. State,*
37 Tenn. 496 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*District of Columbia v. Heller,*
554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 16

*Dowling v. United States,*
473 U.S. 207 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Dubin v. United States,*
599 U.S. 110 (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Elonis v. United States,*
575 U.S. 723 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Guido v. Mount Lemmon Fire District,*
859 F.3d 1168 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**Table of Authorities** – continued

**Case Law Authority**                                                    **Page(s)**

*Henderson v. United States,*
    575 U.S. 622 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Hokulani Square, Inc.,*
    776 F.3d 1083 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*McBoyle v. United States,*
    283 U.S. 25, 27 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17, 19, 20

*Nunn v. State,*
    1 Ga. 243 (1846) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Perri v. Dep't of Treasury; Bureau of Alcohol, Tobacco & Firearms,*
    637 F.3d 1332 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Rehaif v. United States,*
    588 U.S. 225 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Rouse v. United States,*
    391 A.2d 790 (D.C. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Ruan v. United States,*
    597 U.S. 450 (2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5

*Staples v. United States,*
    511 U.S. 600 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 26

*Teixeira v. County of Alameda,*
    873 F.3d 670 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Aguilar,*
    515 U.S. 593 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Table of Authorities** – continued

<u>**Case Law Authority**</u>                                                    <u>**Page(s)**</u>

*United States v. Causey*,
    835 F.2d 1289 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Duroseau*,
    26 F.4th 674 (4th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Flores-Payon*,
    942 F.2d 556 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Gillis*,
    474 F.2d 4 (9th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Gooch*,
    6 F.3d 673 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 22

*United States v. Henry*,
    688 F.3d 637 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Hopkins*,
    703 F.2d 1102 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Hunter*,
    843 F. Supp. 235 (E.D. Mich. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Joe*,
    452 F.2d 653 (10th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Johnson*,
    979 F.3d 632 (9th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Kenney*,
    91 F.3d 884 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Lucero*,
    989 F.3d 1088 (9th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Table of Authorities** – continued

<u>**Case Law Authority**</u>                                                          <u>**Page(s)**</u>

*United States v. Martinez,*
    967 F.2d 1343 (9th Cir. 1992)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24, 25

*United States v. McCauley,*
    601 F.2d 336 (8th Cir. 1979) (*per curium*) . . . . . . . . . . . . . . . . . . . .  24, 25

*United States v. Melancon,*
    462 F.2d 82 (5th Cir. 1972)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24, 25

*United States v. Morgan,*
    2024 WL 3936767 (D. Kan. Aug. 26, 2024) . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Nader,*
    542 F.3d 713 (9th Cir. 2008)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*United States v. Neuner,*
    535 F. App'x 373 (5th Cir. 2013)  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7. 9

*United States v. Paulson,*
    68 F.4th 528 (9th Cir. 2023)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

*United States v. Rahimi,*
    602 U.S. _, 144 S. Ct. 1889 (2024)  . . . . . . . . . . . . . . . . . . . . . . . . . .  15, 17

*United States v. Ubaldo,*
    859 F.3d 690 (9th Cir. 2017)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 9

*United States v. Williams,*
    113 F.4th 637 (6th Cir. 2024)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*United States v. Woodfolk,*
    656 A.2d 1145 (D.C. 1995)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24, 25

*United States v. X-Citement Video, Inc.,*
    513 U.S. 64 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

**Table of Authorities** – continued

## <u>Case Law Authority</u>                                    <u>Page(s)</u>

*Watson v. Stone*,
   148 Fla. 516, 4 So.2d 700 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21


## <u>Statutory or Rule Authority</u>                           <u>Page(s)</u>

UNITED STATES CONSTITUTION

   Second Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 22

UNITED STATES CODE

   Title 18
        § 2
           (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
           (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

        § 922
           (g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
           (g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 22
           (o) . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9, 11, 12, 18, 19
           (o)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
           (o)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
           (o)(2)(A) . . . . . . . . . . . . . . . . . . . . 1, 2, 5, 6, 7, 8, 9, 10, 12

   Title 26
        § 5852(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

UNITED STATES SENTENCING GUIDELINES

   § 4A1.2(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**Table of Authorities** – continued

<u>**Other Legal Authorities**</u>                                <u>**Page(s)**</u>

MODEL PENAL CODE (Am. Law Inst. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

Brief of Petitioner-Appellees, *DeWilde v. United States Attorney
    General, et al*, 2023 WL 7740322 (2023) . . . . . . . . . . . . . . . . . . . . . . . . . 19

Foner, Eric, RECONSTRUCTION: AMERICA'S UNFINISHED REVOLUTION
    422-25 (1st Perennial Library Ed. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 21

Kopel, David B. and Joseph G.S. Greenlee, *The History of Bans
    on Types of Arms Before 1900*, 50 J. LEGIS. 223 (2024) . . . . . . 18, 21, 22

Scalia, Antonin & Bryan A. Garner, READING THE LAW: THE
    INTERPRETATION OF LEGAL TEXTS 391 (West 2012) . . . . . . . . . . . . . . .  10

Spitzer, Robert J. *Understanding Gun Law History after Bruen:
    Moving Forward by Looking Back*, 51 FORDHAM URB. L.J. 58
    (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Wilson, James & Bird Wilson, WORKS OF THE HONOURABLE JAMES
    WILSON, VOL. 3 (1804) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

The Firearm Owners' Protection Act of 1986,
    Pub. L. 99-308, § 1(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10, 26

# I. INTRODUCTION

Defendant Daniel Matthew Kittson submits the following reply to address the issues raised in the government's Answering Brief ("AB"). Docket Entry 26.1.

