**No. 23-4132**

**Panel: Schroeder, Owens, and VanDyke**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

DANIEL KITTSON,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the District of Oregon
No. 3:21-cr-00075-IM
Hon. Karin J. Immergut

---

**APPELLANT'S PETITION FOR REHEARING
AND REHEARING EN BANC**

---

Michael Charles Benson
Assistant Federal Public Defender
101 SW Main Street, Suite 1700
Portland, Oregon 97204
(503) 326-2123
Michael_Benson@fd.org

*Attorney for Appellant Daniel Kittson*

# TABLE OF CONTENTS

**Page**

Summary of Reasons for Panel Rehearing or En Banc Rehearing............................6

Factual and Procedural Background ........................................................................7

    A.    Trial Court Proceedings ........................................................................7

    B.    Panel Decision ........................................................................................8

        1.    Majority Opinion........................................................................9

    C.    Dissent ..................................................................................................10

Reasons for Granting the Petition .........................................................................11

    A.    The majority's approach centers congressional intent over statutory text, which should be the focal point of statutory analysis. .......................................................................................11

    B.    Contrary to the majority's claim, no case has interpreted the transfer provision in § 922(o)(2)(A). ..................................................14

    C.    The majority's construction of § 922(o)(2)(A) cannot be squared with the statutory text and would represent a significant change in the scope of criminal liability beyond what Congress wrote. ...............................................................................................19

Conclusion ............................................................................................................24

Certificate of Compliance for Petitions for Rehearing or Responses

Appendix:    Opinion (filed 12/10/2025)................................................. Appendix-1
              Memorandum (filed 12/10/2025) ...................................... Appendix-61

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*,
340 U.S. 593 (1951) ....................................................................... 13

*Ariz. Health Care Cost Containment Sys. v. McClelland*,
508 F.3d 1243 (9th Cir. 2007) ...................................................... 20

*Azar v. Allina Health Services*,
587 U.S. 566 (2019) ....................................................................... 21

*Bartenwerfer v. Buckly*,
598 U.S. 69 (2023) ......................................................................... 12

*Bittner v. United States*,
598 U.S. 85 (2023) ......................................................................... 22

*Bostock v. Clayton County*,
590 U.S. 644 (2020) ....................................................................... 12

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland
Sec.*,
107 F.4th 1064 (9th Cir. 2024) ..................................................... 14

*Guido v. Mount Lemmon Fire District*,
859 F.3d 1168 (9th Cir. 2017) ...................................................... 12

*Lamie v. United States Trustee*,
540 U.S. 526 (2004) ....................................................................... 12

*Leuthauser v. United States*,
71 F.4th 1189 (9th Cir. 2023) .................................................. 10, 20

*Lewis v. United States*,
385 U.S. 206 (1966) ....................................................................... 22

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) ........................................................... 13

*Perri v. Department of the Treasury; Bureau of Alcohol, Tobacco and Firearms*,
637 F.2d 1332 (9th Cir. 1981) ............................................ 16, 18, 19

*SEC v. McCarthy*,
322 F.3d 650 (9th Cir. 2003) ............................................. 20

*United States v. Brooks*,
611 F.2d 614 (5th Cir. 1980) .......................................... 16, 17, 18, 19

*United States v. Davis*,
588 U.S. 445 (2019) ......................................................... 13

*United States v. Duroseau*,
26 F.4th 674 (4th Cir. 2022) ............................................. 23

*United States v. Engstrom*,
No. 24-1878, 2026 WL 305112 (9th Cir. Feb. 5, 2026) .................... 12

*United States v. Everett*,
700 F.2d 900 (3rd Cir. 1983) ............................................. 23

*United States v. Hopkins*,
703 F.2d 1102 (9th Cir. 1983) ........................................... 23

*United States v. Kirilyuk*,
29 F.4th 1128 (9th Cir. 2022) ............................................ 15

*United States v. Kittson*,
161 F.4th 619 (9th Cir. 2025) ................... 6, 8, 9, 12, 14, 15, 17, 18, 19, 21, 22

*United States v. Neuner*,
535 Fed.App'x. 373 (5th Cir. 2013) ................................... 14

*United States v. Paulson*,
68 F.4th 528 (9th Cir. 2023) ............................................. 20

*Yeager v. United States*,
557 U.S. 110 (2009) ......................................................... 24

iv

## STATUTES

18 U.S.C. § 2 ................................................................................. 7

18 U.S.C. § 922 ........................ 6, 7, 8, 9, 10, 11, 12, 14, 15, 17, 19, 20, 21, 22, 24

18 U.S.C. § 924 ........................................................................... 21

18 U.S.C. § 925 ............................................................. 10, 15, 16, 18

18 U.S.C. § 2252 ......................................................................... 23

18 U.S.C. § 5852 ........................................................................... 9

## OTHER

Federal Rule of Criminal Procedure 29 ................................................. 8

## SUMMARY OF REASONS FOR PANEL REHEARING OR EN BANC REHEARING

A divided panel of this Court relied on congressional intent and non-binding precedent to broadly construe a criminal statute beyond the statute's plain reach. Under 18 U.S.C. § 922(o), it is unlawful to "transfer or possess a machinegun," but that prohibition does not apply in the case of "a transfer to or by, or possession by or under the authority of, the United States [. . .]" 18 U.S.C. §§ 922(o)(1), (o)(2)(A). Here, Daniel Kittson facilitated the transfer of a machinegun to a buyer who turned out to be an undercover federal agent. Because his conduct fell into the exception for a "transfer to . . . the United States," he should not have been convicted.

The majority, effectively ignoring the statutory text, looked to the statute's history and opined that Congress could not have intended an interpretation that undermines sting operations. Based on its view of congressional intent and deferring to out-of-circuit cases in which the transfer provision of § 922(o)(2)(A) was never implicated, the majority held that a transfer is exempted only if it is "authorized by the government for the benefit of federal, state, or local government entities." *United States v. Kittson*, 161 F.4th 619, 624 (9th Cir. 2025).

Because the majority's approach turns to policy instead of text to expand the reach of a criminal statute, this Court should grant either panel or en banc

6

rehearing and reverse. A "plain application" of § 922(o)(2)(A) "excepts from liability any machinegun transfer to the government." *Id*. at 634 (VanDyke, J. dissenting). Therefore, Mr. Kittson was "convicted of a crime that doesn't exist." *Id*.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Trial Court Proceedings

In January of 2020, Bureau of Alcohol Tobacco and Firearms (ATF) Agent Jason Weber was introduced to Daniel Kittson by an informant. 3-ER-375–76. By phone and text message, Agent Weber negotiated with Mr. Kittson for the purchase of a World War II era PPSh-41. 3-ER-375–76; 4-ER-727. On the day the purchase was to be finalized, Agent Weber picked Mr. Kittson up from his home and followed Mr. Kittson's directions to a residence where another person, Ray Bohanan, sold him the PPSh-41. Mr. Kittson was present and helped count the money.

The government filed a two-count indictment against Mr. Kittson. Count 1 charged him with aiding and abetting the possession or transfer of a machinegun, in violation of 18 U.S.C. § 922(o) and 18 U.S.C. § 2. Count 2 charged him with possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). 5-ER-440–41. Both counts referred to the same firearm.

7

Mr. Kittson stipulated to his prior felony but otherwise maintained his
innocence of the crimes charged. His sole defense at trial to Count 2 was that he
never possessed the machinegun, which was controlled by Bohannan. As to Count
1, Mr. Kittson moved for a directed verdict under Federal Rule of Criminal
Procedure 29, arguing that the transfer of the machinegun to a government agent
fell within the § 922(o)(2)(A) exemption for a transfer. 3-ER-435–36 (docket entry
112). Mr. Kittson also requested that the jury be instructed on the statutory
exemption. 2-ER-103. Both requests were denied. 1-ER-40–44, 2-ER-103. The
district court concluded that Mr. Kittson would have to know the agent's status for
the transfer exemption under § 922(o)(2)(A) to apply.

## B.  Panel Decision

The panel issued a published ruling splitting two-to-one on Mr. Kittson's
statutory interpretation argument. The majority concluded that a transfer is
exempted under § 922(o)(2)(A) only if it is "authorized by the government for the
benefit of federal, state, or local government entities" and does not apply to a
transfer to an undercover agent. *Kittson*, 161 F.4th at 624. The dissent would have
remanded for a new trial because the exception excluded the transfer theory of
liability. *Id*. at 647 (VanDyke, J. dissenting).

8

### 1. Majority Opinion

The majority opinion starts with regulations predating the Firearm Owners Protection Act of 1986 which created § 922(o). *Id*. at 622. The opinion did not analyze the text of these statutes, which include an exclusion from the taxation requirement for transfers made to the government so long as the transfer is made "pursuant to an application in such form and manner as the Secretary may by regulations prescribe." *Id*.; 18 U.S.C. § 5852(f). The majority read cases upholding sting operations under these statutes as establishing a tradition where "undercover agents for decades have regularly targeted" machineguns. *Kittson*, 161 F.4th at 623.

The majority opinion viewed this "tradition" as "context," which supports reading § 922(o)(2)(A)'s broadly worded transfer exception as being equivalent to the more narrowly worded transfer exceptions in other statutes. *Id*. at 627. In support of this view the majority opinion relied on prior unpublished cases from this Circuit and several out of circuit cases. *Id*. at 624–27. None of those cases involved a defendant who had merely transferred without possessing the firearm or considered the statutory construction arguments present by Mr. Kittson. In addition, the majority relied heavily on cases involving a different statute 18 U.S.C. § 925(a). *Id*. at 625–26. The majority reasoned the tradition embodied by

9

these cases and earlier regulations required ignoring the comma and disjunction separating the "transfer" and "possession" clauses because reading the statute strictly as written could protect a hypothetical terrorist organization that might "attack a Veterans Day Parade" or a "cartel leader" if they unknowingly transfer their weaponry to the government. *Id*. at 629.

### C.    Dissent

Dissenting, Judge VanDyke concluded that a "plain application" of § 922(o)(2)(A) "excepts from liability any machinegun transfer to the government"—including Mr. Kittson's transfer to an undercover agent. In dissent, Judge VanDyke argued that the "use of commas to offset the possession and transfer clauses evinces that these clauses are disjunctive and must be read distinctively." *Id*. at 640 (citing *Leuthauser v. United States*, 71 F.4th 1189, 1196 (9th Cir. 2023). Because a transfer must only be "to" the government while possession must be pursuant to government authority, it follows that transfer need not be authorized to be protected. *Id*.

Judge VanDyke recognized that none of the case law referenced by the majority had ever directly construed the transfer clause of § 922(o)(2)(A) independently of the possession clause. *Id*. at 639–40. Judge VanDyke reasoned that the majority's hypotheticals were overstated given how hard it would be to

10

imagine a real arms trafficker could operate without running afoul of constructive possession and would only be protected if the government received the firearms. *Id*. at 645 n.11. What is more, a broadly worded government transfer protection would facilitate removal of machineguns from circulation by allowing individuals to transfer firearms to the government without worrying about running afoul of licensing or paperwork requirements. *Id*. at 643–44.

## REASONS FOR GRANTING THE PETITION

The majority did not orient its construction of the transfer exemption in § 922(o)(2)(A) through the statute's plain text or canons of statutory construction. Instead, the majority relied on its view of Congress' policy aims to broaden criminal liability beyond the words Congress used. The Court should rehear this case and reject that judicial expansion of criminal law. As the dissent explained, a "plain application" of § 922(o)(2)(A) exempts transfers to the United States, as occurred here.

### A. The majority's approach centers congressional intent over statutory text, which should be the focal point of statutory analysis.

The bulk of the majority's analysis regarding § 922(o)(2)(A)'s meaning addresses points other than the statutory text. The majority considers legislative history, purpose, as well as hypothetical individuals deserving of punishment who

11

might not be punished on a narrow reading of liability. *Kittson*, 161 F.4th at 624–30.

That ignores "the three 'basic rules of statutory interpretation': '(1) Read the statute; (2) read the statute; (3) read the statute!'" *United States v. Engstrom*, No. 24-1878, 2026 WL 305112, at *5 (9th Cir. Feb. 5, 2026) (quoting Justice Amy Coney Barrett, *Listening To the Law: Reflections on the Court and Constitution* 212 (2025)). Statutory construction must always start with the text of the statute. *E.g.*, *Bartenwerfer v. Buckly*, 598 U.S. 69, 74 (2023); *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004). "Only the written word is the law and all persons are entitled to its benefit." *Bostock v. Clayton County*, 590 U.S. 644, 653 (2020).

A court interpreting a statute does not divine congressional intent which "is a non-sequitur; it is not a factor that should affect the determination of whether a statue's plain meaning is ambiguous." *Guido v. Mount Lemmon Fire District,* 859 F.3d 1168, 1173 (9th Cir. 2017) (citing Antonin Scalia & Bryan A. Garner, READING THE LAW: THE INTERPRETATION OF LEGAL TEXTS 391 (West 2012)). Where a statute's meaning is plain and can be determined through ordinary rules of statutory construction, courts are required to follow that plain meaning. *Id*.

The need to hew closely to statutory text is particularly important in criminal cases where freedom is on the line and due process protections are at their peak. *See United States v. Davis*, 588 U.S. 445, 464 (2019) ("Respect for due process and the separation of powers suggests a court may not, in order to save Congress the trouble of having to write a new law, construe a criminal statute to penalize conduct it does not clearly proscribe."). Since this country's founding, penal laws have been strictly construed against the government. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 434 (2024) (Gorsuch, J., concurring). The rule of lenity "upholds due process by safeguarding individual liberty in the face of ambiguous laws. And it fortifies the separation of powers by keeping the power of punishment firmly in the legislative, not in the judicial department." *Id.* at 434–45 (simplified).

Policy rationales cannot substitute for the government's obligation to show that a defendant's conduct violated the will of Congress *as expressed through statutory text*, and not merely the law Congress may have meant to enact if it had considered a particular case. "After all, Congress expresses its purpose by words." *62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 596 (1951). The role of a court is "to ascertain" that meaning, "neither to add nor to subtract, neither to delete nor to distort." *Id.* This Court has made clear:

"'undesirable policy consequences'" play no role in statutory interpretation.

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.*,

107 F.4th 1064, 1079 (9th Cir. 2024).

**B.** **Contrary to the majority's claim, no case has interpreted the transfer provision in § 922(o)(2)(A).**

The majority opinion argues that "decades of case law" support a narrow

interpretation of the broadly worded transfer exclusion. *Kittson*, 161 F.4th at 626.

In reality, no case has specifically addressed whether § 922(o)(2)(A) exempts

transfers to undercover agents. In every case involving the statutory exclusion in

§ 922(o)(2)(A), the individual who transferred the firearm also possessed it,

making the distinction between the transfer and possession clauses of

§ 922(o)(2)(A) irrelevant. *See Kittson*, 161 F.4th at 634–40 (reviewing the cases

cited by the majority and showing that none of them considered transfer

independently of possession) (VanDyke, J., dissenting). For example, in *United

States v. Neuner*, 535 Fed.App'x. 373, 374–75 (5th Cir. 2013), the defendant

personally converted firearms to fully automatic and was convicted solely for

"possession of a machinegun." *Neuner* does not discuss the defendant's liability

for transfer at all, yet the majority relies on its footnote mentioning possession and

transfer to label Mr. Kittson's argument (an argument *Neuner* never even

considered) "absurd." *Kittson*, 161 F.4th at 626.