This appeal presents a unique set of circumstances, not previously raised before any other court. The government's arguments consistently ignore the unique nature of the case, and distort the applicability of other decisions. Those arguments should therefore be rejected, and Mr. Kittson is entitled to relief from his conviction or a remand for a new trial.

# II. ARGUMENT

## A. The Clear Language Of 18 U.S.C. § 922(o)(2)(A) Precludes Criminal Liability For Transferring A Machinegun To A Government Agent, Regardless Of A Defendant's Knowledge Or Intent.

Mr. Kittson was charged under 18 U.S.C. § 922(o), subsection (1) of which criminalizes the possession or transfer of a machinegun with exceptions set out in subsection(2). The exceptions include "any transfer to or by, or possession by or under the authority of, the United States[.]" 18 U.S.C. § 922(o)(2)(A). This statutory language has no requirement that the transferor know the identity of the transferee. The government urges this Court to modify the statutory language to add such a requirement, relying on: the

doctrine of scienter; case law interpreting distinguishable statutes; and, the government's view of congressional intent. None of those arguments support broadening criminal liability beyond the text of the statute Congress enacted.

> 1. *The doctrine of scienter narrows criminal liability where required to avoid punishing innocent conduct; it cannot be used to broaden a statute to impose liability for conduct that does not violate the plain text of the statute.*

The government acknowledges that § 922(o)(2)(A) is silent concerning the defendant's mental state. AB-14. However, the government argues that reading a knowledge requirement into the silent statute is required to prevent individuals with guilty intent from going free. The doctrine of scienter cannot be used to broaden criminal liability in that way.

The government's authorities require proof of scienter to narrow criminal statutes when necessary to avoid penalizing innocent conduct. *See, e.g., United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994) ("[T]he presumption of a scienter requirement should apply to each of the statutory elements that criminalize otherwise innocent conduct."); *Staples v. United States*, 511 U.S. 600, 614-15 (1994) (expressing concern that failing to include scienter would punish the innocent). In other words, those cases impose an additional burden the government must prove; they do not add extra-statutory requirements to narrow a defense.

Longstanding concerns about punishing those who are not conscious of their guilt do not apply when narrowing a defense. Instead, doctrines like the rule of lenity cut the opposite way; it would undermine Mr. Kittson's due process rights to exclude him from the protection of a statutory exclusion if the text of the exclusion plainly applies to his case. *Bittner v. United States*, 598 U.S. 85, 102 (2023) ("[S]tatutes imposing penalties are to be 'construed strictly' against the government and in favor of individuals.") (quoting *Commissioner v. Acker*, 361 U.S 87, 91 (1959)); *see also Dubin v. United States*, 599 U.S. 110, 130 (2023) ("Time and again, this Court has prudently avoided reading incongruous breadth into opaque language in criminal statutes."); *United States v. Aguilar*, 515 U.S. 593, 600 (1995) ("We have traditionally exercised restraint in assessing the reach of a federal criminal statute [. . . .]" (citing *Dowling v. United States*, 473 U.S. 207 (1985); *McBoyle v. United States*, 283 U.S. 25, 27 (1931)).

The government relies primarily on *Ruan v. United States*, 597 U.S. 450 (2022), to support its conclusion that a culpable mental state should be grafted onto an affirmative defense "to effectuate the separation of innocent from culpable conduct." AB-13. While *Ruan* is instructive, it contradicts the government's position; the holding uses scienter to narrow criminal liability

-3-

by requiring the government to prove scienter in addition to the actus reus and result elements of the statute.

In *Ruan* the Court considered a statute that criminalized dispensing controlled substances "except as authorized." 597 U.S. at 457. The parties conceded that a prescription is lawful if it is "authorized" as defined in federal regulations. *Id.* at 455. The issue was whether the government needed merely to "to prove that a prescription was *in fact* not authorized" or also had to prove "that the doctor *knew* or *intended* that the prescription was unauthorized." *Id.* (emphasis in original). In its holding, the Supreme Court explained the statute in precisely this way, holding that "the government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner." *Id.* at 468.[1]

The majority opinion cited the body of precedent underlying the ordinary practice of including scienter in criminal statutes. *Ruan*, 597 at 457-61. The Court explained that this requirement is intended to protect the rights of the defendant, not the government, by protecting those who break the law without

_____

[1] The majority opinion in *Ruan* never used the phrase "affirmative defense" to describe the "except as authorized" provision. However, *Ruan* did require that the defendant bear the initial burden of production. *Id.* at 468. Here the issue is not the burden of production, but the correct construction of the statute, making the question of whether the exception is an affirmative defense irrelevant.