14

When a person both transfers *and* possesses a machinegun, the possession would have to be "under the authority of" the government to fall within the exemption. It is only in the rare case where an individual transfers, but does not possess, a machinegun that a court would have occasion to analyze the "transfer" clause independently. Because that issue simply has not been squarely put before a court, the "overwhelming consensus" cited by the majority consists of opinions that never reached the question presented here. *See United States v. Kirilyuk*, 29 F.4th 1128, 1134 (9th Cir. 2022) ("Prior precedent that does not 'squarely address' a particular issue does not bind later panels on the question."); *Kittson*, 161 F.4th at 638 ("[T]he majority fails to point to a single case that turned on § 922(o)(2)(A)'s transfer exception and relies only on possession cases to support its conclusions in this case.") (VanDyke, J. dissenting).

The majority also claims support from cases addressing a different firearms statute: 18 U.S.C. § 925(a)(1). That statute creates an exemption from liability, but its structure is different. It states:

> The provisions of this chapter . . . shall not apply with respect to the transportation, shipment, receipt, possession, or importation of any firearm or ammunition imported for, sold or shipped to, or issued for the use of, the United States or any department or agency thereof or any State or any department, agency, or political subdivision thereof.

15

18 U.S.C. § 925(a)(1). Citing a Fifth Circuit opinion, *United States v. Brooks*, 611 F.2d 614 (5th Cir. 1980), this Court held that § 925(a)(1) does "not exempt a sale" to an undercover agent. *Perri v. Department of the Treasury; Bureau of Alcohol, Tobacco and Firearms,* 637 F.2d 1332, 1337 (9th Cir. 1981). A close reading of *Brooks* shows that its reasoning reflects the different structure of that statute, that its statements about knowledge referred to an ATF manual rather than the statute, and that it misquoted the relevant statute.

Addressing the text of § 925(a)(1) *Brooks* wrote:

Brooks next asserts that the sales were exempt under a statutory exception for "the transportation, shipment, receipt, or importation of any firearm or ammunition . . . sold or shipped to . . . the United States or any department or agency thereof . . . ." 18 U.S.C. § 925(a)(1). This subsection does not exempt any sale or delivery of firearms; it expressly covers only the "transportation, shipment, receipt, or importation" of firearms "for the use of the United States."

*Brooks*, 611 F.2d at 617. The Fifth Circuit's conclusion that § 925(a)(1) "does not exempt" sale or delivery, but only "transportation, shipment, receipt, or importation . . ." splits the statute into two parts. Part 1 lists the conduct exempted, and Part 2 lists the circumstances required for exemption:

| Part 1 | Part 2 |
|---|---|
| [the provisions] shall not apply with respect to the transportation, shipment, receipt, possession, or importation of any firearm or ammunition | imported for, sold or shipped to, or issued for the use of, the United States or any department or agency thereof or any State or any department, agency, or political subdivision thereof. |

16

The Fifth Circuit held that only a defendant satisfying *both* Part 1 *and* Part 2 receives the exemption. Because sales do not appear in Part 1, they are not protected at all regardless of their presence in Part 2. Section 922(o)(2)(A) is not similarly structured and only has two exempted types of conduct—transfer and possession—with different qualifications attached to each.

The Fifth Circuit also said that the exemption covers transportation and other listed conduct "for the use of the United States," but it made that statement in the context of noting that the statute "does not exempt *any* sale or delivery," only the other, listed types of conduct. *Id.* (emphasis added). Any implication beyond that holding would not have mattered to the Fifth Circuit's analysis and would be dicta.

The majority reads *Brooks* to suggest that the limiting clause "for the use of" applies to all of the listed clauses in "imported for, sold or shipped to, or issued for the use of, the United States," despite the commas separating that provision and limiting it to the "issued for" clause. *Kittson*, 161 F.4th at 628. But, aside from never clearly reaching that question, the Fifth Circuit appears to have either overlooked the comma or misquoted the statute. *Brooks* quoted the statute to say, "for the use of the United States," omitting the comma altogether. It did not

analyze the comma and determine it was not relevant; it simply did not notice its existence.

The majority also seizes on two additional sentences from *Brooks* in which the Fifth Circuit apparently addressed a different basis for potentially exempting sales to undercover officers. The court stated:

> No greater reliance can be placed on Subsection 45 of the Firearms Regulation Book, published by the Treasury Department, which purports to exempt sales of firearms to police officers. If such a sale is indeed exempt, the seller must have knowledge that the buyer is a police officer and must secure a signed statement from an official of the agency for which the buyer works stating that the firearm is to be used in the buyer's official duties. Brooks did not meet these requirements.

*Brooks*, 611 F.2d at 617–18. The majority contends that this section adopts a rule that knowledge of the agent's status and signed approval is required for the statutory exclusion to apply. *Kittson*, 161 F.4th at 628. But, that section of the opinion is not referring to § 925(a)(1); it refers specifically to "Subsection 45 of the Firearms Regulation Book," as an alternative source exempting "sales of firearms to police officers" not the statutory text.

When (in dicta) *Perri* discussed "a statement from the [agent's] agency" it referenced the similarly worded sentence in *Brooks* which cites the exemption within the Firearms Regulation Book. *Perri*, 637 F.2d at 1337. *Perri* never discussed the statutory analysis in *Brooks* and nothing in the short passage suggests

18

it intended to import the Fifth Circuit's mistaken quotation of the statute. *Id*.

"Accordingly, neither *Perri*'s nor *Brooks*'s unexplained dicta involving a

hypothetical about another statute would control even as to that statute in those

cases—much less the very differently worded statute at issue here." *Kittson*, 161

F.4th at 639 (VanDyke, J. dissenting).

> **C.** **The majority's construction of § 922(o)(2)(A) cannot be squared with the statutory text and would represent a significant change in the scope of criminal liability beyond what Congress wrote.**

The statute in this case is plain, simple, and unambiguous. Section 922(o)(1)

makes it a crime to possess or transfer a machinegun unless that possession or

transfer falls within two statutory exceptions:

> (o)(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
>
> (2) This subsection does not apply with respect to--
>
> > (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
> >
> > (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

Under § 922(o)(2)(A), "a transfer to or by . . . the United States" is not

criminalized. In this case, uncontested trial testimony confirmed that the firearm

was transferred to a federal ATF agent who took possession of it on behalf of the

19

United States Government. Because the firearm was "transfer[ed] to" the government, it was exempted by the plain language of the statute.

The text does not support the majority's view that "under the authority" of modifies both transfer and possession. Congress used different words to describe the exceptions for "transfer to" and "possession by or under the authority of" the United States. "[A] court must presume that Congress intended a different meaning when it uses different words in connection with the same subject . . ." *Ariz. Health Care Cost Containment Sys. v. McClelland*, 508 F.3d 1243, 1250 (9th Cir. 2007) (citing *SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003)). Where, as here, a comma separates two parts of a statute, those parts are normally treated as distinct clauses and read separately. *United States v. Paulson*, 68 F.4th 528, 537 (9th Cir. 2023). Congress also used the disjunctive "or" indicating that it intended the "transfer" and "possession" clauses to be read separately. *Leuthauser v. United States*, 71 F.4th 1189, 1196 (9th Cir. 2023). Finally, the rule of the last antecedent indicates that "under authority of" modifies only the immediately preceding "possession" antecedent, not the more remote "transfer" antecedent. *See Paulson*, 68 F.4th at 537 (applying the rule of the last antecedent).

The majority opinion does not offer a plausible alternative reading of the statute's plain text. Instead, citing congressional purpose, it suggests that Congress

20

must have meant something different by the word "transfer" in § 922(o)(1) than it did fourteen words later in the same statute when it used "transfer" again in § 922(o)(2)(A). *Kittson*, 161 F.4th at 626–27. While the same word *can* have different meanings even within a single statute, that is the exception not the rule. *Azar v. Allina Health Services*, 587 U.S. 566, 574 (2019) (discussing the "normal presumption that, when Congress uses a term in multiple places within a single statute, the term bears a consistent meaning throughout.") (citation omitted).

Even more strained is the specific meaning the majority has assigned to "transfer" in § 922(o)(2)(A). The majority suggests that Congress must have meant something like "lawful transfer" or "transfer consistent with other federal regulations" in § 922(o)(2)(A), because Congress intended to incorporate a host of other federal regulations with separate theories of criminal liability relating to machinegun transfers. *Kittson*, 161 F.4th at 627. Congress's choice to exempt a "transfer to . . . the United States" cannot be read to silently incorporate other regulations that carry their own criminal enforcement mechanism. Restricting the transfer exclusion in § 922(o)(2)(A) to transfers that meet all regulatory requirements would make even knowing transfers to government agents with incorrect or missing paperwork felonies subject a maximum of ten years of incarceration. 18 U.S.C. § 924(a)(2).

21

Construing "transfer" in § 922(o)(2)(A) to mean "lawful transfer" also fails to assign meaning to the fact that Congress expressly used that exact phrase—"lawful transfer or lawful possession"—in § 922(o)(2)(B) but chose not to not include that language in § 922(o)(2)(A). "When Congress includes particular language in one section of the statute, but omits it from a neighbor, we normally understand that difference in language to convey a different meaning." *Bittner v. United States*, 598 U.S. 85, 94 (2023).

The majority turns the normal presumptions of statutory interpretation upside down by reasoning that, if Congress intends a statutory exemption "to disrupt" a longstanding law enforcement practice like sting operations, it must do so expressly. *Kittson*, 161 F.4th at 628. However, Congress did so expressly by exempting any "transfer to . . . the United States." Further, the majority cites no authority for applying a rule of statutory interpretation that allows criminal statutes to be *expanded* due to congressional silence.

The majority's concerns about sting operations are overstated. Sting operations do not receive specialized rules of statutory construction. *See e.g.*, *Lewis v. United States*, 385 U.S. 206 (1966) (declining to extend special Fourth Amendment protections to sting operations). Often, criminal liability for sting operations is premised on attempt to account for the factual impossibility of

22

completing the crime. That is the case for distribution of child pornography, cited in the majority opinion. *See* 18 U.S.C. § 2252(b)(1) (providing liability for anyone who "attempts or conspires" to distribute child pornography). Factual impossibility is not a defense to an attempt. *See United States v. Everett*, 700 F.2d 900, 903–04 (3rd Cir. 1983) (explaining impossibility as applied to attempts).

But a federal defendant "can only be found guilty of an attempt to commit a federal offense if the statute defining the offense also expressly proscribed attempt." *United States v. Hopkins*, 703 F.2d 1102, 1104 (9th Cir. 1983) (citations omitted); *see United States v. Duroseau*, 26 F.4th 674, 677–78 (4th Cir. 2022) (overturning a firearm conviction where law enforcement prevented completion of the offense and the statute did not include attempt liability).

In sum, the majority's reasoning expands criminal law to reach conduct the court believes Congress ought to have criminalized. The same policy argument the majority makes in this case could be made for any statute that does not include attempt liability. Any time a person tries, but fails, to commit a crime, one could argue that they are an aspiring member of the Legion of Doom who escapes accountability only by accident. But accountability in our system of justice is confined solely to the words Congress actually enacted. It cannot be expanded by imagining what Congress ought to have written but did not.

23

## CONCLUSION

For the foregoing reasons, the Court should grant rehearing by the panel or rehearing en banc to interpret 18 U.S.C. § 922(o)(2)(A) consistently with the statutory text. On rehearing, the Court should reverse and remand the case for entry of a judgment of acquittal on Count 1 because, absent the invalid transfer theory, the jury already determined Mr. Kittson did not possess the firearm through its acquittal on Count 2. *See* Op. Br. at 35; *Yeager v. United States*, 557 U.S. 110, 125 (2009).

Date: February 23, 2026

*s/ Michael Charles Benson*
Michael Charles Benson

*Attorney for Appellant Daniel Kittson*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* *https://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** 23-4132

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel

rehearing/petition for rehearing en banc/response to petition is *(select one)*:

◉ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** 4,189 .
*(Petitions and responses must not exceed 4,200 words)*

**OR**

◯ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** s/ Michael Charles Benson **Date** February 23, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 11** *Rev. 12/01/24*

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-4132 |
| *Plaintiff - Appellee*, | D.C. No. 3:21-cr-00075-IM-1 |
| v. | |
| DANIEL MATTHEW KITTSON, | OPINION |
| *Defendant - Appellant*. | |

Appeal from the United States District Court
for the District of Oregon
Karin J. Immergut, District Judge, Presiding

Argued and Submitted June 12, 2025
Portland, Oregon

Filed December 10, 2025

Before: Mary M. Schroeder, John B. Owens, and Lawrence
VanDyke, Circuit Judges.

Opinion by Judge Owens;
Dissent by Judge VanDyke

Appendix-1

# SUMMARY[*]

## Criminal Law

The panel affirmed Daniel Matthew Kittson's conviction for possessing or transferring a machinegun in violation of 18 U.S.C. § 922(o).

Section 922(o)(1) provides that "it shall be unlawful for any person to transfer or possess a machinegun." But § 922(o)(2)(A) provides that the prohibition does not apply to "a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof."

Kittson argued that § 922(o) does not apply here, as he transferred the machinegun to a federal agent, and § 922(o)(2)(A) exempts any transfers to the United States, even those to undercover agents. The panel held that the § 922(o)(2)(A) exemption does not apply to transfers to undercover agents, as the exemption for transfers covers solely those transfers authorized by the government for the benefit of federal, state, or local government entities. Accordingly, the district court, like every other court to confront this issue, correctly rejected Kittson's argument regarding the § 922(o)(2)(A) exemption.

Kittson also argued that § 922(o) violates the Second Amendment. In *United States v. Henry*, 688 F.3d 637 (9th Cir. 2012), this court rejected that argument and held that

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Appendix-2

USA v. KITTSON 3

machineguns are dangerous and unusual weapons that are unprotected by the Second Amendment. Rejecting Kittson's argument that *Henry* is clearly irreconcilable with the Supreme Court's intervening decision in *New York State Rile & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the panel held that *Henry* controls the outcome here.

The panel addressed Kittson's other arguments in a concurrently filed memorandum disposition.

Judge VanDyke dissented. He wrote that in reaching a result contrary to what the statutory text demands, the majority relies on cases that either implicate § 922(o)'s *possession* element—textually different in important ways from the *transfer* element—or implicate entirely different statutes altogether, thereby failing to deal with the unique case at hand: a criminal defendant who transferred a machinegun to the United States without first possessing it. The majority's application of off-point precedent here effectively creates a reverse state-of-mind carveout to a statute's plain exception, thus expanding the reach of the criminal prohibition that Congress created. Judge VanDyke would not reach the Second Amendment question, but wrote that the majority erred by merely assuming that machineguns fall outside the ambit of constitutionally protected firearms by finding that those arms are dangerous and capable of inflicting injury—a definition that could apply to any firearm.

4                 USA v. KITTSON

## COUNSEL

Sarah Barr (argued), Leah K. Bolstad, and Kelly A. Zusman, Assistant United States Attorneys; Suzanne Miles, Criminal Appellate Chief; Natalie K. Wight, United States Attorney; Office of the United States Attorney, United States Department of Justice, Portland, Oregon; for Plaintiff-Appellee.

Michael C. Benson (argued) and C. Renee Manes, Assistant Federal Public Defenders, Federal Public Defender's Office, Portland, Oregon, for Defendant-Appellant.

Donald Kilmer Jr., Law Offices of Donald Kilmer, Caldwell, Idaho; Carl D. Michel, Joshua R. Dale, Alexander A. Frank, and Konstadinos T. Moros, Michel & Associates PC, Long Beach, California; for Amici Curiae California Rifle & Pistol Association Inc., Second Amendment Law Center Inc., and the Second Amendment Foundation.