-4-

a culpable mens rea. *Id.* at 458. Thus, for example, the felon who did not know her crime was punishable by more than a year in prison does not violate 18 U.S.C. § 922(g)(1). *United States v. Johnson*, 979 F.3d 632, 635 (9th Cir. 2020). So the government must show both that the defendant had been convicted of a crime punishable by more than a year and knew that fact. *See also Rehaif v. United States*, 588 U.S. 225, 227-28 (2019) (determining the applicability of a scienter requirement because the defendant argued that he did not know his presence in the United States was unlawful).

Applying *Ruan*'s reasoning to the exception in § 922(o)(2)(A) would only assist a defendant who transferred a machinegun to a private party but contended they believed the private party was a government agent; just as in *Ruan* the government would have had to prove *both* that the transfer was not authorized *and* that the defendant knew it was not authorized. The second factor of *Ruan* would never be an issue here, however, because the PPSh-41 was in fact transferred to the government.

The government's contention that imposing a scienter requirement is necessary to punish culpable defendants who intend to transfer a machinegun to a private party—even if that result ends up being an impossibility—conflates the scienter element of a crime with attempt liability. When a statute includes a scienter requirement, the government must prove both the act and result

-5-

element of the crime and the appropriate mens rea. *See, e.g.,* MODEL PENAL CODE § 2.02(1) (Am. Law Inst. 1985); *Elonis v. United States,* 575 U.S. 723, 726 (2015) ("Petitioner was convicted of violating this provision under instructions that required the jury to find that he communicated what a reasonable person would regard as a threat. The question is whether the statute *also* requires that the defendant be aware of the threatening nature of the communication [. . .]") (emphasis added). When the government proves only that the defendant acted with the appropriate mens rea but did not in fact achieve the prohibited result (in other words the defendant intended to violate the law but failed), that is an attempt. MODEL PENAL CODE § 5.01(1) (Am. Law. Inst. 1985).[2]

The uncontroverted evidence was that the PPSh-41 was transferred to the government and thus the transfer was excepted from the transfer prohibition by 18 U.S.C. § 922(o)(2)(A). Mr. Kittson's intent is irrelevant, as Congress did not criminalize any attempt to violate this statute.

---

[2] Model Penal Code § 5.01(1)(a) nearly matches the government's theory of liability, applying whenever a person "engages in conduct that would constitute the crime if the attendant circumstances were as he believes them to be."

2.  *The government identifies no case or doctrine that would permit the Court to impose liability for conduct excluded by the plain language of the statute.*

The government argues that that this Court and others have read a knowledge requirement and imposed liability for sting operations with other firearms provisions. AB-15-17. The government neglects to acknowledge and explain the different statutory language at issue in those decisions, which make them inapplicable here.

The government cites a Fifth Circuit decision and contends that court deemed Mr. Kittson's position "utterly meritless" but that decision actually involved the defendant's possession *and* transfer of a machinegun. *United States v. Neuner*, 535 F. App'x 373, 375 n.1 (5th Cir. 2013) (indicating that § 922(o)(2)(A) does not protect the defendant "from criminal liability for possessing machine guns" during sting operations). Possession must be "by or under the authority of" the government to fall within the § 922(o)(2)(A) exception, whereas transfer must simply be "to" the government; *Neuner* did not address whether knowledge is required for the later.

In *United States v. Gillis,* 474 F.2d 4, 5 (9th Cir. 1973), the court addressed a different statute, and relied on explicit language contained within the statutory exemption limiting its application to transfers "pursuant to an

application in such form and manner as the Secretary may by regulations prescribe." 26 U.S.C. § 5852(f). No such language exists in § 922(o)(2)(A).

As explained in Mr. Kittson's opening brief, *Perri v. Dep't of Treasury; Bureau of Alcohol, Tobacco & Firearms*, 637 F.3d 1332 (9th Cir. 1981), dealt with a statutory exemption that did not apply to "sales." AOB-31-33.

In the government's last authority, *United States v. Ubaldo,* 859 F.3d 690 (9th Cir. 2017), the defendants did not argue any statutory exclusion covered their conduct. *Id.* at 701-02. Instead, the defendants argued that they were not liable for aiding and abetting the illegal importation of firearms under 18 U.S.C. § 2(b), because it was FBI agents rather than the defendants who imported the firearms. *Id.* at 701. Here, the jury was specifically instructed on aiding and abetting under 18 U.S.C. § 2(a). 2-ER-71.[3] Under § 2(a) the government must show "someone committed the substantive crime" unlike

---

[3] The government never relied on § 2(b) at trial, waiving that theory of liability. *United States v. Gooch*, 6 F.3d 673, 678 (9th Cir. 1993) (citing *United States v. Flores-Payon,* 942 F.2d 556, 558 (9th Cir. 1991)). If the government was allowed to pursue the theory now, this matter must be remanded for a new trial. However, there is no purpose for any such remand. Under § 2(b) the jury would have had to find that Mr. Kittson caused Bohannan to perform an act which "if directly performed by" Mr. Kittson would be a crime. The jury has already rejected that Mr. Kittson caused the conduct of Bohanan in possessing the machinegun, when it acquitted Mr. Kittson of possessing the weapon under a constructive possession theory. 2-ER-230-231 (government argument); 2-ER-70 (instruction). And the transfer to a government agent was lawful under the statute regardless of whether it was performed by Bohanan or Mr. Kittson.