USA V. KITTSON                                    5

**OPINION**

OWENS, Circuit Judge:

Daniel Matthew Kittson appeals from his conviction for possessing or transferring a machinegun in violation of 18 U.S.C. § 922(o). We have jurisdiction under 28 U.S.C. § 1291, and we affirm.[1]

**I. BACKGROUND**

In January 2020, federal agents learned that Kittson, a previously convicted felon, was willing to sell a World War II-era Russian machinegun, which he acknowledged could not be lawfully transferred. An undercover federal agent, posing as a firearms and drug trafficker, exchanged phone calls and text messages with Kittson to make a deal. While Kittson did not physically possess the machinegun, he arranged for Ray Bohanan, who had the weapon, to finalize the transfer. The agent and Kittson drove to Bohanan's location, where they negotiated the final price and exchanged cash for the machinegun. The agent remained undercover, and the United States Marshals Service subsequently arrested Kittson.

A grand jury indicted Kittson for (1) possessing and transferring a machinegun in violation of 18 U.S.C. § 922(o), and (2) felon-in-possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Relevant here, § 922(o)(1) provides that "it shall be unlawful for any person to transfer or possess a machinegun." But the prohibition

---

[1] Kittson also raises jury instruction and sentencing challenges. We address these arguments in a concurrently filed memorandum disposition, in which we affirm.

Appendix-5

6                       USA v. KITTSON

does not apply to "a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof." § 922(o)(2)(A).

Kittson moved pretrial to dismiss the § 922(o) count, arguing that the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), required the statute's invalidation. The district court rejected that claim. It cited *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012), in which our court held that the Second Amendment did not cover machineguns, and concluded that *Henry* was not "clearly irreconcilable" with *Bruen*. *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc).

The matter proceeded to trial. At the close of the government's case, Kittson moved under Federal Rule of Criminal Procedure 29 for a judgment of acquittal on the § 922(o) count. Kittson argued that § 922(o) did not apply here, as he transferred the machinegun to a federal agent and, according to Kittson, § 922(o)(2)(A) exempts any transfers to the United States, even those to undercover agents.

The district court denied the motion, noting that Kittson's "interpretation of 18 U.S.C. § 922(o)(2)(A) would provide complete immunity for any defendant who transfers a machinegun to an undercover government agent, even if the defendant does not know or believe the undercover agent to be an agent of the government." Relying on an unpublished Ninth Circuit table disposition which addressed this precise issue, *United States v. Bascue*, 97 F.3d 1461, 1996 WL 554488 (9th Cir. 1996), and *Perri v. Department of the Treasury*, 637 F.2d 1332, 1337 (9th Cir. 1981), which analyzed a similar firearms statute, the district court held that

Appendix-6

the § 922(o)(2)(A) exemption did not apply in these circumstances: "[Kittson] did not know that the undercover agent was in fact an agent of the government, and therefore cannot escape liability for the transfer under 18 U.S.C. § 922(o)(2)(A)."

The jury delivered a split verdict—not guilty on the felon-in-possession count, but guilty on the possession or transfer count. The district court sentenced Kittson to twenty-seven months' imprisonment, and Kittson timely appealed.

## II. DISCUSSION

### A. Standard of Review

"We review *de novo* a district court's denial of a Rule 29 motion for a judgment of acquittal." *United States v. Gagarin*, 950 F.3d 596, 602 (9th Cir. 2020). We also review *de novo* "questions of law, including constitutional issues, and questions of statutory interpretation." *United States v. Mongol Nation*, 56 F.4th 1244, 1250 (9th Cir. 2023) (internal citation omitted).

### B. The Regulation of Machineguns and § 922(o)

#### 1. The National Firearms Act of 1934, Omnibus Crime Control and Safe Streets Act of 1968, and Gun Control Act of 1968

When we interpret "transfer" to the United States under § 922(o)(2)(A), we must bear in mind the unique history and tradition of federal oversight of machineguns. "Congress has closely regulated machine guns pursuant to its taxation power since the National Firearms Act of 1934, which subjected machine guns, unlike ordinary firearms, to federal registration and a transfer tax." *United States v. Kenney*, 91

8                    USA V. KITTSON

F.3d 884, 890 (7th Cir. 1996).  The National Firearms Act
outlawed the transfer of a machinegun without the payment
of applicable taxes and an order from the Secretary of
Treasury.  *See* National Firearms Act of 1934, Pub. L. No.
73-757, §§ 3–4, 48 Stat. 1236, 1237–38 (1934); *Haynes v.
United States*, 390 U.S. 85, 87–89 (1968) (describing
requirement that "[a]ny person who wishes to transfer [a
machinegun] may lawfully do so only if he first obtains a
written order from the prospective transferee on an
'application form issued . . . for that purpose by the
Secretary'" (citation omitted)); *Mock v. Garland*, 75 F.4th
563, 569 (5th Cir. 2023) (describing the National Firearm
Act's transfer tax as "explicitly intended to tax these
weapons out of existence").

     With the Omnibus Crime Control and Safe Streets Act
of 1968 ("Omnibus Act"), Congress enacted 18 U.S.C.
§ 922, which further tightened the laws on machineguns.
Pub. L. No. 90-351, § 922, 82 Stat. 197, 228 (1968).  In
particular, § 922(a)(4) made it unlawful "for any person,
other than a licensed importer, licensed manufacturer, or
licensed dealer, to transport in interstate or foreign
commerce any . . . machinegun . . . except as specifically
authorized."  *Id.* at 229.  And § 922(b)(4) made it unlawful
for any licensed importer, manufacturer, or dealer to "sell or
deliver . . . to any person . . . [a] machine gun" unless certain
requirements were met.  *Id.* at 230.  When enacting the
Omnibus Act, Congress found "that the high incidence of
crime in the United States threaten[ed] the peace, security,
and general welfare of the Nation and its citizens" and that
"law enforcement efforts must be better coordinated,
intensified, and made more effective" to prevent crime.  *Id.*
at 197; *see also Bryan v. United States*, 524 U.S. 184, 186
(1998) (observing that "Congress made findings concerning

Appendix-8

USA V. KITTSON                    9

the impact of the traffic in firearms on the prevalence of lawlessness and violent crime in the United States"). Congress thus declared that its policy was to "assist State and local governments in strengthening and improving law enforcement at every level by national assistance." Omnibus Act § 902, 82 Stat. at 198.

That same year, Congress amended the Omnibus Act as part of the Gun Control Act of 1968 and "rewrote the [National Firearms] Act." *United States v. Clements*, 471 F.2d 1253, 1257 (9th Cir. 1972); *see also* Gun Control Act of 1968, Pub. L. No. 90-618, § 201, 82 Stat. 1213, 1232 (1968). The stated purpose of the Gun Control Act is to "provide support to . . . law enforcement officials in their fight against crime and violence" without placing "undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to . . . lawful activity." Gun Control Act § 101, 82 Stat. at 1213–14.

Under the reconfigured National Firearms Act,[2] it is unlawful to transfer a machinegun unless certain requirements are met. *See* 26 U.S.C. §§ 5852, 5861; 27 C.F.R. §§ 479.89–90, 479.105. For example, the machinegun must be registered, the transfer approved by the Secretary of the Treasury, and the applicable taxes paid. *See* 26 U.S.C. §§ 5811 (taxes), 5812 (transfers), 5841 (registration), 5845 (definitions). Transfers to the "United States or any department, independent establishment, or agency thereof" and to "any State, possession of the United States, any political subdivision thereof, or any official police organization of such a government entity engaged in

---

[2] Any references to the National Firearms Act relate to provisions regarding machineguns under the Gun Control Act. *See* 26 U.S.C. § 5849.

Appendix-9

10                      USA v. Kittson

criminal investigations" are exempt from the tax requirement. *Id.* §§ 5852–53. Nevertheless, even those transfers must comply with certain procedures prescribed by the Secretary. *See id.* §§ 5852–53; 27 C.F.R. §§ 479.89–90 (transfers to the United States and certain government entities), 479.105 (transfer and possession of machineguns). It is unlawful to transfer a machinegun in violation of these requirements. *See* 26 U.S.C. § 5861(e), (j). And as part of this regulatory scheme, undercover agents for decades have regularly targeted those involved in the transferring of machineguns.[3]

### 2. The Firearm Owners' Protection Act of 1986 and § 922(o)

Enacted in 1986 under the Firearms Owners' Protection Act ("Act" or "FOPA"), § 922(o) was part of an extensive overhaul of federal firearms laws. *See* Firearms Owners' Protection Act, Pub. L. No. 99-308, § 102, 100 Stat 449, 451 (1986); *United States v. Knutson*, 113 F.3d 27, 30 (5th Cir. 1997) ("Section 922(o), . . . is but the latest manifestation of the federal government's longstanding record of regulating

---

[3] *See, e.g.*, *United States v. Gillis*, 474 F.2d 4, 5 (9th Cir. 1973) (per curiam) (unlawful transfer of a firearm to an undercover agent without complying with the relevant regulations); *United States v. Sorrells*, 714 F.2d 1522, 1524–26 (11th Cir. 1983) (unlawful transfer of unregistered machinegun to undercover agent); *United States v. Rogers*, 652 F.2d 972, 973–74 (10th Cir. 1981) (unlawful transfer of unregistered machinegun to undercover agent); *United States v. Tarr*, 589 F.2d 55, 60–61 (1st Cir. 1978) (unlawful transfer of machinegun to undercover agents where "[t]he legal requirements for the transfer of the machine gun . . . were not met"); *United States v. Dwyer*, 539 F.2d 924, 925, 926 (2d Cir. 1976) (transfer of machinegun to undercover agent in violation of 26 U.S.C. §§ 5811 (tax requirement), 5812 (application requirement), 5861(e) (prohibited transfer)); *United States v. Pingleton*, 458 F.2d 722, 724 (7th Cir. 1972) (unlawful transfer of machinegun to undercover agent).

USA v. KITTSON                              11

machineguns."). FOPA was "designed to relieve the nation's sportsmen and firearms owners and dealers from unnecessary burdens under the Gun Control Act of 1968, to strengthen the Gun Control Act of 1968 to enhance the ability of law enforcement to fight violent crime and narcotics trafficking, and to improve administration of the Act." H.R. Rep. 99-495, at 1, *as reprinted in* 1986 U.S.C.C.A.N. 1327, 1327 (1986). Under the Act, "[t]he term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b))." Firearms Owners' Protection Act § 101, 100 Stat. at 450.

Section 922(o) provides:

> (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

> (2) This subsection does not apply with respect to--

> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

> (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C. § 922(o).

Under the Act, "[p]rivate citizens, whether federal firearms licensees or members of the general public, who are not acting under the authority of the United States or a state, may transfer or possess only machine guns that were

Appendix-11

12                    USA v. KITTSON

registered on or before May 16, 1986." *United States v. Rodman*, 776 F.3d 638, 640–41 (9th Cir. 2015) (citing 18 U.S.C. §§ 922(o)(2)(A) – (B)). "Outside of a few government-related uses, machine guns largely exist on the black market." *Henry*, 688 F.3d at 640. "[W]hen read together, § 922(o) and the legislative records of the Omnibus Act, [Gun Control Act], and FOPA 'demonstrate that Congress has sought to regulate the interstate flow of firearms, including machineguns, as a means to aid local law enforcement.'" *United States v. Beuckelaere*, 91 F.3d 781, 784–85 (6th Cir. 1996) (quoting *United States v. Wilks*, 58 F.3d 1518, 1522 (10th Cir. 1995)).

### 3. The § 922(o)(2)(A) Exemption Does Not Apply to Transfers to Undercover Agents

As the history and extensive caselaw make clear, we do not approach this statutory interpretation question with a blank slate. For nearly four decades, courts around the country have held that the § 922(o)(2)(A) "transfer to . . . the United States" exemption is an extremely narrow one, *see Hardin v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 65 F.4th 895, 900 (6th Cir. 2023) (noting the two exceptions in § 922(o)(2) are "extremely limited" (citation omitted)), and only applies to transfers "authorized by the government for the benefit of federal, state, or local government entities." *United States v. Bailey*, 123 F.3d 1381, 1393 (11th Cir. 1997) (citation omitted). Every circuit to examine this provision has come to the same conclusion.[4]

---

[4] *See, e.g.*, *United States v. Warner*, 5 F.3d 1378, 1381 (10th Cir. 1993) (concluding, based on explicit language and legislative history, that § 922(o)(2)(A) "was enacted so that military personnel and police officers, when acting officially, could utilize and possess machine guns"); *United States v. Aiken*, 974 F.2d 446, 449 (4th Cir. 1992)

USA v. KITTSON 13

Confronted with this overwhelming consensus regarding § 922(o)(2)(A)'s narrow scope, the dissent invents a distinction between the "possession exception" and the "transfer exception." But this ignores the plain language of these decisions, which explicitly encompass both the possession and the transfer of machineguns. For example, in one of the first cases to consider § 922(o)(2)(A), the Eleventh Circuit clearly stated: "Congress intended to limit lawful *transfer and possession* of machine guns to instances authorized by the government for the benefit of federal, state, or local governmental entities." *Farmer v. Higgins*, 907 F.2d 1041, 1045 (11th Cir. 1990) (emphasis added). The *Farmer* court's detailed recitation of the legislative history confirms that the possession and transfer elements of § 922(o)(2)(A) were always meant to be read together, not

---

(observing that, in enacting 18 U.S.C. § 922(o)(1), "Congress made it illegal for anyone other than government personnel to possess or transfer a machine gun"); *United States v. Neuner*, 535 F. App'x 373, 374 n.1 (5th Cir. 2013) ("Clear statutory language and Congressional intent limited lawful transfer and possession of machine guns to authorized governmental personnel for use in their official capacities."); *Doe v. Biden*, No. 2022-1197, 2022 WL 16545125, at *4 (Fed. Cir. Oct. 31, 2022) ("[W]e agree with the Eleventh Circuit that Congress intended for the phrase 'under the authority' in § 922(o)(2)(A) 'to limit lawful transfer and possession of machine guns to instances authorized by the government for the benefit of federal, state, or local governmental entities.'" (citation omitted)); *cf., e.g.*, *McCutchen v. United States*, 14 F.4th 1355, 1359 (Fed. Cir. 2021) ("[The § 922(o)] language makes it unlawful to possess or transfer a 'machinegun,' with exceptions for governments and pre-FOPA lawful possession."); *United States v. Fisher*, 149 F. App'x 379, 382 (6th Cir. 2005) ("[One of] [t]he only exceptions to [§ 922(o)(1)] occur[s] when the transfer or possession is authorized by the United States or any of its agencies or political subdivisions . . . .").

Appendix-13

14                          USA v. KITTSON

separated into two exceptions of drastically different scope.[5]
*See id.* at 1044–45. Thus, contrary to the dissent's
characterization, it is not accidental that courts "typically
just collapse the [transfer and possession] exceptions
together when discussing them." It is for good reason that
court after court has followed *Farmer*—and none has
disagreed with it—in finding both the "lawful *transfer and
possession* of machine guns" limited to "instances
authorized by the government." *Bailey*, 123 F.3d at 1393
(quoting *Farmer*, 907 F.2d at 1045) (emphasis added); *Doe*,
2022 WL 16545125, at *4 (quoting *Farmer*, 907 F.2d at
1045); *Warner*, 5 F.3d at 1381 (quoting *Farmer*, 907 F.2d at
1045); *see also Neuner*, 535 F. App'x at 374 n.1 (citing
*Bailey*, 123 F.3d at 1393).