-8-

§ 2(b), which allows for prosecution "even though the person who completes the wrongful act violates no criminal statute because of lack of criminal intent or capacity." *United States v. Causey*, 835 F.2d 1289, 1291-92 (9th Cir. 1987). *Ubaldo* specifically relied on the wording of § 2(b) and not any limitation on a statutory exclusion in upholding the conviction. 859 F.3d at 701-02. It is therefore inapplicable.

The government describes Mr. Kittson's position as pushing an "over-broad" reading of § 922(o)(2)(A) that "[n]o other court has adopted." AB -16. But one might just as easily argue that no cases have adopted the government's approach. That is because the cases interpreting the "transfer" exclusion have all involved defendants who both possessed and transferred the machinegun, and possession specifically requires the individual possession to be "under the authority of" the government. *See, e.g., Neuner,* 535 F. App'x at 375 n.1. The application of the exclusion to a case where the defendant only aided and abetted the transfer of a firearm to a government agent but did not possess it is a novel issue of first impression for this Court.[4]

---

[4] In every other decision involving § 922(o) of which counsel are aware, the accused both possessed and transferred the weapon; Mr. Kittson's situation is likely to arise in only a *de minimus* number of cases.

-9-

### 3. The plain text of 18 U.S.C. § 922(o)(2)(A) exempts transfer to a government agent and cannot be re-written to reflect the government's policy concerns.

Ultimately the statutory text controls. *United States v. Nader,* 542 F.3d 713, 717 (9th Cir. 2008). Yet the government does not explain why the phrase "under the authority of" the government should mean the same thing as a "transfer to" the government. Instead of the text, the government relies on its view of Congress's general purpose in enacting the Firearm Owner's Protection Act. But an appeal to congressional intent "is a non-sequitur; it is not a factor that should affect the determination of whether a statute's plain meaning is ambiguous." *Guido v. Mount Lemmon Fire District*, 859 F.3d 1168, 1173 (9th Cir. 2017) (citing Antonin Scalia & Bryan A. Garner, READING THE LAW: THE INTERPRETATION OF LEGAL TEXTS 391 (West 2012)).

The government's recitation of the statutory purpose supports Mr. Kittson's position as much the government's. The government relies on Senator Hatch's statement that the Act's goal was "to redirect law enforcement toward the kind of transaction most likely to be a factor in violent firearms crime." Pub. L. 99-308, § 1(b)(2), 100 Stat. 449. That is consistent with Mr. Kittson's view that Congress did not view machinegun ownership as inherently immoral, but instead aimed to remove machineguns from commerce because of their danger. *See United States v. Kenney,* 91 F.3d 884, 890 (7th Cir. 1996)

(referring to "§ 922(o)'s purpose of freezing the number of legally possessed machine guns at 1986 levels[.]"); *United States v. Hunter*, 843 F. Supp. 235, 249 (E.D. Mich. 1994) ("If Congress had intended to simply ban possession outright, it would not have 'grandfathered' the transfer and possession of machineguns lawfully possessed on the statute's effective date."). Any transfer to the government, whether intended or not, meets the statute's goals by removing the firearm from circulation and making it unlikely to be "a factor in violent firearms crime." This explains why the transfer exclusion is broader than the possession exclusion; machineguns in private hands may still be dangerous, but those transferred to the government are not regardless of the state of mind of the transferor.

The government also invokes the doctrine of absurdity. AB-15. But absurdity "isn't a license for [the Court] to disregard the statutory text where it conflicts with [the Court's] policy preferences . . . ." *In re Hokulani Square, Inc.*, 776 F.3d 1083, 1088 (9th Cir. 2015). In order for the canon of absurd results to apply, the party invoking it must show that the results are irrational rather than merely unwise. *United States v. Paulson*, 68 F.4th 528, 544 (9th Cir. 2023). "To justify a departure from the letter of the law upon that ground, the absurdity must be so gross as to shock the general moral or common

sense." *United States v. Lucero*, 989 F.3d 1088, 1098 (9th Cir. 2021) (quoting *Crooks v. Harrelson*, 282 U.S. 55, 60 (1930)).

The government does not even attempt to carry that heavy burden. If this Court were to accept the argument that § 922(o)(2)(A) is absurd merely because it does not punish all individuals who have a culpable mental state, it would effectively suggest that every federal criminal statute that does not include an explicit attempt provision is absurd. An individual who mistakenly believes they possess a machinegun is just as willing to violate the law as an individual who actually knowingly possesses one. Yet attempted possession of a machinegun is not a crime because attempt is not included in § 922(o). *United States v. Hopkins*, 703 F.2d 1102, 1104 (9th Cir. 1983) ("A defendant therefore can only be found guilty of an attempt to commit a federal offense if the statute defining the offense also expressly proscribed an attempt.") (*citing United States v. Joe,* 452 F.2d 653, 654 (10th Cir. 1971)); *United States v. Duroseau*, 26 F.4th 674, 677-78 (4th Cir. 2022) (overturning a conviction for illegal firearm transfer because the transfer was not completed and the statute did not include attempt liability). The Court's task "is to construe what Congress has written. After all, Congress expresses its purpose by words. It is for [the Court] to ascertain—neither to add nor to subtract, neither to delete nor to distort." *62 Cases, More or Less, Each Containing Six Jars of Jam v.*

-12-

*United States*, 340 U.S. 593, 596 (1951). Here, the Court cannot rewrite the plain text of the statute to punish those not within its reach.