_____

[5] During the Senate floor debate, consideration of whether various
machinegun transfers would be lawful under the proposed bill assumed
that lawful transfers would need to take place under the authority of the
United States. For instance, while discussing the application of
§ 922(o)(2)(A) to the sale of weapons to foreign allies, Senator Hatch
explained that "these [sales] should be considered transfers under the
authority of the United States" and therefore fall under the exemption.
*Farmer*, 907 F.2d at 1045 (quoting 132 Cong. Rec. 9600 (1986)
(statement of Sen. Hatch)). When manufacturers sell machineguns to the
military, such activity falls under the exemption because "these sales and
other transactions would clearly take place *under the authority of the
United States*." *Id*. (quoting 132 Cong. Rec. 9600 (1986) (statement of
Sen. Hatch)). Discussing whether the exemption would permit a police
force to authorize its officers to purchase machineguns in their personal
capacity, Senator Hatch noted that "*possession or transfer of those
weapons would cease to enjoy the authorization of the State agency or
subdivision when the officer was no longer on the police force*. The
police force would then have to exercise its authority to guarantee that
the machinegun was transferred to another entity authorized by the State
or the United States to possess such weaponry." *Id.* (quoting 132 Cong.
Rec. 9601 (1986) (statement of Sen. Hatch)).

Appendix-14

USA v. KITTSON                    15

The Supreme Court also has held for decades "that, in the detection of many types of crime, the Government is entitled to use decoys and to conceal the identity of its agents." *Lewis v. United States*, 385 U.S. 206, 208–09 (1966). Accordingly, in cases featuring other statutes regulating the transfer of firearms, we have held that the involvement of an undercover agent does not shield a defendant from liability.[6]

In *Perri*, we came to this same conclusion when examining a very similar statute, 18 U.S.C. § 925(a)(1). 637 F.2d at 1337. Section 925(a)(1) provides a government exemption for "the transportation, shipment, receipt, possession, or importation of any firearm . . . imported for, sold or shipped to, or issued for the use of, the United States or any department or agency thereof or any State or any department, agency, or political subdivision thereof." Rejecting a virtually identical argument to the one that Kittson makes, we held that the section "does not exempt a sale of firearms through an undisclosed under-cover agent of

---

[6] *See, e.g.*, *United States v. Ubaldo*, 859 F.3d 690, 701–03 (9th Cir. 2017) (holding that the involvement of an undercover FBI agent in an arms smuggling scheme does not absolve the defendant from liability); *Gillis*, 474 F.2d at 5–6 (noting that the transfer of an unregistered machinegun to an undercover agent was illegal unless it met requirements under the relevant regulations); *see also United States v. Bogden*, 865 F.2d 124, 127 n.4 (7th Cir. 1988) (dismissing as without merit the argument that a defendant who "was making [a] gun for an undercover ATF agent" was exempted from liability under 26 U.S.C. §§ 5851, 5852); *cf., e.g.*, *Peterson v. United States*, 405 F.2d 102, 108 (8th Cir. 1968) (noting the "obvious purpose" of a statutory exception for the "sale" or "giving away of narcotic drugs to any officer of the United States Government" was "to allow legitimate transfers to government officials" and holding the exception did not apply to the sale of narcotics to an undercover agent (citation omitted)).

Appendix-15

16                          USA V. KITTSON

the United States." *Id.* "To excuse a dealer's willful
violation of the Act by selling to an unlawful purchaser
simply because the government ultimately receives the
firearm would circumvent the Act in a way that Congress did
not intend." *Id.* We also noted that if the defendant "knew
the purchaser was a government agent and received a
statement from the latter's agency that the firearm would be
used for official business, the transaction might fall within
the exemption." *Id.*; *see also Hyland v. Fukuda*, 580 F.2d
977, 979 (9th Cir. 1978) ("We agree with the district judge
that the plain terms of section 925(a)(1) remove firearms
owned by the state and *used exclusively for its purposes* from
the limitations of section 922." (emphasis added)).

    In light of this compelling statutory interpretation
background, it is not surprising that two panels of our court
already have rejected the argument that § 922(o)(2)(A)
provides a get out of jail free card when a defendant transfers
a machinegun to an undercover agent posing as a drug
trafficker, terrorist leader, mass school shooter, or other vile
criminal. *See Bascue*, 1996 WL 554488 at *2 ("Section
922(o)'s government agency exemption was not meant to
exempt from criminal liability sellers of unlawful firearms
caught in government sting operations."); *United States v.
Nadal*, 64 F.3d 667 (9th Cir. 1995) (table) (rejecting
defendant's "contention that his convictions under 18 U.S.C.
§ 922(o)(1) must be overturned because he was acting under
the authority of an agent of the United States" as "frivolous"
because he "had no knowledge that he was interacting with
government officials at the time of the transactions, and thus
he was not acting pursuant to governmental authority"). A
Fifth Circuit panel even went as far to call this argument
"absurd." *Neuner*, 535 F. App'x at 374 n.1.

USA v. KITTSON                    17

Without citing a single case, Kittson demands that we sweep away decades of case law and logic and hold that there is nothing illegal about transferring machineguns to undercover agents posing as the most odious criminals. He asserts that the "plain language" of the statute establishes that the word "transfer" in § 922(o)(2)(A) covers his "transfer" in this case, so he is in the clear. To support this argument, he suggests that the language "under the authority of" modifies only "possession" and not "transfer" because there is a comma separating "transfer to or by" and "possession by or under the authority of." Thus, according to Kittson, any transfer to the United States is exempted under § 922(o)(2)(A), regardless of whether it is authorized. Kittson also argues that because § 922(o)(2)(B)'s exemption for "lawful transfer[s]" of machineguns before a certain date includes the word "lawful," and § 922(o)(2)(A) does not include the modifier "lawful" before "transfers," Congress intended § 922(o)(2)(A) to exempt any transfers to the United States, regardless of whether they are lawful or authorized.

Kittson's argument that the "transfer" in § 922(o)(2)(A) must be the same as "transfer" in § 922(o)(1) ignores the Supreme Court's sage advice: "In law as in life, . . . the same words, placed in different contexts, sometimes mean different things." *Yates v. United States*, 574 U.S. 528, 537 (2015) (plurality opinion); *see also, e.g.*, *Marshall v. Green Goddess Avocado Corp.*, 615 F.2d 851, 854 (9th Cir. 1980) ("[T]he same word may, depending on context, have different meanings within the same statute."); *Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932) ("Most words have different shades of meaning, and consequently may be variously construed, not only when they occur in

Appendix-17

18                      USA v. KITTSON

different statutes, but when used more than once in the same statute or even in the same section.").

Simply put, context matters, which is why we still have human beings interpret statutes, rather than MU-TH-UR 6000, Skynet, or Hal 9000 donning black robes. "When interpreting words in a statute, we start with the premise that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *United States v. Wing*, 682 F.3d 861, 867 (9th Cir. 2012) (citation and internal marks omitted). "Our goal is to understand the statute as a symmetrical and coherent regulatory scheme and to fit, if possible, all parts into a harmonious whole." *Id.* (citation and internal marks omitted).

Congress did not enact FOPA in isolation. And "as a matter of statutory construction, we 'presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts.'" *United States v. Hunter*, 101 F.3d 82, 85 (9th Cir. 1996) (quoting *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 185 (1988)). The surrounding statutes closely regulating machineguns thus provide additional context to the meaning of "transfer to" the United States. As explained, machineguns must be registered, and machinegun transfers, even those to the United States, must meet certain requirements and be approved by the Secretary of Treasury, none of which occurred here or would ever happen in undercover operations. *See* 26 U.S.C. §§ 5812, 5852–53; 27 C.F.R. §§ 479.89–90, 479.105; *see also United States v. Freed*, 401 U.S. 601, 605 (1971) (noting that a "lawful transfer" of machinegun must include an application supported "by a certificate of a local or federal law enforcement official that he is satisfied that the photograph and fingerprints are those of the transferee and that the weapon is intended for lawful uses"). Construing

Appendix-18

§ 922(o)(2)(A) to exempt any machinegun "transfer" to undercover agents—regardless of compliance with applicable requirements—would essentially sanction the very conduct Congress intended to prohibit and regulate. Such a reading also would undermine the goals of Congress to aid law enforcement officers to combat crime. *See Beuckelaere*, 91 F.3d at 785; *see also United States v. Meek*, 366 F.3d 705, 719 (9th Cir. 2004) (rejecting interpretation of statute that would "frustrate" the purpose of a statute and hinder law enforcement efforts).

Indeed, what these firearm statutes demonstrate is what courts have been saying for decades—that the exemptions for transfers cover solely those transfers "authorized by the government for the benefit of federal, state, or local government entities." *Bailey*, 123 F.3d at 1393 (citation omitted). Kittson's inability to identify a single case to support his "absurd" reading of § 922(o)(2)(A), as the Fifth Circuit put it, *Neuner*, 535 F. App'x at 374 n.1, is telling.

The district court's reading is consistent with our precedent regarding other statutes regulating machineguns. As noted, in *Perri* we held that the exemption in § 925(a) for firearms sold to the United States did not apply to sales to undercover agents. 637 F.2d at 1337. Kittson attempts to distinguish *Perri* by arguing that the Fifth Circuit case upon which *Perri* relied, *United States v. Brooks*, 611 F.2d 614 (5th Cir. 1980), *overruled on other grounds by United States v. Henry*, 749 F.2d 203 (5th Cir. 1984), purportedly held that the exemption did not apply to a sale to an undercover agent because § 925(a)(1) applies only to "transportation, shipment, receipt, or importation" and not "sales." Kittson misreads *Brooks* and cannot avoid *Perri*'s direct application here.

Appendix-19

As in *Perri*, the Fifth Circuit in *Brooks* rejected the defendant's argument that his sales to an undercover federal agent were exempt under § 925(a)(1). 611 F.2d at 617. The Fifth Circuit held that § 925(a) "does not exempt any sale or delivery of firearms; it expressly covers only the 'transportation, shipment, receipt, or importation' of firearms '*for the use of the United States.*'" *Id.* (emphasis added). "If such a sale is indeed exempt, the seller must have knowledge that the buyer is a police officer and must secure a signed statement from an official of the agency for which the buyer works stating that the firearm is to be used in the buyer's official duties." *Id.* at 618. Contrary to Kittson's argument, *Brooks* does not stand for the proposition that the § 925(a)(1) exemption excludes all "sales." Rather, the Fifth Circuit narrowed the exemption to encompass only the sales and deliveries of firearms "for the use of the United States." *Id.* at 617.

In analyzing a statute similar to § 922(o)(2)(A), *Brooks* and *Perri* demonstrate that the placement of a comma is not dispositive. Section 925(a)(1), like § 922(o)(2)(A), has commas separating "sold or shipped to," "or issued for the use of," and "the United States." Under Kittson's view, the language "for the use of" would modify only "issued" and not "sold," meaning that any firearm sold to the United States would be exempted under § 925(a)(1). Such a reading directly conflicts with *Perri*. *See* 637 F.2d at 1337 (noting that sales to a government agent may be exempted if there was a statement from the applicable agency "that the firearm would be used for official business"); *see also Brooks*, 611 F.2d at 618 (same).

If Congress had intended to disrupt the history and tradition of law enforcement using undercover agents to stop arms traffickers from peddling exceedingly dangerous,

military grade automatic weapons, it could have easily done so by inserting such language into § 922(o). It never did, and we are not in the business of doing so, especially when it would lead to the absurd result of trying to catch arms traffickers after they have transferred the weapon to a mass killer, rather than stopping them before the carnage ensues. *See United States v. Casasola*, 670 F.3d 1023, 1029 (9th Cir. 2012) ("[C]ourts do not construe statutes in a manner that would lead to absurd results."). We do not believe that questionable comma placement trumps decades of case law, history, or common sense. *See Sorrells v. United States*, 287 U.S. 435, 446 (1932) ("Literal interpretation of statutes at the expense of the reason of the law and producing absurd consequences or flagrant injustice has frequently been condemned.").

The dissent's many arguments, ranging from speed limit hypotheticals to unwell uncles, branch from the same thought tree—that Congress would care deeply about someone *possessing* a machinegun, but couldn't care less about someone who wanted to *transfer* that same machinegun to the vilest of criminals.

The dissent's explanation for this logical disconnect? That "[i]n the vast majority of cases involving an undercover sting, that distinction doesn't matter much because the defendant will inevitably have both transferred the machinegun *and* necessarily possessed it when he personally handled it before transferring it." In other words, the transfer language of 922(o) vanishes from the statute when undercover agents are involved.

The dissent never explains why we should erase transfer liability from section 922(o). It presents no support for its claim that the "vast majority" of undercover sting cases will

22 USA v. KITTSON

involve a defendant who both transfers and personally possesses a machinegun. One can easily conjure up countless examples of when someone would be guilty of transferring firearms even if they did not possess them—a sophisticated arms dealer who uses a third party to transfer the machinegun to a terrorist organization who will attack a Veterans Day Parade, the cartel leader who orders his foot soldiers to transfer a machinegun to the sicario, a white supremacist who commands his new recruit to trade the machinegun for fentanyl, and so on. Or a simpler case, like this one, where Kittson caused the transfer of a machinegun to someone he thought was a drug dealer.

But what the dissent cannot conjure up is why Congress would ever intend for this Legion of Doom to avoid prosecution. Much like Kittson, the dissent cannot cite a single case, law review article, or even scrap of legislative history to prop up its reading of Section 922. Instead, it speculates that "[b]y granting immunity to individuals who transfer machineguns to the federal government, Congress encourages the central goal of § 922(o): limiting machineguns in private ownership and stopping the interstate transfer of those weapons." But it is hard to see how immunizing defendants like Kittson could help stem the interstate transfer of machineguns. A defendant in Kittson's position, looking to transfer a machinegun to someone he believes to be an arms trafficker, should reasonably feel emboldened under the dissent's interpretation of Section 922. If the buyer is in fact an arms trafficker, then he has avoided capture in a government sting operation. If the buyer is an undercover officer, he is home free under the dissent's reading of § 922(o)(2)(A). On the other hand, the dissent's interpretation does nothing to promote lawful transfers to government. Merely excluding defendants

Appendix-22

USA V. KITTSON                                    23

caught in sting operations from the razor-thin ambit of § 922(o)(2)(A) immunity, as the majority does here, has no effect on individuals intending to make lawful machinegun transfers to the government.

The dissent also proclaims that we read a "reverse state-of-mind element" into the § 922(o)(2)(A) exemption. It asserts that "under [the majority's] holding, Kittson must not only transfer a firearm to the government, but must also do so knowingly." But nothing in the majority opinion suggests this. To be clear, we do not hold that the exemption in § 922(o)(2)(A) requires a defendant to prove any particular mental state, much less the mental state of knowledge. Rather, we simply reaffirm the validity of sting operations involving machineguns. A defendant like Kittson, whose attempt to illegally transfer a machinegun is intercepted by an undercover agent, is not protected under § 922(o)(2)(A).

This is the same principle that governs all undercover cases. Following the dissent's logic to its natural conclusion would curtail the use of sting operations in many traditional contexts. Courts, including this one, have long accepted the validity of convictions resulting from undercover operations. Such cases include the export of illegal arms,[7] the distribution of child pornography,[8] and the distribution of

---

[7] *See, e.g.*, *United States v. Hendron*, 43 F.3d 24, 25 (2nd Cir. 1994) (per curiam) (affirming the defendant's sentence for violating the Arms Export Control Act after he contracted to sell AK-47s to undercover agents posing as representatives of the Republic of Iraq).