The government's argument boils down to its view that Mr. Kittson ought to be accountable for his culpable mental state, and thus exempting him by applying the plain text of the provision would "eliminate[] the fulcrum of culpability." AB-18. But the issue is not whether the government deems Mr. Kittson morally culpable; it is whether Mr. Kittson's conduct falls within the plain meaning of the statute under which he was prosecuted and the protection of the letter of the law to which he is entitled. *Bostock v. Clayton County,* 590 U.S. 644, 653 (2020) ("Only the written word is the law, and all persons are entitled to its benefit."). Because the plain text of the statute excludes Mr. Kittson from liability, the court should vacate his conviction and direct a judgment of acquittal.

**B.    Finding That Machineguns Fit Within A Tradition Of Banning "Dangerous And Unusual" Weapons Requires This Court To Engage In A Historical Analysis, Which It Has Not Yet Done; Doing So Would Find No Colonial Or Founding Era Tradition Of Banning Certain Types Of Arms.**

The government argues primarily that machineguns can be banned because they are "dangerous and unusual" and thus simply not covered by the Second Amendment. But the government does not argue that the plain text of the Second Amendment excludes machineguns. Thus, any limitation on

-13-

"dangerous and unusual" weapons must be found in the Nation's historical tradition of firearms regulation. On this record, the government has not met its burden to establish a historic tradition of banning machinegun transfers in a person's home.

### 1. This Court's decisions have not yet engaged in the mandatory historical analysis required by recent Supreme Court precedent.

The Supreme Court first referenced the possibility that "dangerous and unusual" weapons might be subject to regulation in dicta, citing a specific historical tradition involving so-called "going armed" restrictions. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008). *Heller* specifically indicates that the Court expects that a limitation on certain firearms "is fairly supported by the historical tradition" restricting dangerous and unusual weapons and cites examples of the historical tradition on which the Court relies. *Id.* Those citations reference a common law tradition of various offenses with language similar to "where a man arms himself with dangerous and unusual weapons, in such a manner, as will naturally diffuse terrour among the people." James Wilson and Bird Wilson, 3 Works of the Honourable James Wilson 79 (1804). The first citation in *Heller* is to the Blackstone passage discussed in Mr. Kittson's opening brief. AOB-38-39. *Heller* did not purport to engage in a thorough historical analysis of these restrictions, explicitly leaving that issue

for future decisions. 554 U.S. at 635 ("And there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us.").

Following *Heller*, this Court took up the issue of machinegun bans in *United States v. Henry*, 688 F.3d 637 (9th Cir. 2012). While concluding that a machinegun ban is constitutional, the decision failed to cite any historical tradition of firearm regulation in support. *Id.* at 640

Subsequent Supreme Court decisions make it clear that so long as the plain text of the Second Amendment covers the conduct, a historical analysis is not optional, but mandatory. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 597 U.S. 1, 17 (2022) ("the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."); *United States v. Rahimi*, 602 U.S.__, 144 S. Ct. 1889, 1891 (2024) ("As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin the Nation's regulatory tradition.") (citing *Bruen*, 597 U.S. at 26-31). Because *Henry* did not engage in any historical analysis, its reasoning is flatly inconsistent with recent Supreme Court precedent.

2. *The historical tradition referenced in Heller did not involve banning particular kinds of weapons, and the government does not explain how going armed laws support a total ban on machineguns.*

*Heller* did not discuss the historical tradition in depth, and the Court took up those issues later in *Bruen. See, e.g., Bruen*, 597 U.S. at 33-55. What the Court held was that these historical laws did not ban owning certain weapons; the laws banned certain conduct. As the Court summarized:

> As during the colonial and founding periods, the common-law offenses of "affray" or going armed "to the terror of the people" continued to impose some limits on firearm carry in the antebellum period. But as with the earlier periods, there is no evidence indicating that these common-law limitations impaired the right of the general population to peaceable public carry.

*Id.* at 50-51.

The Court explained that, on closer inspection, the historical laws limiting firearms were more appropriately classified as "going armed" laws, prohibiting individuals who could be shown to have ill intent from "going armed" in public, while generally protecting the rights of "those who sought to carry firearms publicly and peaceably [. . .]" to do so, without any restriction on the type of arms. *Bruen*, 597 U.S. at 50-51.