[8] *See, e.g.*, *United States v. Hernandez*, 795 F.3d 1159, 1162–63 (9th Cir. 2015) (affirming the defendant's sentence for distribution of child pornography after he shared files with undercover agents).

Appendix-23

Case: 23-4132, 12/10/2025, DktEntry: 53.1, Page 24 of 60


24                          USA v. KITTSON

narcotics.[9]  This has never been understood as creating a "reverse state of mind" requirement.  Under the dissent's reasoning, all defendants caught up in sting operations are being punished for failing to prove an innocent state of mind—had they shown they knew the person on the other end was an undercover agent, they would have been innocent of any crime.  But this exotic framing obscures the fact that sting operations are a common law enforcement practice.[10]  Section 922 bears no indication that Congress intended to interfere with them.

Accordingly, the district court, like every other court to confront this issue, correctly rejected Kittson's argument regarding the § 922(o)(2)(A) exemption.[11]

## C.  The Constitutionality of § 922(o) after *Bruen*

Kittson also argues that § 922(o) violates the Second Amendment.  In *Henry*, we rejected that argument and held that "machine guns are 'dangerous and unusual weapons' that are unprotected by the Second Amendment."  688 F.3d at 638 (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 627 (2008)).  As he did before the district court, Kittson

---

[9] *See, e.g.*, *United States v. Privett*, 443 F.2d 528, 529 (9th Cir. 1971) (affirming the defendant's conviction for selling cocaine after he completed a transaction with an undercover agent); *Barnett v. United States*, 171 F.2d 721, 721–22 (9th Cir. 1949) (affirming the defendant's conviction for selling narcotics after he agreed to make a sale to an undercover agent).

[10] *See Lewis*, 385 U.S. at 208–09; *see also* cases cited *supra* note 6.

[11] In the alternative, Kittson argues that the district court erred in denying his request for an affirmative defense jury instruction based on the exemption for transfers to the United States under § 922(o)(2)(A).  We address this argument in a concurrently filed memorandum disposition, in which we affirm.

Appendix-24

USA v. KITTSON                           25

argues that *Henry* is clearly irreconcilable with *Bruen*. We agree with the district court that *Henry* remains good law and controls the outcome here.

### 1. *Heller* and the Second Amendment Jurisprudence

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Supreme Court held that the Second Amendment "protect[s] an individual right to keep and bear arms for self-defense." *Bruen*, 597 U.S. at 17. However, the Court emphasized the right "is not unlimited," and "was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.

One "important limitation" is that only certain types of weapons are protected under the Second Amendment. *Id.* at 627; *see also id.* at 623 ("[T]he Second Amendment right . . . extends only to certain types of weapons."). For example, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id.* at 625. In other words, "the sorts of weapons protected were those 'in common use at the time.'" *Id.* at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). *Heller* recognized that this "limitation [was] fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* (citation omitted); *see also id.* at 625 (noting the limitation "accords with the historical understanding of the scope of the right").

In considering the types of weapons protected, *Heller* rejected a "startling reading" of its precedent that would

Appendix-25

26                    USA v. KITTSON

protect "only those weapons useful in warfare[,] . . . since it
would mean that the National Firearms Act's restrictions on
machineguns . . . might be unconstitutional, machineguns
being useful in warfare in 1939." *Id.* at 624. The Court also
explained that "weapons that are most useful in military
service—M–16 rifles and the like—may be banned." *Id.* at
627.

Then in *Henry*, we applied *Heller* to conclude "machine
guns are highly 'dangerous and unusual weapons' that are
not 'typically possessed by law-abiding citizens for lawful
purposes.'" 688 F.3d at 640 (quoting *Heller*, 554 U.S. at
625, 627). We relied on sources explaining the history of
machinegun usage and the weapon's characteristics to
conclude machineguns are dangerous, with "few weapons
that are more dangerous." *Id.* For example, the machinegun
was "first widely used during World War I, where it
'demonstrated its murderously effective firepower,'" and
now modern machineguns have the ability to "fire more than
1,000 rounds per minute, allowing a shooter to kill dozens of
people within a matter of seconds." *Id.* (citations omitted).

We also determined that machineguns were unusual
because "private possession of all new machine guns, as well
as all existing machine guns that were not lawfully possessed
before the enactment of § 922(o), has been unlawful since
1986." *Id.* We found that "[o]utside of a few government-
related uses, machine guns largely exist on the black
market." *Id.* Accordingly, we held "the Second Amendment
does not apply to machine guns," and therefore, did not
consider the applicable "level of constitutional scrutiny"
required under our pre-*Bruen* interest balancing test. *Id.*

In *Bruen*, the Supreme Court rejected the two-step
"interest balancing" or "means-end" test our Circuit and

Appendix-26

USA v. KITTSON                                    27

several others employed as "one step too many." 597 U.S. at 18–19 & 23 n.5. But *Bruen* did not disturb *Heller*. Rather *Bruen* stated that its holding was "[i]n keeping with *Heller*," *id.* at 17, that the text and history test applied was the one "set forth in *Heller*," *id.* at 26, and that it was making "the constitutional standard endorsed in *Heller* more explicit," *id.* at 31.

As in *Heller*, *Bruen* emphasized the Second Amendment was "not unlimited." *Id.* at 21 (quoting *Heller*, 554 U.S. at 626). It also reiterated that in *Heller*, the Court "found it fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons that the Second Amendment protects the possession and use of weapons that are in common use at the time." *Id.* at 21 (internal quotation marks omitted) (quoting *Heller*, 554 U.S. at 627); *see also id.* at 47 (noting the Court "already acknowledged" in *Heller* that "colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons'"). *Bruen* further acknowledged that in *Heller*, the Court was "[d]rawing from this historical tradition" and had "explained there that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Id.* at 47 (quoting *Heller*, 554 U.S. at 627). As the Sixth Circuit recognized, *Bruen* "did not call *Heller* into question; to the contrary, *Bruen* was an unqualified endorsement of *Heller*." *United States v. Bridges*, 150 F.4th 517, 523 (6th Cir. 2025); *see also United States v. Morgan*, 150 F.4th 1339, 1349 (10th Cir. 2025) ("*Bruen* said nothing contrary to *Heller*'s 'in common use' language" (citing *Bruen*, 597 U.S. at 21, 32 (quoting *Heller*, 554 U.S. at 627))).

Most recently in *United States v. Rahimi*, the Supreme Court again reaffirmed that the Second Amendment "right

Appendix-27

28              USA v. KITTSON

was never thought to sweep indiscriminately" and reiterated *Heller*'s finding that there is a historical tradition of prohibiting the carrying of "dangerous and unusual weapons." 602 U.S. 680, 691 (2024) (quoting *Heller*, 554 U.S. at 627); *see also id.* at 696–98 (discussing historical laws).

### 2. *Henry* is Not Clearly Irreconcilable with *Bruen*

"Generally, a panel opinion is binding on subsequent panels unless and until overruled by an en banc decision of this circuit." *United States v. Eckford*, 77 F.4th 1228, 1233 (9th Cir. 2023) (citation omitted). Under *Miller v. Gammie*, one exception to this rule is where "intervening Supreme Court authority is clearly irreconcilable with our prior circuit authority." 335 F.3d at 900. "[T]he clearly irreconcilable requirement is a high standard that demands more than mere tension between the intervening higher authority and prior circuit precedent." *Eckford*, 77 F.4th at 1233 (alteration in original) (citation and quotation marks omitted). "[I]f we can apply our precedent consistently with that of the higher authority, we must do so." *Id.* (alteration in original) (citation omitted). Here, *Henry* is not clearly irreconcilable with *Bruen*.

As an initial matter, *Bruen*'s rejection of the interest balancing or means-end test did not affect *Henry*. "*Bruen* overturned only those post-*Heller* decisions that 'had *mis*applied *Heller* by erroneously adding a means-end-scrutiny step to *Heller*'s text-and-history standard." *United States v. Brown*, 147 F.4th 687, 689 (6th Cir. 2025) (emphasis in original) (quoting *Bridges*, 150 F.4th at 523). But *Henry* did not conduct any such test. *See* 688 F.3d at 640. Accordingly, to the extent *Bruen* abrogated some of

Appendix-28

our cases, it did not necessarily affect our other Second Amendment precedents that "straightforwardly applied *Heller*, a case that *Bruen* emphatically endorsed." *Bridges*, 150 F.4th at 523.

And while *Henry*'s review of history was not as thorough as some post-*Heller* cases, it did independently conduct a historical analysis, noting that machineguns rose in prominence during World War I, were considered to be dangerous, and are uncommon as they now exist mainly in the black market. *See Henry*, 688 F.3d at 640; *cf. Bridges*, 150 F.4th at 523 (noting pre-*Bruen* precedent could "rel[y] entirely on *Heller*'s clear statements, rooted in historical analysis, that applied to machineguns" rather than "conduct its own independent review of text and history").

But even if its historical analysis was not as exhaustive as some may prefer, *Henry* faithfully applied the reasoning in *Heller* and relied on the Supreme Court's own finding of a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Henry*, 688 F.3d at 640 (quoting *Heller*, 554 U.S. at 627). As Justice Kavanaugh noted in his concurrence in *Rahimi*, "[a]lthough *Heller* declined to 'undertake an exhaustive historical analysis,' it recognized a few categories of traditional exceptions to the right." *Rahimi*, 602 U.S. at 735 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626). One such category is that "the Second Amendment attaches only to weapons 'in common use' because 'that limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons.'" *Id.* (quoting *Heller*, 554 U.S. at 626–27).

*Bruen* did not disturb the parts of *Heller* upon which *Henry* relied, and actually endorsed *Heller*'s finding of a

Appendix-29

30                          USA V. KITTSON

"historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627). *Bruen* further acknowledged that *Heller* was "[d]rawing from this historical tradition" when it "explained there that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Id.* at 47 (quoting *Heller*, 554 U.S. at 627).

The Sixth and Tenth Circuits have rejected post-*Bruen* challenges to the constitutionality of § 922(o). *See, e.g.*, *Bridges*, 150 F.4th at 519; *Brown*, 147 F.4th at 689; *Morgan*, 150 F.4th at 1341. The Sixth Circuit has likewise held that *Bruen* did not disturb its pre-*Bruen* precedent. Pre-*Bruen*, the Sixth Circuit held the Second Amendment "does not authorize an unlicensed individual to possess unregistered machine guns for personal use." *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009). *Hamblen* did not conduct any means-end test and relied solely on *Heller*. *See id.* Post-*Bruen¸* the Sixth Circuit concluded "pre-*Bruen* cases that did not wrongfully apply means-end scrutiny remain binding." *Bridges*, 150 F.4th at 523. As such, the court held *Hamblen* "remains good law after *Bruen*" because it did not conduct a means-end test and instead "straightforwardly applied *Heller*, and *Bruen* did nothing to displace those aspects of *Heller* on which *Hamblen* relied." *Id.* "Although *Hamblen* did not conduct its own independent review of text and history," the Sixth Circuit determined "it did not have to" as "it instead relied entirely on *Heller*'s clear statements, rooted in historical analysis, that applied to machineguns." *Id.* It stated, "[i]f *Heller* was rooted in history, then so too was *Hamblen*." *Id.* at *5.

Similarly, *Henry* straightforwardly applied the reasoning in *Heller*, which *Bruen* endorsed. As such *Bruen* has not

USA V. KITTSON                                 31

"undercut the theory or reasoning underlying [*Henry*] in such a way that the cases are clearly irreconcilable." *Miller*, 335 F.3d at 900. Accordingly, the district court correctly concluded *Henry* remains binding, and Kittson's Second Amendment challenge fails.

**AFFIRMED.**

VANDYKE, Circuit Judge, dissenting:

It is a bedrock principle of statutory interpretation that all people are entitled to the benefit of the law as written. That principle is particularly weighty here—where an unsympathetic criminal defendant asks us for nothing more than the plain application of a criminal statute. Because (1) Daniel Kittson transferred a machinegun to the United States and (2) Congress expressly did not criminalize that conduct, Kittson should never have been convicted of a crime that doesn't exist. This court should have vacated his conviction and remanded his case for a new trial.

The majority declines to do so. In reaching a result contrary to what the statutory text demands, the majority applies an uncritical approach to precedent, taking as good enough any application of federal law's machinegun prohibitions, without considering whether those applications of § 922(o) are relevant to the exception at issue here. That approach fails to grapple with the specifics of the case before us by relying on cases that either implicate § 922(o)'s *possession* element—textually different in important ways from the *transfer* element we are considering here—or implicate entirely different statutes altogether. Simply put, the majority fails to deal with the unique case at hand: a

Appendix-31

| 32 | USA v. KITTSON |
|---|---|

criminal defendant who transferred a machinegun to the United States without first possessing it. As explained below, the cases the majority relies upon do not support its argument.

Nor could they. Section 922(o)(2)(A) excepts from liability any machinegun transfer to the government. To uphold Kittson's conviction, the majority must read an implicit reverse mens rea element into a criminal statute's exception. That is, to receive the *benefit* of a criminal statute's plain carveout, a defendant must first show an innocent state of mind. That requirement is nowhere in the text. Adding it expands criminal liability beyond what Congress created and, worse yet, sets a dangerous precedent for judicially expanding criminal liability by reading unwritten innocent state of mind requirements into otherwise clear exceptions to criminal conduct. Because the district court erroneously instructed the jury that it could convict Kittson of a crime that does not exist, and because this error was not harmless, I would vacate the conviction and remand for further proceedings.

Although I would not reach the Second Amendment question, in response to the majority's analysis of that issue I observe only that it fails to grapple with *Bruen*'s analogical reasoning requirement and merely assumes that machineguns fall outside the ambit of constitutionally protected firearms. That assumption is inappropriate given the Supreme Court's demand that the government support firearm regulations with historical analogues. It's especially inappropriate here, where the majority assumes machinegun ownership is overwhelmingly criminal in nature without any fact-finding from the district court on that question.

Appendix-32

USA v. KITTSON                                    33

**I.  The majority fails to muster a single case that controls or even informs the proper interpretation of § 922(o)'s exception in this case.**

As the majority tells it, today's outcome was already decided by an overwhelming majority of our sister circuits, or at least inevitable in light of our own caselaw.  But that's not what those decisions show.  To the contrary, it doesn't appear that any court—ours or otherwise—has considered a case like this: where a defendant did not possess the machinegun that he transferred to a federal agent.  Because no decision controls ours today, I would not preordain the analysis by incorrectly claiming that we are merely following a well-trodden path.

**A. No decision from our sister circuits lends credibility to the majority's holding.**

The majority drafts behind nine out-of-circuit decisions, claiming that each blesses its reading of § 922(o)(2)(A)'s transfer exception.  None do.  But first it's worth noting a bit of nuance on this point—and briefly summarizing some important facts that make this case different.

Section 922(o) generally criminalizes the transfer or possession of machineguns, but § 922(o)(2)(A) sets out two distinct exceptions from liability.  First, the statute exempts "a transfer to or by … the United States or any [state or federal agency]."  *Id.*  Second, it exempts "possession by or under the authority of, the United States or any [state or federal agency]."  *Id.*  Notice that while lawful "possession" must be "under the authority of" the government, the text applies no such requirement to the transfer exception.