When the government seeks to regulate the constitutional right to bear arms, the government bears the burden of identifying the historical tradition it relies on and explaining how the "principles" underlying that tradition

-16-

support the regulation. *Rahimi*, 144 S. Ct. at 1898 ("As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition.") (citing *Bruen*, 597 U.S. at 26-31). The government revisits the tradition of "going armed" laws in its briefing and asserts that restricting carrying weapons in a manner that will "terrorize the people" involves the same principle as outright banning "firearms not typically possessed for lawful purposes." AB-56. In the government's view, regardless of how those weapons are employed, the firearms themselves are inherently terrifying. AB-56. That argument *might* apply to some individual selling a machinegun in a shopping mall, but that is not what occurred. Instead, a firearm was sold inside a home, and there is no reason such a sale would "terrify" people.

18 U.S.C. § 922(o) bans virtually all transfers, including transfers within the home. There is no requirement that the individual engage in any reckless or dangerous conduct. What is more, as discussed at trial, a fully automatic rifle looks precisely the same as a semiautomatic rifle. See 3-ER-339-42 (discussing the difficulty in determining whether or not an AR-15 is fully automatic). A full automatic AR-15 is no more terrifying than a semiautomatic AR-15 given that they look identical.

The government's assertion that machineguns are not "typically possessed for lawful purposes" is also flatly wrong. There are over 740,000 legally registered machineguns in the United States. *United States v. Morgan*, 2024 WL 3936767 (D. Kan. Aug. 26, 2024) (citing Alcohol Tobacco Firearms and Explosives, Firearms Commerce in the United States – Annual Statistical Update 2021.) There is no evidence that these legally registered machineguns are possessed for unlawful purposes.

3. *Bans on Bowie knives were limited, and there is no principle connecting them to a total ban on machineguns.*

The government contends that laws regarding certain knives and blunt implements support a total ban on machineguns. America did not have a historical tradition of outright bans on arms at the time of the founding. "During the colonial period and the Founding era, there were no bans in the English colonies or the new nation on types of arms." David B. Kopel and Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 385 (2024). In the Early Republic private citizens were able to import significant firepower including muskets and even artillery. *Id.* at 260. Later in the nineteenth century, a few outlying jurisdictions outright banned the sale of Bowie knives, but most jurisdictions with restrictions banned things like concealed carry or sales to minors and did not have outright bans

-18-

on possession. *Id.* at 227. The same jurisdictions that banned Bowie knives outright restricted the carrying of handguns, a minority tradition that *Bruen* rejected. *Id.* at 386. Further, most outright bans on the sale or possession of certain kinds of arms are from after 1879, and thus not persuasive evidence of founding-era principles. *Id.* at 369-70. Before 1900 only three states banned the sale and possession of Bowie knives, and one such ban was held to be unconstitutional because it reached open carry, not just the more dangerous conduct of carrying them in secret. *Id.* at 370; *Nunn v. State*, 1 Ga. 243, 251 (1846) ("We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void[.]").[5]

The government does not explain what principles underlying these limited bans make them similar to the machinegun transfer ban in 18 U.S.C. § 922(o). Reviewing the statutes cited by the government, the earliest statute is from 1837, and many are from the 20th century. Brief of Petitioner-Appellees,

---

[5] The defendant in *Nunn* possessed a pistol not a Bowie knife, but nothing in the reasoning of *Nunn* is specific to pistols. 1 Ga. at 249.

*DeWilde v. United States Attorney General, et al*, 2023 WL 7740322 at 22-25 (government brief). None dates from the founding as required in *Bruen*, 597 U.S. at 34 (indicating that sources from the founding are more persuasive because "when it comes to interpreting the Constitution, not all history is created equal."). In reality, there is no connection between the bans the government cites and bans on "unusual" weapons. Rather, Bowie knives were regulated because they were all too common. Robert J. Spitzer, *Understanding Gun Law History after Bruen: Moving Forward by Looking Back*, 51 FORDHAM URB. L.J. 58, 90 (2023) (discussing the Bowie knives' "notorious reputation" which "fanned its sale and acquisition."). Indeed, many of the states that banned Bowie knives enacted similar bans on handguns. *See id.* at 105-15 (tabulating pistol restrictions); *see also Bruen*, 597 U.S. at 70 (holding that a ban on carrying a handgun is unconstitutional).

Most troubling, when considered in historical context the principle underlying the limited restrictions on types of arms reveals a familiar pattern of denying constitutional rights to disfavored groups. This tradition is well documented by, for example, laws that explicitly attempted to disarm Black Americans. *United States v. Williams*, 113 F.4th 637, 656-57 (6th Cir. 2024) (discussing the applicability of the "sordid history of race-based" firearms discrimination to modern regulation). The three states that restricted the sale