In the vast majority of cases involving an undercover sting, that distinction doesn't matter much because the

Appendix-33

34                          USA V. KITTSON

defendant will typically have both transferred the machinegun *and* necessarily possessed it when he personally handled it before transferring it. Indeed, in the examples cited by the majority the defendant was often arrested before he ever had a chance to actually transfer the machinegun, so he is necessarily prosecuted only for possessing it. That perhaps explains why the specific issue presented in this case apparently has never been addressed by a court before. But that distinction matters immensely in this case, because here we must assume that Kittson never possessed the machinegun. Instead of bringing a machinegun to an undercover agent, Kittson brought the agent to a third person who then sold the gun to the agent. At all times that third person had physical possession of the firearm. We cannot know whether the jury in this case concluded that Kittson ever possessed the machinegun.[1]

---

[1] It's important to recognize why—for purposes of this appeal—we must assume that the jury convicted Kittson for transferring, but not possessing, a machinegun. There is no evidence in the record that Kittson ever physically possessed the machinegun, and the government doesn't argue that he did. And while in theory a jury might have convicted Kittson for constructively possessing the machinegun, that seems unlikely since it acquitted him on the felon *in possession* charge. But even if we focused on the machinegun charge alone, we would still have to set aside that conviction if the jury might have relied on an erroneous transfer instruction. *See United States v. Galecki*, 89 F.4th 713, 739 (9th Cir. 2023) (requiring vacatur of conviction that could have relied on a legally erroneous ground). Because we can't know with certainty whether the jury convicted Kittson under § 922(o) for transferring or possessing the machinegun, we must assume the jury convicted under the transfer theory. So, for purposes of my analysis, I assume that Kittson never "possessed" the machinegun. Although I expand on this point later in more detail, along with the importance of Kittson preserving this issue and why the error wasn't harmless, I don't read the majority as disputing this legal point.

Appendix-34

USA V. KITTSON                                            35

Because a case like this one is unusual, courts have rarely needed to distinguish between the possession and transfer elements of § 922(o)(2)(A). Instead, they typically just collapse the exceptions together when discussing them. *United States v. Neuner*, 535 F. App'x 373 (5th Cir. 2013), illustrates this well. The majority cites that unpublished case from our sister circuit for the proposition that § 922(o) "limit[s] lawful transfer and possession of machine guns to authorized governmental personnel for use in their official capacities." The majority's implicit point seems to be that the Fifth Circuit held that § 922(o)(2)(A)'s "by or under the authority of" language applies to the transfer exception too. But the Fifth Circuit couldn't have held that because *Neuner* involved only a defendant's *possession* of a machinegun and did not involve a transfer at all. *See* 535 F. App'x at 374 n.1 (holding § 922(o)(2)(A) "do[es] not except unwary targets of undercover operations … from criminal liability for *possessing* machine guns" (emphasis added)).

The defendant in *Neuner* never claimed his conduct fell within § 922(o)(2)(A)'s *transfer* exception but relied instead on a defense that the United States authorized his machinegun *possession*. *Id.* I hardly see how the Fifth Circuit rejecting the premise that a defendant "act[ed] under the authority of the government to legally *possess* a machine gun" has anything to do with Kittson, who avails himself of § 922(o)(2)(A)'s transfer exception only. *Id.* (emphasis added). *Neuner* was only about the possession exception. This case is only about the transfer exception.[2]

---

[2] This makes it more than a little unfair for the majority to repeatedly wrap itself in *Neuner*'s characterization of the defendant's argument there as "absurd." 535 F. App'x at 374 n.1. That is particularly true given that, as discussed, the statutory exception for possession expressly

Appendix-35

That's a common theme in the majority's cited out-of-circuit decisions. *United States v. Warner* also involved a defendant found guilty of "the crime of illegally possessing a machine gun," who relied only on an argument that state law authorized his conceded possession of that firearm. 5 F.3d 1378, 1379–81 (10th Cir. 1993). So too in *Doe v. Biden*, which turned entirely on the possession exception to § 922(o)'s prohibition and considered whether the possession prong's "under the authority of the United States" modifier allowed the ATF to authorize machinegun possession for private purposes. No. 2022-1197, 2022 WL 16545125, at *4 (Fed. Cir. Oct. 31, 2022). The court concluded that it didn't by explaining that "under the authority of" required a nexus to a governmental purpose. *Id.* at *4. And it's the same story in *United States v. Fisher*, where a defendant—you guessed it—possessed, but did not transfer, a machinegun. 149 F. App'x 379, 382 (6th Cir. 2005). That court briefly considered § 922(o)'s exception only to reject the idea that "possession of [the defendant's] four machine guns was … authorized by the National Guard

---

requires that it be "under the authority of the government," while the transfer exception has no such requirement. While *Neuner* did mention the word "transfer" once, the defendant in *Neuner* only "argue[d] that he should be given … the exemption … to legally *possess* a machine gun," not to transfer one. *Neuner*, 535 F. App'x at 374 n.1 (emphasis added). It was "[t]hat argument [the Fifth Circuit] rejected as utterly meritless." *Id.* It only labeled as "absurd" Neuner's contention that the statute's exemption for "possessing machine guns" should encompass possession under a supposed "official capacity" notwithstanding that he intended to use the machineguns "to harm law enforcement personnel." *Id.* And the Fifth Circuit was right—that is an absurd argument. But it has nothing to do with the transfer exemption.

USA v. KITTSON                                      37

or 'reasonably connected to his militia service.'" *Id.* at 383 n.2.[3]

Neither *Aiken* nor *McCutchen* cleanly involved a transfer to the government either. *See United States v. Aiken*, 974 F.2d 446, 448–49 (4th Cir. 1992) (considering a taxing power challenge to the National Firearms Act's shotgun possession regulations); *McCutchen v. United States*, 14 F.4th 1355, 1359 (Fed. Cir. 2021) (considering a class-action challenge to bump-stock regulations by "possessors of such devices"). But regardless, I don't necessarily disagree with the principle the majority pulls from these two cases: that § 922(o)(2)(A)'s exceptions require government *involvement* in the transfer or possession of a firearm. It seems self-evident that a transfer "to or by … the United States" requires governmental involvement, which no one disputes.

But the majority's biggest reach in its strange misreading of § 922(o) is its reliance on *Farmer v. Higgins*, 907 F.2d 1041 (11th Cir. 1990), which it reads to "confirm[] that the possession and transfer elements of § 922(o)(2)(A) were always meant to be read together." *Farmer* held no such thing.[4] In that case, the Eleventh Circuit considered whether federal law "prohibits private persons from *possessing*

---

[3] And the story continues in *Hardin* and *Bailey*, which the majority cites briefly for broad principles about how narrowly we should read the transfer exception. *See United States v. Bailey*, 123 F.3d 1381, 1384 (8th Cir. 1997) (challenging conviction for "possession of machineguns"); *Hardin v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 65 F.4th 895, 897 (6th Cir. 2023) (considering regulatory challenge by an individual who possessed bump stocks).

[4] *See Farmer*, 907 F.2d at 1045 ("In sum, we hold that section 922(o) prohibits the private possession of machine guns not lawfully possessed before May 19, [1986].").

Appendix-37

38                           USA V. KITTSON

machine guns." *Id.* at 1042 (emphasis added). That court
had no occasion to consider the scope of § 922(o)(2)(A)'s
transfer exception because the plaintiff did not wish to
transfer a firearm and only applied "to legally make and
register a machine gun for his personal collection." *Id.*
Nonetheless, the Eleventh Circuit consulted the legislative
history surrounding § 922(o)'s passage (more on that later)
to reach the conclusion "that Congress intended to limit
lawful transfer and possession of machine guns to instances
authorized by the government." *Id.* at 1045. From this, the
majority pulls its principle that the Eleventh Circuit
authoritatively held that § 922(o)(2)(A)'s exception clauses
collapse upon each other and "court after court" has
endorsed that view.

That's a stretch to say the least. The majority's logical
mistakes first rely on *Farmer*'s forbidden peek into
legislative history in a case that did not even involve
§ 922(o)(2)(A)'s transfer exception. Then the majority
contends that court after court relied on that analysis in cases
that also did not encompass the transfer exception. The
majority insists that our sister circuits all adopted its view of
§ 922(o)(2)(A)'s statutory language, but none of this lengthy
discussion even arguably shows that. It does not identify a
single case that had occasion to consider the transfer
exception at issue here.

Aside from the important fact that the cases don't say
what the majority says they say, I fear that the majority's
failure to engage with the facts of the cases it cites betrays
an even more fundamental misunderstanding of this court's
role. In the majority's view, "the plain language of these
decisions" demonstrates an "overwhelming consensus" that
those other courts adopted an atextual reading of
§ 922(o)(2)(A)'s transfer exception. And our court is now

USA V. KITTSON                              39

duty bound to follow the "plain language" of our sister circuits. But of course, even if that was true—which again, it isn't—it is not the "plain language" of unprecedential court opinions that matter when interpreting statutes, but the plain text of the law itself. The majority's contentions to the contrary—that other courts' drive-by characterizations of statutes must be accorded more weight than the text of those statutes—would elevate judicial musings over enacted law. Such a misunderstanding departs from the proper role the judiciary plays in our constitutional order. *See New Prime Inc. v. Oliveira*, 585 U.S. 105, 113 (2019) (warning departures from a statute's plain text "risk amending legislation outside the 'single, finely wrought and exhaustively considered, procedure' the Constitution commands" (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983))); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 857 (2025) (rejecting assertion that a court's opinion alone "has the legal force of a judgment").

In sum, the majority's bold assertion that "[e]very circuit to examine this question has come to the same conclusion" misfires. To the contrary, the majority fails to point to a single case that turned on § 922(o)(2)(A)'s transfer exception and relies only on possession cases to support its conclusions in this case. If the majority could do better than pulling unrelated dicta from sister circuit decisions, I'm confident it would have. Its failure to do so refutes its view that "extensive caselaw" from outside our circuit makes today's decision "clear."[5]

---

[5] I don't address the majority's collected cases in its footnote six for the obvious reason that "other statutes regulating the transfer of firearms" contain different prohibitions and differently worded exceptions than § 922(o).

Appendix-39

40                         USA V. KITTSON

**B. Ninth Circuit caselaw does not require the
   majority's result.**

The majority also argues that our own precedent, while
not controlling, counsels in favor upholding Kittson's
conviction.  But none of those cases justify the majority's
outcome in this one either.

The majority first cites two cases as "[r]ejecting a
virtually identical argument" under "a very similar statute."
I agree with the first part of that, since those defendants also
argued that their illegal firearm sales to undercover officers
were exempted from criminal liability.  *See Perri v. Dep't of
Treasury*, 637 F.2d 1332, 1337 (9th Cir. 1981) (arguing
"sales to the undercover agents fall within the exemption");
*United States v. Brooks*, 611 F.2d 614, 617 (5th Cir. 1980),
*overruled on other grounds by United States v. Henry*, 749
F.2d 203 (5th Cir. 1984) (en banc) (same).  But I disagree
that the different statute at issue in *Perri* and *Brooks* is "very
similar" to the one here.

Those cases considered whether a firearm sale to an
undercover "straw purchaser" fell within federal law's
prohibition on selling firearms to convicted felons.[6]  *Perri*,
637 F.2d at 1336; *Brooks*, 611 F.2d at 616.  The defendants
in those cases argued that their sales to undercover officers
were not criminalized because federal prohibitions on those
sales "shall not apply" to "the transportation, shipment,
receipt, possession, or importation of any firearm or
ammunition imported for, sold or shipped to, or issued for

---

[6] A "straw purchase" or "strawman purchase" is any sale where one
person enlists another individual to purchase the firearm in order to
transfer it to the first person.  *Abramski v. United States*, 573 U.S. 169,
180–81 (2014).  Usually the first person is legally prohibited for some
reason from purchasing the firearm directly themselves.

Appendix-40

the use of, the United States or any [applicable agency]." 18 U.S.C. § 925(a)(1); *see Perri*, 637 F.2d at 1336; *Brooks*, 611 F.2d at 616.

While the defendants argued that their conduct was exempted since the firearms were "sold … to … the United States," it's not surprising that both *Perri* and *Brooks* rejected that argument. That's because the statutory exception they argued for only applies where the firearm or ammunition was "imported for, sold or shipped to, or issued for the use of, the United States [or applicable agency]." 18 U.S.C. § 925(a)(1). In other words, the requirement in § 925(a)(1) that a firearm be "sold" to the United States is a modifier, further limiting the class of "transported, shipped, received, possessed, or imported" firearms that are exempted under the criminal statute. Unlike § 922(o)(2)(A)'s transfer exemption for machineguns, selling a firearm to the government is not an action that alone is exempted under § 925(a)(1). *See Brooks*, 611 F.2d at 617 ("This subsection does not exempt any sale or delivery of firearms; it expressly covers only the 'transportation, shipment, receipt, or importation' of firearms 'for the use of the United States.'"); *see also United States v. Cruz*, 50 F.3d 714, 716 (9th Cir. 1995) ("While § 925(a)(1) excepts use of a firearm for a government purpose and in turn, receipt of the firearm for government use, it does not permanently exempt those firearms from the federal gun laws.").

It is true that *Perri* and *Brooks* also further opined that if the undercover agent announced himself as law enforcement, then the transaction might fit within § 925(a)(1)'s exemption. *Perri*, 637 F.2d at 1337; *Brooks*, 611 F.2d at 618. But those gratuitous statements, casually "uttered in passing without due consideration of the alternatives," would not bind this court even if this was a

§ 925(a)(1) case. *United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019) (quoting *United States v. Ingham*, 486 F.3d 1068, 1078 n.8 (9th Cir. 2007)). There's no serious argument that either *Perri* or *Brooks*—which involved sales to *undercover* government agents—needed to make law about a hypothetical case where the government agent's identity was known. *See, e.g.*, *Perri*, 637 F.2d at 1337 ("Those were not the facts here."). And *Perri*'s and *Brooks*'s one-sentence, afterthought dicta did not analyze or explain why this knowledge would make any difference. *Id.*; *Brooks*, 611 F.2d at 618.[7] Accordingly, neither *Perri*'s nor *Brooks*'s unexplained dicta involving a hypothetical about another statute would control even as to the statute at issue in those cases—much less the very differently worded statute at issue here.[8]

---

[7] Indeed, the entire discussion of § 925(a)(1) in both *Perri* and *Brooks* is very truncated—just a few sentences in each opinion that are heavy on assertion and short on any actual analysis. I'm not sure that *Perri*'s fly-by interpretation of § 925(a)(1) would merit binding deference even in a § 925(a)(1) case. *See McAdory*, 935 F.3d at 843. It certainly merits none in this § 922(o)(2)(A) case.