or possession of Bowie knives were all slave states. It is not a historical accident that many of the laws cited by the government are from former confederate states following the Civil War, states which enacted a wide range of restriction intended to limit the civil rights of former slaves. Eric Foner, RECONSTRUCTION: AMERICA'S UNFINISHED REVOLUTION 422-25 (1st Perennial Library Ed. 1989); Kopel & Greenlee, *supra*, *The History of Bans on Types of Arms Before 1900*, 50 *J. Legis.* at 316 ("After slavery was outlawed by the Thirteenth Amendment in December of 1865, the most oppressive Bowie-knife and gun controls were enacted in areas where slavery had been abolished [. . .]"). There is more than sufficient reason to be skeptical about the enforcement of such laws even where ostensibly race-neutral. As one Florida Supreme Court Justice admitted about the state's broad licensing regime "[t]he statute was never intended to be applied to the white population and in practice never has been so applied." *Watson v. Stone*, 148 Fla. 516, 524 (1941) (Buford, J. *concurring*). The Tennessee Supreme Court admitted that its law against using a Bowie knife was "generally disregarded in our cities and towns." *Day v. State*, 37 Tenn. 496, 499 (1857). The desire to restrict access to weapons to those deemed undesirable would explain why the most commonly banned arm was not a state of the art rifle or pistol, but the slungshot, a generally non-lethal improvised blunt force weapon marked more

by its affordability than lethality. Kopel & Greenlee, *supra*, 50 J. LEGIS. at 344-51.

### 4. *Transfer of firearms is protected under the Second Amendment and no historical tradition connects Mr. Kittson's 1987 felony conviction and a ban on transfer of firearms.*

For the first time on appeal the government argues a new theory of culpability: that Mr. Kittson's 1987 felony conviction disqualifies him even from aiding in a transfer of a firearm he never possessed, regardless of whether the transfer itself was lawful. As the government never presented this as a theory of culpability at trial, it has waived this argument. *Gooch, supra,* 6 F.3d at 678.

Next, the only authority the government cites in support is 18 U.S.C. § 922(g)(1), but Mr. Kittson was acquitted of that conduct.

Then, such a theory would still require documentation of a historical tradition supporting that regulation, as even the transfer of firearms is constitutionally protected in order to protect the rights of others to own and possess firearms. *Teixeira v. County of Alameda*, 873 F.3d 670, 689-90 (9th Cir. 2017). No such historical tradition has been cited by the government.

Finally, this contention has already been rejected by the Supreme Court, in *Henderson v. United States,* 575 U.S. 622 (2015). The Court allowed a felon to authorize a transfer of a weapon he formerly legally owned to another,

finding that "§ 922(g) does not bar" such a transfer "unless it would allow the felon to later control the guns [. . .]". 575 U.S. at 628.

Mr. Kittson's transfer of the PPSh-41 was presumptively constitutionally protected. There is no founding era precedent that supports a tradition of banning certain kinds of weapons. The limited history of weapons bans adopted later, in the Nineteenth Century, fails to document any historical principle supporting banning machineguns outright. Because the government has failed to carry its burden, and Mr. Kittson's conduct was constitutionally protected, his conviction should be reversed.

## C. The Government's Authorities Confirm That The Trial Court Improperly Removed A Contested Issue Of Fact From The Jury With An Instruction That Excluded Any Consideration Of An Operable Magazine From The Definition Of A Machine Gun As A Matter Of Law.

One of the most contested issues at trial was whether the weapon Bohanan sold to the government functioned as a machinegun, and in particular whether Bohanan believed that the weapon functioned as a machinegun. Significant evidence was presented that would have allowed the jury to conclude that Bohanan did not believe the machinegun fired automatically or was capable of being restored to fire automatically because he did not have a functioning magazine for the gun; that such magazines were difficult if not impossible to readily obtain; that Bohanan intentionally sold this non-working machinegun

rather than others that were in his possession; and, that Bohanan arranged the sale in a manner so that his identity and location were hidden from the buyer, likely because the machinegun would not fire automatically. *See* AOB-42-43. All of this evidence created a reasonable doubt as to whether Bohanan believed the weapon was a machinegun, which doubt would transfer to Mr. Kittson under the law of aiding and abetting. When this defense was discussed at a pretrial conference, the district court adopted an instruction affirmatively telling the jury that a functioning magazine was not necessary for the weapon to be deemed a machinegun.

In response to Mr. Kittson' objections to this instruction, the government contends that the instructions adequately stated the law regarding the definition of a machinegun, citing four cases it contends are on point: *United States v. McCauley*, 601 F.2d 336 (8th Cir. 1979) (*per curium*); *United States v. Melancon*, 462 F.2d 82 (5th Cir. 1972); *United States v. Woodfolk*, 656 A.2d 1145 (D.C. 1995); and, *United States v. Martinez*, 967 F.2d 1343 (9th Cir. 1992). That analysis is erroneous.

*McCauley* involved the sale of a "Japanese type-96 light machinegun, which lacked the magazine necessary for automatic firing[,]" 601 F.2d at 337, though the defendant also offered to sell a magazine for the weapon. *Id.* at 338. The issue on appeal was a constitutional challenge to the definition of a

-24-

machinegun in 26 U.S.C. § 5845(b), which the defendant contended should be held to be unconstitutionally vague. *Id.* at 340. The only discussion of jury instructions confirmed that the definition of machinegun given to the jury was "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." *Id.* at 338 n.2.

*Melancon* involved a Russian machine pistol, and the question on appeal was sufficiency of the evidence; there was no discussion of jury instructions, and no indication that any instruction was at issue. 462 F.2d at 95.