[8] There is yet another reason the terse statements in those cases are unpersuasive. The dicta employed in *Perri* and *Brooks* are "relic[s] from a bygone era of statutory construction," where courts were far more comfortable replacing Congress's chosen text with legal constructions derived from the judges' own legislative preferences. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019). Thankfully, courts now widely recognize that it is not our role to endorse such "a casual disregard of the rules of statutory interpretation," and we should instead engage "in a careful examination of the ordinary meaning and structure of the law itself." *Id.* at 436. That point is well illustrated by the bizarre statement in *Perri* and *Brooks* that a gun seller must receive a "signed statement" from a government official's agency before falling within the statutory exception—a *Miranda*-style requirement simply pulled from the judges' own legislative imaginations with no basis whatsoever in the

USA V. KITTSON                                    43

Finally, the majority confidently overreads *Perri* as controlling the outcome reached in two unpublished decisions of our court that, unlike *Perri* itself, were considering § 922(o)'s exceptions: *Bascue* and *Nadal*. But both those cases involved defendants who possessed machineguns. *See United States v. Bascue*, 97 F.3d 1461, 1461 (9th Cir. 1996) ("[Defendants] were convicted of transferring and possessing machine guns."); *United States v. Nadal*, 64 F.3d 667, 667 (9th Cir. 1995) ("[Defendants] appeal their convictions … for conspiring to manufacture, transfer and possess machineguns."). So whatever language the majority pulls from those nonbinding cases about § 922(o)(2)(A)'s transfer exception was necessarily dicta, and—as is common with our court's unpublished dispositions—also unsupported by any reasoned analysis at all. So those cases hold no persuasive value. *See Small v. Allianz Life Ins. Co. of N. Am.*, 122 F.4th 1182, 1195 (9th Cir. 2024) (dismissing "truncated reasoning" in unpublished decision as unpersuasive).

At bottom, the majority finds no decision that controls, or even provides reasoning that directly supports, its reading of § 922(o)(2)(A)'s transfer exception. That alone doesn't make the majority's position untenable, of course. But its representation—that an overwhelming body of precedent demands today's outcome—obscures the fact that today's decision breaks novel ground. Because it does so, I would squarely analyze the plain text of § 922(o)(2)(A)'s exceptions to determine whether Kittson's machinegun transfer to the United States did or did not constitute a crime.

---

statutory text. *Perri*, 637 F.2d at 1337; *Brooks*, 611 F.2d at 618. I see no reason to transplant such illegitimate dicta into an entirely new statutory context.

## II. The majority errs in reading a reverse state-of-mind element into § 922(o)'s exception.

When you focus on the text itself of § 922(o)(2)(A)'s exceptions, a fair reading precludes upholding Kittson's conviction. Although § 922(o) generally criminalizes the possession or transfer of machineguns, it does not criminalize any possession under the authority of the government or any transfer to the government. Those exceptions are distinct and must be read disjunctively. A defendant who avails himself of the transfer exception need not show that he did so "under the authority" of the government.

In fact, § 922(o)(2)(A)'s transfer exception contains no state of mind requirement at all. Any person who transfers a machinegun to the government does not commit a crime by doing so, even if he is mistaken about the legality of his action. The majority's conclusion to the contrary effectively reads a reverse state of mind element into the statute's plain exception—forcing defendants to prove an innocent state of mind to avoid conviction. Worse still, the majority broadens "transfer" to encompass the entirety of the federal register's technical procedures for transferring firearms to the government. Such a reading creates an impossibly complex—and hidden—labyrinth for everyday Americans to navigate, creating serious notice concerns and undercutting Congress's aim to encourage the transfer of privately owned machineguns to the government.

Since it's impossible to determine whether Kittson was convicted for possessing a machinegun or transferring one, the jury could have (and likely did) convict Kittson on the legally erroneous theory that transferring a machinegun to the government constitutes a crime. For that reason, we

USA V. KITTSON                    45

should have vacated Kittson's conviction and remanded his case for a new trial.

### A. Section 922(o)(2)(A)'s transfer exception is read disjunctively from the possession exception.

Federal law makes it "unlawful for any person to transfer or possess a machinegun." 18 U.SC. § 922(o)(1). But that prohibition "does not apply" to "a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof[.]" *Id.* § 922(o)(2)(A). The statute's use of commas to offset the possession and transfer clauses evinces that these clauses are disjunctive and must be read distinctively. *See Leuthauser v. United States*, 71 F.4th 1189, 1196 (9th Cir. 2023) ("As a general rule, the use of a disjunctive in a statute indicates alternatives and requires that they be treated separately." (quoting *Azure v. Morton*, 514 F.2d 897, 900 (9th Cir. 1975))). While the majority accuses me of "invent[ing] a distinction between" these prongs, it is Congress itself that created this distinction through its use of statutory language. And, if we follow the disjunctive language that Congress employed, the statute exempts from liability any "transfer to or by … the United States" and any "possession by or under the authority of the United States."

The majority's conclusion to the contrary generally falls into two camps: one that relies on precedent and another that focuses on legislative history. First, the majority contends that this textual analysis is in direct conflict with our court's previous decision in *Perri*. But even if *Perri* broadly stands for the proposition that our court has adopted a binding atextual interpretation of § 925(a)'s statutory exception, I hardly see why we should extend that error to § 922(o)'s exceptions. To the contrary, principles of statutory

Appendix-45

46                    USA v. KITTSON

interpretation counsel in favor of cabining that mistake, and we certainly don't ignore commas as "questionably placed" in other cases. *See, e.g.*, *United States v. Paulson*, 68 F.4th 528, 537 (9th Cir. 2023) ("A term or phrase set aside by commas and separated by a conjunctive word from a limiting clause stands independent of the language that follows." (cleaned up)).

The majority's brief crack at its own statutory analysis merits a longer response—if only to cover the extent of its error—but it's sufficient to say that its adoption of the Eleventh Circuit's "detailed recitation of the legislative history" of § 922(o)'s passage is rather unpersuasive in overcoming the statute's plain text. To begin, the entire enterprise of overcoming a statute's ordinary meaning with contemporaneous statements about its passage is illegitimate. *See Mohamad v. Palestinian Auth.*, 566 U.S. 449, 458 (2012) ("[R]eliance on legislative history is unnecessary in light of the statute's unambiguous language." (quoting *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 236 n.3 (2010))); *see also Apache Stronghold v. United States*, 101 F.4th 1036, 1107 (9th Cir. 2024) (en banc) (R. Nelson, J., concurring), *cert. denied*, 145 S. Ct. 1480 (2025), *reh'g denied*, No. 24-291, 2025 WL 2824572 (U.S. Oct. 6, 2025) ("That certain members of Congress made statements about RFRA's scope as Congress debated its enactment does not provide any reliable evidence of RFRA's meaning.").

What's worse, the Eleventh Circuit's decision in *Farmer*—and the majority's adoption of its rationale— represents the worst aspects of this forbidden foray into a statute's meaning. That's because the legislative history, as used by the majority, begins by asking the illegitimate question of what did Congress "intend" to accomplish when

Appendix-46

passing § 922(o).  In search of that answer, the majority pulls statements from individual representatives during floor debates to conclude (unsurprisingly) that Congress would have wanted what the majority wants: Kittson to face criminal liability.

That analysis departs from the now established rule that courts must aim to determine the objective meaning of statutory language, rather than the animating intentions of some legislators who passed it.  *See Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) ("We are governed by laws, not by the intentions of legislators."). And even if we did aim to divine the intentions of what a legislature *meant* to accomplish when passing a criminal statute, I'm not sure that the majority's reliance on individual statements about that statute amount to anything more than the judicial equivalent of "entering a crowded cocktail party and looking over the heads of the guests for one's friends." *Id.*  But if I could pursue Justice Scalia's cocktail metaphor one step further, I'm not even sure that the majority's friends would necessarily agree with it.  The statements cited by the majority simply state the common-sense idea that in the vast majority of transfers to the government, there will be someone involved in that transfer with the authority to accept the firearm on behalf of the government.  That cannot change that the text only *requires* government authorization for possession but not transfer.

None of the majority's arguments to abandon § 922(o)(2)(A)'s plain text are persuasive.  Because Congress employed disjunctive language when writing those statutory exceptions, I would give full weight to its chosen language and interpret "transfer to … the United States" as separate from "possession … under the authority of, the United States."  § 922(o)(2)(A).

Appendix-47

### B. Section 922(o)(2)(A)'s transfer prong contains no state of mind requirement.

As previously explained, § 922(o)(2)(A) exempts transfers of machineguns to the government. That exception contains no state of mind requirement. It merely states that a machinegun "transfer to … the United States" is not a crime. § 922(o)(2)(A). And because everyone agrees that Kittson transferred a machinegun to the government, this should be a fairly straightforward case.

But the majority modifies the statute's text by adding a new, unwritten element. Under its holding, Kittson must not only transfer a firearm to the government, but must also do so knowingly. Courts often read state of mind requirements into statutes to mitigate criminal liability, such as to "require that the defendant know the facts that make his conduct illegal." *Staples v. United States*, 511 U.S. 600, 605 (1994). But I'm unaware of any case—and the majority cites none— that requires the opposite. That is, the majority does not point to a single case where a court has required a defendant to show an *innocent* state of mind to avail himself of an exception to a criminal law's prohibition that contains no such textual requirement.

That's a concerning development with implications beyond just this case. Consider a criminal statute that makes it illegal to drive faster than 15 miles per hour in a school zone. Later on, lawmakers realize that the prohibition is unnecessary on weekends, so they provide an exception: a speed limit of 35 miles per hour applies on Saturday and Sunday. If a person drives 30 miles per hour there on a Sunday, but believes that it is Monday, are they guilty of violating the statute? Of course not. They didn't exceed the applicable speed limit, regardless of their mistaken belief.

| USA v. KITTSON | 49 |
|---|---|

But the majority's approach in this case would uphold a conviction against that driver for *thinking* they committed a crime.

The majority's thought-crime rule would run headlong into how courts typically distinguish between attempted and completed crimes. For example, our court considered this distinction in *United States v. Quijada*, 588 F.2d 1253, 1255 (9th Cir. 1978). There, an undercover officer negotiated the purchase of cocaine from a defendant and eventually bought eight ounces of a white substance. *Id.* at 1254. The police arrested the defendant and charged him with distribution of cocaine. *Id.* But there was a problem with that charge. Although the defendant believed that he sold cocaine to the officer, he actually sold him lidocaine hydrochloride, which is not a controlled substance. *Id.* Since federal law criminalizing the distribution of controlled substances requires that a defendant actually distributed a controlled substance, the government could indict the defendant only for *attempting* to distribute cocaine, not the substantive crime of distribution. *Id.*; *see also* 21 U.S.C. § 841(a)(1).

In that context, where the government tried a defendant for *attempted* distribution, our court rejected a legal impossibility argument and held that—for purposes of an attempt prosecution—a defendant is stuck with the facts as he understood them even if those facts were wrong. *Id.* at 1255. But if that principle extended beyond attempted crimes and into substantive ones, then the government would have had no problem convicting the *Quijada* defendant of the substantive crime of cocaine distribution, our mistaken

50                     USA v. KITTSON

school zone driver for speeding, or even Michael Scott for possession of a controlled substance.[9]

And that's the problem with the majority's attempt to stick Kittson with the facts as he understood them. Had the government convicted Kittson of *attempting* to transfer a machinegun to the government, then it would have a much better argument on appeal and Kittson's complaints about undercover officers would fit the majority's response. But that's not the conviction before us.[10] Instead, Kittson was convicted of completing a transfer of a machinegun and the majority denies him the benefit of an exception to that substantive offense because he was unaware of the circumstances of its existence. The majority's insistence that such a standard does not create a reverse state of mind requirement belies reality and conflates § 922(o)'s prohibition with statutes that contain no comparable exception to § 922(o)(2)(A). The majority can protest all it wants that its opinion does not add a reverse state of mind requirement to a criminal statute, but that is exactly what it does. Only defendants who know that the recipient of their machinegun transfer is the government could enjoy the protection of § 922(o)(2)(A)'s transfer exception—a requirement found nowhere in the statute.

---

[9] *See* THE OFFICE, *Framing Toby – The Office US*, at 1:10 (YouTube, Oct. 30, 2020), https://www.youtube.com/watch?v=19MNAajZnts.

[10] Kittson could not be charged for attempting to violate § 922(o), since that statute criminalizes only completed acts and not attempts. *See United States v. Hopkins*, 703 F.2d 1102, 1104 (9th Cir. 1983) ("There is no general federal 'attempt' statute. A defendant therefore can only be found guilty of an attempt to commit a federal offense if the statute defining the offense also expressly proscribes an attempt.").

Next, the majority contends that Kittson's conduct doesn't fit the transfer exception anyway, since he didn't comply with technical regulatory requirements of transfers to the government. I'm frankly baffled. For one, that's a far more extreme position than even the government advocated for, which no party briefed at any point on appeal. But it also doesn't make any sense.

Aside from the fact that the majority's holding would enable regulatory agencies to expand the contours of criminal law by regulatory fiat, forcing everyday Americans to parse the pages of the federal register before transferring a machinegun to the government would undercut § 922(o)'s purpose of limiting private machinegun ownership. Consider an example where, after Crazy Uncle Bob dies and leaves everything to you, you discover he illegally owned a machinegun. Concerned, and vaguely aware that keeping such a firearm constitutes a crime, you want to surrender that weapon to a government agency. Simple enough, right? But imagine coming across today's opinion while searching for the right agency. The Ninth Circuit now says that your transfer of that weapon must accord with the many technical regulations for making a machinegun transfer. And if you mess up, you've just committed a federal felony. Are you still sure about giving that weapon to the government? Probably not. Maybe you pretend you never found the gun. Maybe, scared of going to jail for giving the gun to the government, you give it to a trusted friend instead. Or maybe you "drop it in a lake." What you probably don't do is call a government official and announce, "I'm about to do something that could land me in federal prison if I don't dodge all the regulatory traps correctly."

The majority's primary textual rejoinder here is that "context matters," and because regulations govern

52                    USA V. KITTSON

machinegun transfers elsewhere in federal law, we should give different meanings to the word "transfer" in § 922(o)(1)'s prohibition and § 922(o)(2)(A)'s exception. *But see Mountain Communities for Fire Safety v. Elliott*, 25 F.4th 667, 677 n.4 (9th Cir. 2022) ("When the language is clear as it is here, we need not look to 'history' or 'purpose' of a regulation ….").

While I generally agree that context matters, it's hard to see how a statute criminalizing firearm "transfers" except where those "transfers" are to the government could be talking about anything other than the same act. To the contrary, the majority's attempt to separate "transfer" in § 922(o)(1)'s prohibition from "transfer" in § 922(o)(2)(A)'s exception, and then pigeonhole the federal register's technical requirements into the latter, is the kind of faux textualism disfavored in statutory interpretation and roundly rejected in criminal law. *See Yates v. United States*, 574 U.S. 528, 543 (2015) ("[A] word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." (internal quotation omitted)); *see also Dubin v. United States*, 599 U.S. 110, 130 (2023) ("Time and again, this Court has prudently avoided reading incongruous breadth into opaque language in criminal statutes."). The majority need look no further than its own reasoning to defeat its argument. If Congress wished for § 922(o)(2)(A)'s transfer exception to require compliance with additional regulations—to quote the majority—"it could have easily done so by inserting such language into § 922(o)."

Finally, the majority retreats to its own belief that a plain application of § 922(o) would create "the absurd result" of limiting undercover sting operations. I don't question the

Appendix-52

USA v. KITTSON                                     53

majority's sincerity, but I think it's misplaced. The majority's claim that its argument is settled law in other circuits relies entirely on cases where a defendant *possessed* a machinegun—and sometimes didn't even get the chance to transfer it. So I don't think the government is going to have trouble prosecuting your typical bad guy trying to sell a machinegun to an undercover agent, when they show up to the undercover sting *in possession of* a machinegun.**11**

But even if the majority's concerns were better-founded, ultimately it shouldn't matter what judges think about the wisdom of Congress's choice of legislation. That's a point the majority repeatedly confuses in misconstruing my argument as relying on an assumption "that Congress would care deeply about someone *possessing* a machinegun, but couldn't care less about someone who wanted to *transfer* that same machinegun to the vilest of criminals." **12**

---

11 The majority contends—through various Tom Clancy-style plots that range from arms dealers to cartel leaders—that a "Legion of Doom" could avoid prosecution by simply ordering others to do the dirty work of transferring firearms to bad guys for them. But the majority's point fails twice over. First, that example only works if the Legion of Doom transfers firearms to the government. Second, it's unclear how any of the majority's examples could avoid prosecution for constructively possessing a machinegun. Even the worst villain of all time, Darth Vader, "though lacking … physical custody, still ha[d] the power and intent to exercise control over" the Death Star sufficient to establish constructive possession of that weapon. *Henderson v. United States*, 575 U.S. 622, 626 (2015).