The "sole question" presented on the machinegun at issue in *Martinez* was whether the defendant "*used* or *carried*" the weapon in connection with a drug offense when the machinegun was under a mattress and unloaded. 967 F.2d at 1346 (emphasis in original). There was no question about functionality of the gun or the magazine, and no instruction was given that removed this question from the jury's consideration.

*Woodfolk* is the only decision cited by the government which actually addresses a functioning magazine, and is based on a statutory prohibition on the ownership of any machinegun in the District of Columbia. The weapon at issue would not fire automatically with the magazine that was in the possession of the defendant. 656 A.2d at 1147. The court held that it could not

"agree that, as a matter of law, a magazine must be deemed an integral part of a machinegun" *id.* at 1148, and that the "'question was [at the very least] properly left to the jury." *Id.* at 1149 (quoting *Rouse v. United States*, 391 A.2d 790, 792 (D.C. 1978).

Not one of these authorities cited by the government support instructing the jury that, as a matter of law, the availability of a functioning magazine should not be considered when deciding whether a weapon qualifies as a machinegun, and *Woodfolk* confirms that this is a jury question. Notably, while there have been numerous prosecutions involving machineguns over the almost forty years since the adoption of the Firearm Owners' Protection Act of 1986, the government is not able to proffer one case in which the district court elected to take the question of whether a functioning magazine is a critical component of a machinegun away from the jury's consideration. No other district court has done so, because doing so is improper.

The impropriety was not harmless in this matter given the unique nature of the charge and the facts. The question was not simply whether the government could prove beyond a reasonable doubt that the weapon functioned as a machinegun, but whether the government could prove beyond a reasonable doubt that Bohanan knew and believed the weapon would function as a machinegun. *Staples,* 511 at 606-07. The district court deprived

-26-

Mr. Kittson of his ability to present this defense to the jury, and the matter should be remanded on that basis.

**D.    The Government Fails To Point To Any Evidence Regarding What Occurred In Marion County Circuit Court, And The Only Such Evidence Was The 'Testimony' Of The Court Regarding Her Prior Personal Practice As A State Court Judge.**

Mr. Kittson objected to granting a criminal history point based on diversionary sentence for a charge of driving under the influence that was imposed in 2009 by a Marion County Circuit Court. AOB-15; 1-ER-21. In response, the government repeatedly insists that the point was appropriately awarded because the record reflected there was a court proceeding. AB-31-32.

Whether some court proceeding occurred does not answer the question; the question is whether there was a proceeding in open court at which Mr. Kittson affirmatively made "an admission of guilt, or a plea of *nolo contendere*" as required by U.S.S.G. § 4A1.2(f). Nothing in the record cited by the government answers that question.

The district court's only basis for finding that whatever occurred necessarily included a judicial proceeding in open court at which Mr. Kittson made an admission of guilt or at least a plea of *nolo contendere* was based on the court's personal practice when she was on the bench in another circuit

-27-

court. Consideration of such 'evidence' was improper and violated Mr. Kittson's constitutionally protected rights to Due Process.

### III. CONCLUSION

Mr. Kittson's trial and sentencing fell short of fundamental legal protections defendants are supposed to enjoy. Mr. Kittson did not receive the protection of the letter of the law as both at trial and on appeal the government has been unable to articulate a reason his conduct was not protected by the plain language in the statute. Over Mr. Kittson's objections the jury was never instructed on the exception that applied to his conduct. Regulations on the right to bear arms must fall squarely within the Nation's historic tradition of firearm regulation, yet no founding era statute supports any bans on types of bearable arms. The essential facts supporting Mr. Kittson's guilt are to be found by a jury, yet the judge instructed the jury in this case that it could not consider the fact that the firearm would not function without a replacement magazine fitted to the gun. Finally, Mr. Kittson's sentence was increased based not on facts in the record, but on the trial judge's practice adjudicating related cases in a different county.

Mr. Kittson's conviction should be reversed and the case should be remanded for entry of a judgment of acquittal. Failing that Mr. Kittson should receive a new trial with appropriate jury instructions on the statutory

-28-

exclusion that applies in his case and without a directed factual finding concerning the firearm's magazine. Alternatively, Mr. Kittson's case should be remanded for a new sentencing hearing.

Respectfully submitted, this 21st day of October, 2024.

 _/s/ Michael Charles Benson_               _/s/ C. Renée Manes_
Michael Charles Benson                      C. Renée Manes
Assistant Federal Public Defender           Assistant Federal Public Defender

Attorneys for Defendant-Appellant

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | CA Nos. 23-4132 |
| v. | ) | |
| | ) | |
| DANIEL KITTSON, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

_____

**BRIEF FORMAT CERTIFICATION
PURSUANT TO RULE 32(a)(7)(C)**

_____

Pursuant to Ninth Circuit Rule 32(a)(7)(C), we certify that the APPELLANT'S REPLY BRIEF is proportionately spaced, has a typeface of 14 points or more and contains approximately 5,981 words.

Dated this 21st day of October, 2024.


*/s/ Michael Charles Benson*          */s/ C. Renée Manes*
Michael Charles Benson               C. Renée Manes
Assistant Federal Public Defender    Assistant Federal Public Defender

Attorneys for Defendant-Appellant

-30-