12 I'll admit that I'm perplexed by the majority's contention that I don't believe Congress cared about criminalizing transfers to vile criminals. I don't know how anyone could reach that conclusion given the fact that § 922(o) expressly criminalizes such transfers. What I understand the majority to mean here is that I don't think Congress cared about catching criminals in sting operations. But there's no evidence that members of Congress considering § 922(o) even thought about sting operations at all.

Appendix-53

54                          USA v. KITTSON

My interpretation of § 922(o) does not rely on any
assumptions about what Congress "cares" about. To the
contrary, my reading of § 922(o) begins and ends with the
statutory text and does not attempt to ascertain or optimize
Congress's unwritten desires. What the majority contends—
without outright saying—is that the plain textual reach of
§ 922(o)(2)(A)'s exceptions is absurd and ought not apply.
But the majority has a hard hill to climb if it wants to
overcome § 922(o)(2)(A)'s text with that argument. The
absurdity canon has never empowered courts to engage in a
freewheeling inquiry to improve unwise statutory language
whenever Congress acted foolishly. *See United States v.
Paulson*, 68 F.4th 528, 542 (9th Cir. 2023) (describing the
absurdity canon as applying in only rare and exceptional
circumstances). Instead, the absurdity canon only requires
that a statute's plain text produce "rational" results, not
"wise" ones—much less the best ones. *United States v.
Paulson*, 68 F.4th 528, 544 (9th Cir. 2023). So a statute's
text may lead to results that, in a judge's view, are "not wise"
or "misguided," so long as "it is at least rational." *Id.*
(quoting *In re Hokulani Square, Inc.*, 776 F.3d 1083, 1088
(9th Cir. 2015)). "And 'the bar for "rational" is quite low.'"
*Id.* (quoting *United States v. Lopez*, 998 F.3d 431, 438 (9th
Cir. 2021)).

    Congress's decision to broadly exempt from liability any
transfer to the federal government clears that low hurdle. By
granting immunity to individuals who transfer machineguns

---

Congress never carved out sting operations from its exception for
transfers to the government, and even the majority's dive into legislative
history fails to show that even a single member of Congress ever talked
about sting operations when passing this statute. If Congress meant to
carve out sting operations from the transfer exception like the majority
contends, then it makes sense that it would have said so.

USA V. KITTSON                          55

to the federal government, Congress encourages the central
goal of § 922(o): limiting machineguns in private ownership
and stopping the interstate transfer of those weapons. *See
United States v. Rybar*, 103 F.3d 273, 283 (3d Cir. 1996).
Although the majority might not consider the textual breadth
of this exception wise, or might prefer a narrower
construction that allows more room for sting operations, the
plain meaning of § 922(o)'s exception still serves a rational
purpose by making clear that all transfers to the government
are lawful. That clarity, in turn, encourages individuals to
engage in the conduct of transferring machineguns to the
government, without fear of prosecution. Far from
absolving the core of the law, the statute's plain text supports
it.[13]

Because § 922(o)(2)(A)'s transfer exception does not
contain an innocent state of mind requirement, and because
the majority does not present a compelling reason to
judicially add one, I would apply the plain text of the statute
and exempt from liability any machinegun transfer to the
government.

**III. The panel should have vacated Kittson's sentence
under harmless error review because Kittson**

---

[13] I also remain unconvinced that applying the plain language of
§ 922(o)(2)(A) "would curtail the use of sting operations in many
traditional contexts," since the scenarios cited by the majority do not
implicate a comparable exception to the one at issue here. For example,
the majority's claim that law enforcement could not arrest pedophiles for
sharing child sex abuse material with undercover officers falls flat when
you consider federal law's prohibition on the sharing of that material
contains no wholesale government transfer exception. *See* 18 U.S.C.
§ 2252A(a)(2)(A) (criminalizing the receipt or distribution of child sex
abuse material).

Appendix-55

> **preserved his objections to the jury instruction
> and the error was not harmless.**

Kittson preserved his argument that the district court
erred by including § 922(o)'s transfer prong in the jury
instructions. He did not contest at trial and does not contest
on appeal that he transferred the machinegun. Instead,
Kittson repeatedly argued that § 922(o)'s transfer provision
does not reach his conduct, and the district court erred by not
striking the transfer prong from the jury instructions.
Because that argument addresses whether "the *amply proved
conduct* simply fails to come within the statutory definition
of the crime as charged in the indictment," it falls under
*Yates* legal error review. *Galecki*, 89 F.4th at 740 (internal
quotations omitted); *see also Yates v. United States*, 354 U.S.
298, 311–12 (1957), *overruled on other grounds by Burks v.
United States*, 437 U.S. 1 (1978).

Preserved "errors of the *Yates* variety are subject to
harmless-error analysis." *Skilling v. United States*, 561 U.S.
358, 414 (2010). Under harmless-error analysis, a panel can
find a *Yates* error harmless only if, "after a 'thorough
examination of the record,'" it "'conclude[s] beyond a
reasonable doubt that the jury verdict would have been the
same absent the error.'" *Galecki*, 89 F.4th at 741 (quoting
*Neder v. United States*, 527 U.S. 1, 19 (1999)). And the error
of including the transfer prong in the jury instructions here
was not harmless.

*Leeds v. Russell* demonstrates both the error and the
harm here. 75 F.4th 1009, 1024–25 (9th Cir. 2023). There,
Nevada tried a defendant for several charges, including first-
degree murder. *Id.* at 1012. Nevada supported the first-
degree murder charge with two theories: (1) that the
defendant committed felony-murder by killing a victim

USA v. KITTSON                                    57

during a burglary *or* (2) that he committed "willful, deliberate, and premeditated murder …." *Id.* But the state alleged that the predicate felony of burglary was a burglary of his own home—an erroneous legal interpretation under Nevada law. *Id.* at 1019.

A jury convicted the defendant in a general verdict form that did not specify which theory it used to convict for first degree murder. *Id.* at 1012. It also convicted the defendant of burglary. *Id.* at 1014–15. This court found that the erroneous instruction was not harmless error. *Id.* at 1024. In doing so, we relied heavily on the fact that we "c[ould] not determine whether the jury (or any juror) relied on the felony-murder theory" because of the general verdict form. *Id.* We also noted that because the jury convicted the defendant for burglary, "[i]t is probable that at least one juror relied on the felony-murder theory." *Id.* That probability foreclosed a finding of harmless error because "the outcome of the trial would have been different if even 'one juror would have struck a different balance.'" *Id.* at 1024–25 (quoting *Wiggins v. Smith*, 539 U.S. 510, 537 (2003)).

So too here. The jury convicted Kittson with a general verdict form that did not specify the theory it used to convict—transfer or possession. And the jury's not-guilty verdict "[w]ith respect to Count Two, Felon in Possession of a Firearm," makes it especially "probable that at least one juror relied on the [transfer] theory" to convict. *Leeds*, 75 F.4th at 1024.

Since this error was not harmless, the "general verdict of guilt must be set aside" because "the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Galecki*, 89 F.4th at 739;

Appendix-57

58 USA v. KITTSON

*Yates*, 354 U.S. at 312. Accordingly, I would have vacated Kittson's conviction and remanded for a new trial.

## IV. The majority should have remanded the Second Amendment issue.

Although I would not reach the issue, I'll note only briefly that the majority errs by relying on Ninth Circuit precedent holding that machineguns do not enjoy constitutional protection. The Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), upended this court's interpretive approach to the Second Amendment and abrogated its cases applying that approach. *Bruen* now requires lower courts to conduct inquiries into "the historical tradition that delimits the outer bounds of the right to keep and bear arms" when evaluating firearm regulations. *Id.* at 19. Only after locating a historical analogue to a modern-day firearm regulation may a court uphold a restriction on the right to keep and bear arms. *Id.* at 30.

*United States v. Henry*, 688 F.3d 637 (9th Cir. 2022), did not conduct that analysis. Instead, it defined as "dangerous" anything that "is 'likely to cause serious bodily harm'"—a definition that could apply to any firearm—and cursorily concluded without citation that "machine guns largely exist on the black market." *Id.* at 640.[14] *Bruen*'s demand, that "the

---

[14] When discussing the historical inquiry analysis now required for Second Amendment questions, three Justices have separately explained that *Bruen* and *Rahimi* do not license lower courts to abstract to such high levels of generality. *United States v. Rahimi*, 602 U.S. 680, 740 (2024) (Barrett, J., concurring) ("[A] court must be careful not to read a principle at such a high level of generality that it waters down the right."); *id.* at 736 (Kavanaugh, J., concurring) (explaining that judges must not "let constitutional analysis morph into policy preferences under

USA V. KITTSON                                    59

government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation," is irreconcilable with *Henry*'s cursory analysis. *Bruen*, 597 U.S. at 17.

What's worse, we don't even have a factual record in this case upon which to conduct the required *Bruen* analysis. The district court did not engage in any factfinding when considering Kittson's motion to dismiss Count One of the Indictment. In a six-page order, it instead found that machineguns do not enjoy constitutional protection by concluding—based on *Henry*—that machineguns are dangerous weapons not possessed by law-abiding citizens. The district court's failure to engage in any fact finding is particularly troubling where the extent of private machinegun ownership is disputed by amici on appeal. That disagreement over the extent of machinegun ownership presents a key factual question, particularly given the Supreme Court's signal that stun guns enjoy Second Amendment protection despite only 200,000 existing in the United States. *See Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring).

Given the disputed extent of private machinegun ownership and "the highly fact-specific nature of [*Bruen*'s historical analogue] inquiry, it is best left to

---

the guise of a balancing test that churns out the judge's own policy beliefs"); *id.* at 711 (Gorsuch, J., concurring) ("Courts must proceed with care in making comparisons to historic firearms regulations, or else they risk gaming away an individual right the people expressly preserved for themselves in the Constitution's text."). Broadly relying on abstract historical principles like banning "dangerous" weapons, without referencing any accompanying close historical analogue, treats the Second Amendment inquiry precisely in the manner that *Bruen* instructed against. *Bruen*, 597 U.S. at 30.

Appendix-59

60                          USA v. KITTSON

the District Court to undertake the analysis in the first instance." *Salazar v. Buono*, 559 U.S. 700, 722 (2010). I would have remanded the Second Amendment question to the district court to conduct this analysis.

\* \* \*

Federal law broadly exempts from criminal liability transfers of machineguns to the government. Daniel Kittson appears to be an unsavory character, but his conviction at issue in this appeal runs squarely into that clear exception. Although the majority's opinion puts up a veneer of mundaneness, its decision strips bare to this: the government need not prove that a defendant committed a crime, only that he didn't know his conduct wasn't a crime. The majority's reasoning in support of its result boils down to a belief that Congress should have done more than it did. Maybe Congress should adopt the majority's view of federal machinegun prohibitions. But it didn't. Until it does, I cannot agree with the majority's expansion of criminal law, and thus I respectfully dissent.

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

DEC 10 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DANIEL MATTHEW KITTSON,

Defendant - Appellant.

No. 23-4132

D.C. No.
3:21-cr-00075-IM-1

MEMORANDUM[*]

---

Appeal from the United States District Court
for the District of Oregon
Karin J. Immergut, District Judge, Presiding

Argued and Submitted June 12, 2025
Portland, Oregon

Before: SCHROEDER, OWENS, and VANDYKE, Circuit Judges.

Daniel Matthew Kittson appeals from his conviction for possessing or

transferring a machinegun in violation of 18 U.S.C. § 922(o). He raises jury

instruction and sentencing challenges.[1] As the parties are familiar with the facts,

---

[*]       This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

[1] Kittson also challenges his conviction under 18 U.S.C. § 922(o), arguing that
(1) § 922(o)(2)(A) exempts his transfer of a machinegun to an undercover agent
and (2) § 922(o) is unconstitutional. We address these arguments in a concurrently
filed opinion, in which we affirm.

we do not recount them here.  We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

1.  "A criminal defendant has a constitutional right to have the jury instructed according to his theory of the case, provided that the requested instruction is supported by law and has some foundation in the evidence." *United States v. Anguiano-Morfin*, 713 F.3d 1208, 1209 (9th Cir. 2013) (citation omitted). We review "whether an instruction is 'supported by law'" de novo and "whether it has 'some foundation in the evidence'" for abuse of discretion.  *Id.* (citation omitted).

In the concurrently filed opinion, we hold that the exception for transfers to the United States under § 922(o)(2)(A) does not exempt transfers to an undercover agent.  Here, Kittson does not point to any evidence in the record showing that he knew he was dealing with a government agent.  *See United States v. Heuer*, 916 F.2d 1457, 1460 (9th Cir. 1990) (noting a defendant "could not have believed he was receiving government authorization" from government agents when "he did not recognize that they were undercover agents").  Accordingly, the district court properly concluded that Kittson was not entitled to an affirmative defense instruction.  *See United States v. Gravenmeir*, 121 F.3d 526, 528 (9th Cir. 1997) (holding "[t]he exceptions contained in [§ 922(o)(2)] establish affirmative defenses

to the defined offense" (citation omitted)).[2]

2.      "We also review de novo whether [a] jury instruction[] correctly state[s] the elements of a crime." *Anguiano-Morfin*, 713 F.3d at 1209. Assuming without deciding that giving the "functioning magazine" instruction was erroneous, any error was "harmless beyond a reasonable doubt." *United States v. Bachmeier*, 8 F.4th 1059, 1065 (9th Cir. 2021). Here, overwhelming evidence, including Kittson's own testimony, shows that the PPSh-41 in question is a machinegun as defined under 26 U.S.C. § 5845(b). The evidence shows that the PPSh-41 was "designed to shoot" automatically, and uncontested evidence shows that it could "be readily restored to shoot" automatically. § 5845(b); *see also United States v. Kuzma*, 967 F.3d 959, 967–71 (9th Cir. 2020). Thus, the jury's verdict "would have been the same absent" the purported jury instruction error. *United States v. Saini*, 23 F.4th 1155, 1164 (9th Cir. 2022) (citation omitted).

3.      "We review de novo a claim that a sentence violates a defendant's constitutional right." *United States v. Bowers*, 130 F.4th 672, 673 (9th Cir. 2025). "To succeed on his due process claim, [Kittson] 'must establish the challenged information is (1) false or unreliable, and (2) demonstrably made the basis for the

---

[2] Consistent with the concurrently filed dissent, Judge VanDyke would not reach the question of whether Kittson was entitled to a jury instruction here, since he would vacate Kittson's sentence and remand with instructions to direct a verdict in favor of Kittson on the transfer element of § 922(o).

sentence.'" *United States v. Vanderwerfhorst*, 576 F.3d 929, 935–36 (9th Cir. 2009) (citation omitted). The trial judge's "passing reference" to her familiarity with change of plea proceedings and dockets does not demonstrate reliance on facts outside of the record, and Kittson does not otherwise show his due process rights were violated. *United States v. Hill*, 915 F.3d 669, 674 (9th Cir. 2019).

**AFFIRMED.**